SUMMIT
Court Reporting, Inc.

# Compressed Transcript of the Testimony of
# AJAY GOPALKRISHNA, 10/18/13

**Case:** Dominguez, et al. v. Yahoo, Inc.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Dominguez, et al. v. Yahoo, Inc.                    AJAY GOPALKRISHNA, 10/18/13

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BILL H. DOMINGUEZ, on behalf
of himself and all others
similarly situated,
    Plaintiff,

vs.    Case No. 2:13-cv-01887

YAHOO, INC.,
    Defendant.

- - -

    Oral videotaped deposition of AJAY GOPALKRISHNA
held at the Law Offices of Greenberg Traurig, 1900
University Avenue, Palo Alto, California, on Friday,
October 18, 2013, commencing at 10:07 a.m., taken by and
before Debby Clary, Certified Shorthand Reporter and
Registered Merit Reporter.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters & Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

---

**Page 2**

```
 1  APPEARANCES:
 2  FOR THE PLAINTIFF:  (Via Teleconference)
 3      FRANCIS & MAILMAN, P.C.
        BY:  JAMES A FRANCIS, ATTORNEY AT LAW
 4      19th Floor, Land Title Building
        100 South Broad Street
 5      Philadelphia, Pennsylvania 19110
        (215) 735-8600
 6      jfrancis@consumerlawfirm.com
 7
    FOR THE DEFENDANTS:
 8
        GREENBERG TRAURIG
 9      BY:  WENDY M. MANTELL, ATTORNEY AT LAW
        1840 Century Park East, Suite 1900
10      Los Angeles, California 90067
        (310) 586-6522
11      mantellw@gtlaw.com
12
13  Also present:  Robert Turner, Yahoo in-house counsel
14           Lauren Brennan, Francis & Mailman
                 (Via Teleconference)
15
             Aric Kerhoulas, videographer
16
17
18
19
20
21
22
23
24
```

---

**Page 3**

```
 1              I N D E X
 2
 3  WITNESS                        PAGE
 4  AJAY GOPALKRISHNA
 5  By Mr. Francis                   5
 6
 7
 8              - - -
 9
10            E X H I B I T S
11  Number                       Marked
12
13     Exhibit 1                   30
14     Exhibit 2                   74
15     Exhibit 3                  104
16
17
18
19              - - -
20
21
22
23
24
```

---

**Page 4**

```
 1      THE VIDEOGRAPHER:  Good morning.  We are on the
 2  record at 10:07 a.m. on October 18th, 2013.  This is the
 3  videotaped deposition of Ajay Gopalkrishna in the matter
 4  of Bill H. Dominguez, et al., versus Yahoo, Incorporated
 5  in the United States District Court for the Eastern
 6  District of Pennsylvania.
 7      This deposition is being held at the office of
 8  Greenberg Traurig at 1900 University Avenue in
 9  Palo Alto, California.  My name is Aric Kerhoulas from
10  the firm of Summit Court Reporting, Incorporated.  Our
11  Court Reporter today is Debby Clary, also from Summit.
12      Counsel, would you please state your appearance
13  and firm affiliation for the record.
14      MR. FRANCIS:  Yes.  This is Jim Francis from
15  the law firm of Francis & Mailman for the plaintiff, and
16  with me is Lauren Brennan, a law clerk from my firm.
17      MS. MANTELL:  Wendy Mantell, Greenberg Traurig
18  on behalf of the defendant, Yahoo.
19      MR. TURNER:  Rob Turner from Yahoo, Inc., on
20  behalf of Yahoo, Inc.
21      THE VIDEOGRAPHER:  Will the Court Reporter
22  please swear in the witness.
23  /
24  /
```

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Dominguez, et al. v. Yahoo, Inc.                    AJAY GOPALKRISHNA, 10/18/13

Page 5

1     AJAY GOPALKRISHNA, having been duly
2     sworn/affirmed, was examined as follows:
3                     - - -
4                 EXAMINATION
5                     - - -
6
7         THE VIDEOGRAPHER:  Please proceed.
8     BY MR. FRANCIS:
9         Q.  Yes.  Sir, would you please state and spell
10    your full name for the record.
11        A.  Ajay Gopalkrishna, A-j-a-y
12    G-o-p-a-l-k-r-i-s-h-n-a.
13        Q.  Great.  Thank you.  Mr. Gopalkrishna, have you
14    ever given a deposition before?
15        A.  No.
16        Q.  Okay.  Have you ever given testimony in court
17    of any kind?
18        A.  No.
19        Q.  Okay.  I want to start by giving you some basic
20    instructions as to how the deposition process goes.  I'm
21    sure some of this you've probably heard from your
22    counsel, Ms. Martell [sic] and/or other lawyers from the
23    firm of Greenberg Traurig.  But since I don't know what
24    they've told you, I'm going to give you the instructions

Page 6

1     that I usually give to witnesses.  Okay?
2         A.  Okay.
3         Q.  Good.  If I ask you a question and you do not
4     understand the answer, [sic] please let me know that you
5     didn't understand my question, and I'll try to rephrase
6     it in a way that's understandable to you.  Otherwise I
7     will assume that you understood my question and you're
8     answering to the best of your ability.
9         Do you understand that?
10        A.  Yes.
11        Q.  Okay.  If at any time during the course of the
12    deposition you conclude or, or think that an answer that
13    you gave previously was incorrect, inaccurate, was
14    not truthful, or that you were just wrong when you said
15    what you said, let me know and I'll be happy to give you
16    an opportunity to make that correction on the record.
17    Okay?
18        A.  Okay.
19        Q.  Great.  I don't think we'll have a problem with
20    this based upon just this little back and forth we've
21    had already, but it's important that you wait until I --
22    I'm finished asking my question before you respond.  And
23    conversely I will try to wait until you are absolutely
24    finished with your answer before I ask another question.

Page 7

1     Because the Court Reporter can only take one down of us
2     at a time.  Do you understand that?
3         A.  Yes.
4         Q.  Okay.  It's important for you to know that even
5     though you are on a video screen, and presumably can see
6     me, the official transcript of this deposition is the
7     actual recorded version, what the Court Reporter is
8     taking down, so it's important that the answers that you
9     give you give verbally.  Do you understand that?
10        A.  Yes.
11        Q.  Okay.  Sir, are, are you under the influence of
12    any type of medication or can you think of any reason
13    why you would not be able to testify truthfully and
14    accurately today?
15        A.  I'm not under any kind of medication.  I
16    can work.
17        Q.  Okay.  And finally, even though we are taking
18    this deposition in two separate conference rooms two
19    coasts apart, and there is no judge and jury here, this
20    deposition is being taken in a federal case, and thus
21    your testimony today is being given subject to the
22    penalty of perjury.  Do you understand that?
23        A.  Yes.
24        Q.  Okay.  Sir, who are you employed by?

Page 8

1         A.  By Yahoo, Inc.
2         Q.  Okay.  And can you tell me what your current
3     position is at Yahoo, Inc.?
4         A.  I am a senior product manager at Yahoo Mail.
5         Q.  How long have you held that position?
6         A.  For two years.
7         Q.  Prior to that were you employed by Yahoo?
8         A.  Yes.
9         Q.  And what was your position at that point?
10        A.  I was a project manager prior to this position.
11        Q.  Okay.  How long did you hold the position of
12    project manager?
13        A.  From 2007 until 2011.
14        Q.  Okay.  Prior to becoming project manager at
15    Yahoo, were you employed by Yahoo or were you employed
16    by another company?
17        A.  I was employed by another company.
18        Q.  Okay.  Who were you employed by immediately
19    prior to becoming project manager at Yahoo in 2007?
20        A.  I was employed by Verisign, Inc.
21        Q.  Okay.  And prior to joining Yahoo, what was the
22    last position you held at Verisign, Inc.?
23        A.  It was a project manager position.
24        Q.  Okay.  And how long were you at Verisign, Inc.,

Dominguez, et al. v. Yahoo, Inc.                                    AJAY GOPALKRISHNA, 10/18/13

| Page 9 |
| --- |

1  sir?
2      A. It was for one and a half years.
3      Q. And prior to that were you employed?
4      A. Yes.
5      Q. Okay. What was your position prior to becoming
6  project manager -- excuse me -- product manager at
7  Verisign for that year and a half time period?
8      A. So I just want to make sure I correctly convey.
9  I was, my position at the Verisign, Inc. also was a
10  project manager.
11      Q. Okay.
12      A. And prior to that I was a senior consultant at
13  Deloitte Consulting.
14      Q. How long were you at Deloitte?
15      A. It was for one and a half years, roughly.
16      Q. Would you please describe for me your
17  educational background.
18      A. I have a electronics engineer -- bachelor's of
19  electronics engineering from the University of Bombay,
20  and I have a master's of business administration from
21  Santa Clara University.
22      Q. Okay. When did you receive your, your
23  bachelor's degree from the University of Bombay?
24      A. It was 1994.

| Page 10 |
| --- |

1      Q. And when did you receive your, your business
2  degree from Santa Clara University?
3      A. It was in 2004.
4      Q. Okay. Now, I want to ask you a little bit -- I
5  want to get a little bit of detail about your current
6  position. Can you tell me what your duties and
7  responsibilities are as a senior product manager at
8  Yahoo?
9      A. So I am employed as senior product manager at
10  Yahoo, responsibilities include identifying the road map
11  and items that we need to work on for mitigating abuse,
12  spam in Yahoo Mail and Yahoo Messenger. In addition,
13  I'm also the product manager for delivering mail from,
14  to and from Yahoo Mail.
15      Q. Did you say "delivering mail"?
16      A. Yes.
17      Q. What is your role in the delivery process? I
18  mean, obviously there's some degree to which that's,
19  that's -- that's automated. What is your involvement in
20  that delivery process? What are you doing, actually?
21      MS. MANTELL: Objection to the extent there's
22  testimony that hasn't been given.
23  BY MR. FRANCIS:
24      Q. You can answer.

| Page 11 |
| --- |

1      A. I could, my role is just to identify what
2  infrastructure components are required, and prioritize
3  the work required to make sure that the infrastructure
4  components that are involved in the delivery system work
5  as expected.
6      Q. Okay. Do you work within a department of some
7  sort? In other words, within Yahoo are you part of a
8  broader department?
9      A. Yes. So I'm part of the communications
10  organization within Yahoo.
11      Q. And where do you actually work? Where's your,
12  your physical office?
13      A. In Sunnyvale, California.
14      Q. Is that at Yahoo headquarters?
15      A. Yes.
16      Q. And approximately how many other employees work
17  within the communications organization department within
18  Yahoo?
19      A. It would have to be approximate. I don't know
20  the exact number. My -- as per my understanding, it's
21  around 200 people.
22      Q. Okay. And what is the function of that
23  department? What does it do for Yahoo, the company?
24      A. So it makes -- it builds and maintains and --

| Page 12 |
| --- |

1  all the communication products for Yahoo, which include
2  Yahoo Mail, Yahoo Messenger and Yahoo Groups.
3      Q. Does any part of your job involve either
4  responding to or identifying problems that the company
5  is having regarding the delivery of mail?
6      A. Yes.
7      Q. Okay. What is your involvement in that, are
8  you -- tell me about that.
9      A. So if there are issues in the delivery of mail
10  from external organizations or to external
11  organizations, people contact me and I assign the work
12  identifying what the problem is to the particular
13  engineer and who is responsible for, for that, so that
14  they can investigate what is going on. And then --
15      Q. Okay. Can you give me an example of a problem
16  relating to mail delivery that has been brought to your
17  attention in the past?
18      A. So there have been some e-mail marketers or
19  senders who send e-mail to their target customers, and
20  based on their practices sometimes they do not get
21  delivered into the in-box. So we identify what's the
22  reason for it, and we provide them a patch for that so
23  that they can either, if the issue is on the sender,
24  e-mail sender side so that they can mitigate the issue,

3 (Pages 9 to 12)

Dominguez, et al. v. Yahoo, Inc.                    AJAY GOPALKRISHNA, 10/18/13

Page 13

1    and the issue gets resolved.
2         So we identify and investigate what's, what's
3    the reason behind it, and if it is an issue on our side
4    we fix it. If not, we communicate that to the sender
5    who had contacted us and they -- for them to mitigate
6    it.
7         Q.  Okay.  Does any part of your job involve
8    assisting the company with compliance with any federal
9    or state regulations or laws?
10        A.  There are some cases where it -- I can't answer
11   sort of in a way that there is no specific item where I
12   could say that this is particular for a federal or a
13   state law.  But whatever is in the normal course of
14   business that, that we work with that sort of confines
15   itself within the, within the law.  So -- or within the
16   particular law that -- and I'm no expert in identifying
17   what that law is or --
18        Q.  Right.  That's what I figured.  I just want to
19   make sure.  I mean, there are probably compliance people
20   at Yahoo that work and assist the company with complying
21   with laws.  That's not you, right?  You're not a
22   compliance person?
23        A.  No.
24        Q.  Correct?

Page 14

1         A.  Correct.  I am not a compliance person.
2         Q.  All right.  And have you received any training
3    or any type of, been given any type of guidance or
4    education regarding a law called the Telephone Consumer
5    Protection Act?
6         MS. MANTELL:  Objection to the extent there is
7    privileged communications involved in the answer.  If
8    there's any -- anything you've learned from me or Rob,
9    you don't need to talk about it.
10        THE WITNESS:  Okay.
11        MS. MANTELL:  Are you asking outside of this
12   lawsuit?
13        MR. FRANCIS:  Yeah.
14        Q.  In other words, sir, I'm not asking about
15   anything, any conversations that you may have had with
16   Ms. Martell or anybody who was involved in this lawsuit
17   or defending this case.
18        I'm asking as part of your job on a daily basis
19   or a monthly basis, have you received training or been
20   given educational information regarding the Telephone
21   Consumer Protection Act or compliance with it?
22        A.  No.
23        Q.  Okay.  Have you ever read the statute, the
24   Telephone Consumer Protection Act?

Page 15

1         A.  No, but I have been involved in some of the
2    communications that require SMS communication, but that
3    was more for outside of the country, not -- and it was
4    international, not domestic.
5         Q.  Okay.  But my question was specifically about
6    the United States law, the Telephone Consumer Protection
7    Act.  You have not read that law, correct?
8         A.  Correct.
9         Q.  Okay.  And likewise, am I correct that you
10   haven't read any of the regulations concerning that law,
11   the Telephone Consumer Protection Act, that have been
12   published by the Federal Communications Commission?
13        A.  No, I have not read those.
14        Q.  Okay.  Right.  Now, am I correct, sir, that at
15   least for some period of time Yahoo offered users a
16   service that allowed them to have e-mails forwarded to
17   their phones via SMS messages?
18        A.  Yes.
19        Q.  What, just so that we're on the same page here
20   for this deposition, what do you term that service?
21   What do you call that service?
22        A.  It's an SMS -- e-mail SMS filter.
23        Q.  I'm sorry.  Say it again.  EMS what?
24        A.  It's an e-mail SMS filter, so not the entire

Page 16

1    e-mail message is sent out, only a part or a small part
2    of -- a snippet of the message is actually sent as an
3    SMS.
4         Q.  Right.  No, I understand that.  I'm just asking
5    what do you call that service, or what does Yahoo call
6    that service that it offered consumers?  E -- e-mail SMS
7    service, what do you call it?
8         A.  So it's SMS -- e-mail SMS alert.
9         Q.  Okay.  Great.  Okay.  So Yahoo offered that
10   service, the e-mail SMS alert to customers for people
11   who used Yahoo products for a period of time, correct?
12        A.  Yes.
13        Q.  Can you tell me the time period that that
14   service was available?
15        A.  This was prior to my time when I joined this
16   role.  And it was -- it's -- we stopped it, this
17   particular service was end of life by, on 2011, but it
18   was available six years prior to 2011.
19        Q.  So sometime in 2005 through 2011, the company
20   provided this service, correct?
21        A.  Per my understanding.
22        Q.  Okay.  Now, you said that the -- when the
23   service first started being offered, that predated your
24   employment at Yahoo, correct?

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Dominguez, et al. v. Yahoo, Inc.                          AJAY GOPALKRISHNA, 10/18/13

| Page 17 | Page 19 |
|---|---|
| 1   A. Yes. It, well —<br>2   Q. Okay. Would I be --<br>3   A. Let me just rephrase. I don't, I -- I was not<br>4  involved in that part of the -- of e-mail when I joined<br>5  Yahoo. That was in 2007. And it could have predated me<br>6  since joining, but I was not even involved in that part<br>7  of the -- part of the -- of that service, so I cannot<br>8  comment if it actually was there even before or it was<br>9  working before.<br>10      From -- from -- from what I understand from the<br>11  material that I've been provided when I saw it was for<br>12  six years, so that means it could have been prior to my<br>13  time, yes.<br>14   Q. I understand. So you're saying you simply<br>15  don't know when it began because that's not something<br>16  that you were ever involved in, correct?<br>17   A. Yes.<br>18   Q. I understand. And am I correct that any<br>19  information you have regarding when the service was<br>20  rolled out or began to start being offered to customers,<br>21  that came through things that you learned in this case,<br>22  right?<br>23   A. Yes.<br>24   Q. Okay. So is it fair for me to state that at no | 1  their -- their series of responsibilities and duties,<br>2  correct?<br>3   A. Yes, there might have been, but there was a lot<br>4  of people have, have moved on and left, so there was<br>5  no --<br>6   Q. Okay.<br>7   A. -- one person.<br>8   Q. Okay. Do you know the names of any individuals<br>9  at Yahoo who had responsibility for overseeing the<br>10  e-mail SMS alert service and making sure it was working<br>11  properly?<br>12      MS. MANTELL: Objection; vague.<br>13  BY MR. FRANCIS:<br>14   Q. You can answer.<br>15   A. There are -- there are multiple people involved<br>16  in actually implementing the service and, and actually<br>17  working on the service. And majority of them, all of<br>18  them have actually left the organization. So I don't<br>19  know any one specific person.<br>20   Q. Right. But do you know the names of any of<br>21  them, whether or not they're still employed or not?<br>22   A. The -- I -- there is -- no, I mean not as far<br>23  as whatever documentation I have that's what -- so we<br>24  have only the one name in there which is Vijay Aggarwal, |
| **Page 18** | **Page 20** |
| 1  time during your employment with Yahoo did your<br>2  responsibility include overseeing, managing or<br>3  responding to problems that may have arisen regarding<br>4  the e-mail SMS alert service, correct?<br>5      MS. MANTELL: Objection; vague.<br>6      THE WITNESS: Could you, could you --<br>7  BY MR. FRANCIS:<br>8   Q. Well, let me try again. Yeah. So the e-mail<br>9  SMS alert service which we've talked about which Yahoo<br>10  offered customers for a period of time, that's not ever<br>11  been under your management or domain, correct?<br>12      MS. MANTELL: Objection; misstates testimony.<br>13  /<br>14  BY MR. FRANCIS:<br>15   Q. You can answer.<br>16   A. It has, it has never been under my purview when<br>17  I started, and it has, and it has, as far as when the<br>18  service was ended, at that time I had just joined that<br>19  particular group.<br>20   Q. Right. So you've never really had any direct<br>21  involvement with the e-mail SMS alert service, correct?<br>22   A. Yes.<br>23   Q. Okay. And I assume there's somebody at Yahoo<br>24  who did have that under their, you know, their — | 1  and that's the only name I have.<br>2   Q. Okay. So based upon what you said a few<br>3  moments ago, would I be correct in stating that by the<br>4  time that you came on board as a senior project product<br>5  manager, the service was already being phased out or<br>6  discontinued, correct?<br>7   A. Yes.<br>8   Q. Okay. So just to be clear, at no point during<br>9  your employment with Yahoo did you ever have<br>10  responsibility for overseeing the e-mail SMS alert<br>11  service which is at issue in this case; is that correct?<br>12      MS. MANTELL: Objection; asked and answered.<br>13  BY MR. FRANCIS:<br>14   Q. You can answer.<br>15   A. So it was only during the time when I had to<br>16  investigate this particular issue.<br>17   Q. When you say "this particular issue," do you<br>18  mean the lawsuit that we're talking about right now?<br>19   A. Yes.<br>20   Q. Okay. Prior to this lawsuit, though, and<br>21  independent of the lawsuit, this product, the e-mail SMS<br>22  alert product, was not something that was ever part of<br>23  your job, correct?<br>24   A. Correct. |

5 (Pages 17 to 20)

Dominguez, et al. v. Yahoo, Inc.                          AJAY GOPALKRISHNA, 10/18/13

## Page 21

1     Q.  Okay.  And I guess it flows naturally from
2  that, would I be correct in stating that you did not
3  have any involvement in the building, the design or the
4  architecture of the system that was used to provide the
5  e-mail SMS alert service?
6     A.  Correct.
7     Q.  Okay.  And likewise, at no time during your
8  employment at Yahoo did you have any responsibility for
9  troubleshooting or responding to problems that pertained
10 to the architecture, the design or the e-mail SMS alert
11 service?
12    A.  Yes, and only except for whatever I had to
13 investigate in this, for this particular case.
14    Q.  Right.  Would I be correct in stating, sir,
15 that the only involvement that you would have had in
16 looking at the company's e-mail SMS alert service is in
17 connection with this -- defending this lawsuit, correct?
18    A.  Yes.
19    Q.  Okay.  Now, in connection with whatever you did
20 to, to -- to learn about the service through this
21 lawsuit, were you able to gain knowledge regarding the
22 location of the servers that the company maintained
23 which it used to operate the e-mail SMS alert service?
24    A.  No, I did not.

## Page 22

1     Q.  Okay.  Would I be correct in stating that you
2  don't know where the servers were that the company used
3  to operate the e-mail SMS alert service?
4     A.  Yes, I wouldn't know.  I know where some of our
5  servers are, but for this particular service I do not
6  know.
7     Q.  Right.  Okay.  Do you know how many servers
8  Yahoo used and/or maintained to operate the e-mail SMS
9  alert service?
10    A.  No, I do not know how many, the number.
11    Q.  Now, I don't want to know about anything that
12 you did that, that counsel, that Ms. Martell said to you
13 or you said to her, but I do want to know the basis of
14 your knowledge for being designated to testify today.
15       So I'm going to ask you some questions about
16 what you reviewed, but I don't want you to tell me
17 conversations with Ms. Martell or anybody from the
18 Greenberg firm.  Okay?
19       MS. MANTELL:  It's Mantell, just to let you
20 know.
21       MR. FRANCIS:  Oh, I'm sorry, Wendy.
22       MS. MANTELL:  That's okay.  I just --
23       MR. FRANCIS:  I -- I --
24       MS. MANTELL:  No worries.

## Page 23

1        MR. FRANCIS:  Why did I think -- why did I
2  think it was -- I apologize.
3        MS. MANTELL:  No worries.  No worries.
4  BY MR. FRANCIS:
5     Q.  Are there any -- what materials have you
6  reviewed which have given you any basis to talk about
7  the e-mail SMS alert service?
8     A.  The -- the screen mockups of how you sign up
9  for the service; the technical documentation associated
10 with the service.
11    Q.  Okay.  And when you say the technical
12 documentation, do you mean, for example, the SMS
13 subscription gateway document that was produced in this
14 case?
15    A.  Yes.
16    Q.  Okay.  Can you be more precise and tell me the
17 materials that you reviewed which provide the basis for
18 your testifying about the e-mail SMS alert service
19 today.
20       MS. MANTELL:  Objection --
21  BY MR. FRANCIS:
22    Q.  You already mentioned one.  You can answer.
23 Not counsel communications, but what -- what other
24 documents?  I just want to make sure that I've seen

## Page 24

1  them.
2        MS. MANTELL:  Objection to the extent that's
3  where his knowledge came from.
4        MR. FRANCIS:  Okay.
5        THE WITNESS:  So, yeah, so it was looking at
6  that documentation.
7  BY MR. FRANCIS:
8     Q.  The SMS -- what's that thing called -- the
9  subscription gateway, correct?
10    A.  Yes.
11    Q.  And prior to this lawsuit, would I be correct
12 based upon your previous testimony in stating that you
13 never saw that document before, correct?
14    A.  Yes.
15    Q.  Okay.  And would I be correct in stating that
16 you didn't have any involvement or role in the, the
17 creation of that document, and by that I mean the SMS
18 subscription gateway?
19    A.  Yes, I did not have any involvement in creation
20 of that document.
21    Q.  Right.  You didn't draft any part of it,
22 correct?
23    A.  Correct.
24    Q.  You didn't edit any part of it, correct?

6  (Pages 21 to 24)

Dominguez, et al. v. Yahoo, Inc.                    AJAY GOPALKRISHNA, 10/18/13

Page 25

1        A. Correct.
2        Q. And you weren't consulted at all by anyone at
3    the company in connection with its preparation, correct?
4        A. Correct.
5        Q. All right. Other than counsel, Ms. Mantell and
6    any lawyer from Greenberg -- is that right?
7        That's correct, right?
8        MS. MANTELL: Yes.
9        MR. FRANCIS: Mantell.
10       Q. All right. Other than counsel from, anybody
11   from Greenberg, the Greenberg firm, have you had any
12   discussion with anybody at Yahoo regarding the technical
13   data and/or operation of the e-mail SMS alert service
14   which enables you to testify about it today?
15       A. It was just, it was with my -- the engineering
16   team and one person who is in China, who is the product
17   manager for some part of the -- part of the service,
18   that is involved in part of the service.
19       Q. Okay. You mentioned that you spoke to somebody
20   at the engineering team, correct?
21       A. Yes.
22       Q. Who was that that you spoke to?
23       A. It was the -- the engineer who I work with as
24   part of in the delivery team, his name is Avanish

Page 26

1    Mishra.
2        Q. Would you please spell that, please.
3        A. A -- A-v-a-n-i-s-h, M-i-s-h-r-a.
4        Q. Okay. Anybody else other than him?
5        A. I also spoke with James Hsu. J-a-m-e-s, H-s-u,
6    and he is in China.
7        Q. Okay. So you spoke to two individuals,
8    correct?
9        A. Yes.
10       Q. And when did you speak to the gentleman
11   from the engineering team?
12       MS. MANTELL: Objection; vague.
13       THE WITNESS: What --
14   BY MR. FRANCIS:
15       Q. You can answer.
16       A. What -- I speak to him every day because I work
17   with him closely, so I --
18       Q. I see.
19       A. So he -- he and I work together.
20       Q. Okay. When did you speak to him specifically
21   about getting information about the e-mail SMS alert
22   service?
23       A. It was in the last week.
24       Q. In the last week, okay.

Page 27

1        And when did you speak to Mr. Hsu about the
2    service?
3        A. I had spoken with him on the phone over a month
4    ago. We had e-mail conversations after that.
5        Q. Okay. And would I be correct in stating that
6    prior to a month ago you hadn't spoken to either of
7    those individuals about the e-mail SMS alert service,
8    correct?
9        A. Correct.
10       Q. Okay. And what information did they tell you
11   about the service? What did you learn from speaking
12   with them about how the service worked?
13       A. So I -- I wanted to, I asked them in terms of
14   what does the service actually do and how is the
15   information flow from one system to another because
16   there are mult -- there are a couple of systems involved
17   in the service.
18       So one part is in the purview of the part of
19   the engineer who I spoke with, and the other part is in
20   the purview of the product manager who I spoke with in
21   China.
22       Q. Okay. And would I be correct in stating that
23   prior to speaking with those two individuals within the
24   last month, you didn't know about the information flow

Page 28

1    of the e-mail SMS alert service, correct?
2        MS. MANTELL: Objection; misstates testimony.
3    BY MR. FRANCIS:
4        Q. You can answer.
5        A. I knew there, there are multiple services that
6    this, that are offered as part of the, the service that
7    is offered in China, so I knew, knew -- know about that,
8    and I knew about those services earlier as well. And I
9    did know about the existence of this particular service,
10   but not the details of it.
11       Q. Right. You didn't know the details of the
12   information flow of the e-mail SMS -- SM -- excuse me --
13   the e-mail SMS alert service prior to speaking with
14   those two individuals and that's why you, you called
15   them, correct?
16       MS. MANTELL: Objection; vague and misstates
17   testimony.
18   BY MR. FRANCIS:
19       Q. You can answer.
20       A. So I, like I said, I actually, I knew some
21   parts of this, the service that is, is provided by
22   the -- a team in China so I know that there are other
23   services as well -- as well as after service. But the
24   exact details for this particular service, I went

7 (Pages 25 to 28)

Dominguez, et al. v. Yahoo, Inc.                    AJAY GOPALKRISHNA, 10/18/13

Page 29

1   through the technical documentation to understand it.
2        Q. Okay. And other than the SMS subscription
3   gateway technical manual, for lack of a better term, did
4   you review any other technical publications regarding
5   the service to educate -- which helped you educate
6   yourself about how the service worked?
7        A. There was some, I had, I had discussed this
8   with the engineer who I referred to earlier to
9   understand how does that service work from, within mail.
10  And then how this -- so that part I actually had a
11  discussion with him about it.
12       Q. Okay. But just to be clear, prior to a month
13  ago, am I correct that you didn't really have a detailed
14  understanding about the information flow and how the
15  e-mail SMS alert service worked, correct?
16       MS. MANTELL: Objection; misstates testimony
17  and vague.
18  BY MR. FRANCIS:
19       Q. You can answer.
20       A. So like I said earlier, I -- I did know about
21  the service, the existence of it as well, and I had
22  investigated the issue, this particular case when it had
23  come up, and at that time I had reviewed the, those
24  documentation earlier itself. So the documentation was

Page 30

1   there before. I just wanted to get a little, a better
2   understanding of the documentation when I spoke with
3   these individuals.
4        Q. Right. You had -- correct me if I'm wrong, I
5   think what you're saying is you reviewed the SMS gateway
6   document prior to a month ago, correct?
7        A. Yes.
8        Q. Okay. But you hadn't spoke -- but you spoke to
9   them to get more information in terms of how
10  specifically the information flow worked, and that's
11  when you spoke to these two individuals, correct?
12       A. Yes. I spoke to these two individuals about
13  this particular issue.
14       Q. Right. Okay. At this point I'd like to ask
15  the Court Reporter to please mark the declaration of
16  Ajay Gopalkrishna as Gopalkrishna 1, and hand it to the
17  witness.
18       (WHEREUPON, PLAINTIFF'S EXHIBIT 1
19       WAS MARKED FOR IDENTIFICATION.)
20  BY MR. FRANCIS:
21       Q. Sir, do you have Gopalkrishna 1 in front of
22  you?
23       A. Yes.
24       Q. All right. What I'd like you to do is take a

Page 31

1   look at it, and after you have familiarized yourself
2   with it let me know, and then I'm going to ask you some
3   questions about it.
4        A. Okay.
5        Q. You ready?
6        A. I'm -- I'm actually looking at it. I'm
7   actually --
8        Q. I'm sorry.
9        A. What I meant was I'm looking at it right now.
10  So --
11       Q. Oh, great. Okay.
12       A. -- give me a few moments.
13       Q. Take your time.
14       MS. MANTELL: Jim, it seems the FedEx might be
15  here, so you want to just take a quick second?
16       MR. FRANCIS: Yeah, why don't we take like two
17  minutes, fine.
18       MS. MANTELL: Okay.
19       MR. FRANCIS: Or whatever it takes. All right.
20       THE VIDEOGRAPHER: We'll go off the record.
21  The time is 10:51 a.m.
22       (Recess.)
23       THE VIDEOGRAPHER: We're on the record. The
24  time is 10:57 a.m.

Page 32

1   BY MR. FRANCIS:
2        Q. Okay. Mr. Gopalkrishna, have you had an
3   opportunity to review Gopalkrishna 1?
4        A. Yes.
5        Q. Can you identify it for me, please.
6        A. The one that states "Declaration of Ajay
7   Gopalkrishna in support of Yahoo's, Inc.'s motion for
8   summary judgment"?
9        Q. Yes. What is it? I mean, are we looking at
10  something -- the document that you signed at one point,
11  correct?
12       A. Yes.
13       Q. If you look on Page 3 of the document, your
14  name is at the bottom of it. Do you see that?
15       A. Yes.
16       Q. Is that your signature?
17       A. Yes, it is.
18       Q. Did you sign this document on June 14th, 2013?
19       A. Yes, I did.
20       Q. Prior to signing the document, did you read it?
21       A. I did.
22       Q. Okay. And prior to signing the document, did
23  you determine that the information contained within it
24  was accurate and truthful?

8  (Pages 29 to 32)

Dominguez, et al. v. Yahoo, Inc.                          AJAY GOPALKRISHNA, 10/18/13

Page 33

1    A. As to my knowledge, yes.
2    Q. To your knowledge, okay. Would I be correct in
3  stating that some of the information contained within
4  your declaration is information that you learned -- is
5  based on information that you learned from other people,
6  correct?
7    A. Correct.
8    Q. Okay. Would I be correct in stating that the
9  information contained within Gopalkrishna 1 as it
10  pertains to how the SM -- the e-mail SMS alert service
11  worked was information that you derived from other
12  individuals, correct?
13    A. From document -- from the documentation and the
14  screen mockups and any of the bugs that were filed in
15  the system, based on that I built my knowledge about,
16  about the service.
17    Q. I'm sorry. What were the -- I'm sorry, what
18  did -- what did you just say? Something filed within
19  the system? What did you say? I just couldn't hear
20  you.
21    A. Oh, the bugs. So we keep track of all -- of
22  bugs. So based on whatever bugs identified in the
23  system, I kind of looked at it to, to get additional
24  details.

Page 34

1    Q. What word are you using? Bugs? Or bytes?
2    A. Bugs. These are defects. So, defects.
3    Q. Oh, bugs, okay.
4    A. Yeah. Sorry.
5    Q. Bugs like an insect?
6    A. Yes.
7    Q. Okay.
8    A. That's right. So we call it bugs, but it's
9  actually defects in the system that are recorded and we
10  actually fix those, so....
11    Q. Okay. So in addition to the SMS subscription
12  gateway and speaking to the two individuals, you looked
13  at some type of record which contained what you call
14  bugs, correct?
15    A. Yes.
16    Q. What -- how -- tell me about that. Where did
17  you go to to see these bugs? Is that something you did
18  like through a computer, or is this a paper document?
19    A. It's in the computer system. It's, these
20  defects are recorded in -- on, on the server in the
21  computer system.
22    Q. Okay. What, when did you do, when did you
23  review the bugs?
24    A. It was during the time that we actually looked

Page 35

1  at this case. I mean looked at this particular issue
2  because it was raised as a defect in the system for me
3  to look at, and that's our normal business operation.
4  That's the normal -- so cust -- this issue was raised
5  with the customer care team, and they create a defect
6  and we go through that defect and look at the, the
7  system.
8    Q. Okay. Did you speak with people from the
9  customer care team?
10    A. I, I did not directly speak with folks on the
11  customer care team. It was just I reviewed the bugs
12  that, that were filed that, that were filed for this.
13    Q. Okay. And in order to review the bugs, did you
14  have to go anywhere or can you do that -- could you do
15  that from your office?
16    A. I can do that from my office.
17    Q. Okay. So would I be correct in stating that
18  you have some type of access to the system which would
19  let you see whether there was a defect or a bug,
20  correct?
21    A. If the bug was reported, I could not see the
22  bug in the system. It was just what the report, the bug
23  report that was provided, so I can only see that.
24    Q. Okay. And is there a database that you access

Page 36

1  to see that?
2    A. Yes.
3    Q. What's the name of that database?
4    A. That is called Bugzilla.
5    Q. Bugzilla, okay. And is that a database that's,
6  that's maintained and operated by Yahoo exclusively?
7    A. Yes, it's an internal tool that is operated by
8  Yahoo.
9    Q. Okay. And what type of data is housed within
10  the Bugzilla database?
11    A. Any and all kinds of defects for the entire
12  company, all products across the company are housed in
13  that system.
14    Q. Okay. When you mention defects, can you give
15  me an example of the type of defects you're talking
16  about?
17    A. So if any product, it, it doesn't work as it's
18  supposed to, or if it doesn't function as it's supposed
19  to, that is called a defect and that is recorded in, in
20  this database.
21    Q. Okay. Did you have to look up by, by the
22  plaintiff's, Mr. Dominguez's name in this Bugzilla
23  database or by a number or an e-mail address? What did
24  you have to do in order to see the, the bugs that you

9  (Pages 33 to 36)

Dominguez, et al. v. Yahoo, Inc.                          AJAY GOPALKRISHNA, 10/18/13

Page 37

1  looked at?
2        MS. MANTELL: Objection; compound.
3        THE WITNESS: There are multiple things that we
4  look at, so....
5  BY MR. FRANCIS:
6     Q. Okay. Wendy was right, that was compound. So
7  let me try to be a little more precise.
8        What data did you input into the Bugzilla
9  database to find these bugs or defects that you're
10 talking about? What information did you, did you put
11 in?
12       MS. MANTELL: Objection; misstates testimony.
13 BY MR. FRANCIS:
14    Q. You can answer.
15    A. It is more, it was around this particular
16 service so I'd like to -- I tried to search for this
17 service, for the name of the service in the Bugzilla
18 database.
19    Q. I see. You looked -- correct me if I'm
20 wrong -- you looked for bugs or defects within the
21 e-mail SMS alert service, correct?
22    A. Yes.
23    Q. Okay. And then that shows you all of the bugs
24 and defects for that product?

Page 38

1     A. There isn't one way to pull up all the bugs or
2  defects for that product, so it is, like I said, it is
3  either based on a particular bug number that I knew,
4  that I pulled it up, or based on certain keywords.
5     Q. Okay. What did you do to look into the bugs
6  that pertained to this case? Did you use a keyword or
7  did you have the number, the bug number? What did you
8  have?
9     A. I looked it up based on a key word, which is
10 SMS, but there are a lot of other SMS services as well
11 that the company offers. So I had to sift through to
12 see which for this particular case.
13    Q. Okay. And what did you look at for, for this
14 particular case?
15    A. So we looked at, to, to understand what the,
16 what the, what the issue was about, what was important.
17    Q. Okay. And what did you learn about the bugs
18 and defects in this case, what bugs did you discover?
19       MS. MANTELL: Objection to the extent that this
20 is getting into a privileged area, if he's looking at
21 bugs that were recorded as a result of this lawsuit.
22 BY MR. FRANCIS:
23    Q. Okay. Well, to the -- I don't want to know
24 anything about counsel, communications with counsel or

Page 39

1  something that they did, but what bugs did you discover
2  in the system that, that you looked at in connection
3  with being able to sign this declaration?
4        MS. MANTELL: To the extent that there were any
5  bugs in the system that were recorded prior to or not as
6  a result of this lawsuit.
7        THE WITNESS: Sorry. Can you repeat that; I
8  didn't understand.
9        MS. MANTELL: If there were bugs that were
10 recorded not as a result of this lawsuit.
11       THE WITNESS: Okay.
12       MS. MANTELL: And that you saw when you went
13 in, you can discuss that.
14       THE WITNESS: Okay. Yeah.
15       So this was for, to, just to get an
16 understanding of what are the, what are their, what are
17 the components of the system. And it was more to
18 understand as to what the particular system or what the
19 components of the system were. And to get, to get a
20 better understanding of the system that's where I had, I
21 was looking at, the prior records or prior defects that
22 were filed for this particular service.
23 BY MR. FRANCIS:
24    Q. Okay. And did you find defects for this

Page 40

1  service?
2     A. Yes, there were.
3     Q. Which ones did you -- go ahead. Which ones did
4  you find?
5     A. There were, there were, there were quite a few
6  that were related to how the service was set up, that
7  were related to how the, how the, the interface, the
8  user interface was set up. And so right from where it
9  was supposedly designed and such.
10    Q. Okay. And what bugs or defects did you learn
11 about that related to this case?
12    A. It was --
13       MS. MANTELL: Sorry. Can you repeat that
14 question.
15       THE WITNESS: Yeah.
16 BY MR. FRANCIS:
17    Q. Sure. So what bugs or defects did you
18 discover that pertained to anything that happened to
19 Mr. Dominguez, the plaintiff in this case?
20       MS. MANTELL: Again, to the extent that those
21 bugs were not recorded as a result of the lawsuit being
22 filed.
23 BY MR. FRANCIS:
24    Q. Go ahead.

10  (Pages 37 to 40)

Dominguez, et al. v. Yahoo, Inc.                    AJAY GOPALKRISHNA, 10/18/13

Page 41

1      A. So it was more around how, how this, the
2    service, the user interaction of the services, and how
3    would you, how would one sign up for the service. Some
4    parts of that was in the, in the bug, in the defect.
5      Q. Okay. And what specific defects did you find?
6    What was the problem with signing up for the service?
7      A. So we used defects not -- we used the Bugzilla
8    system not only for defects but also to, to manage and
9    create the product. So there were some what we call as
10   bugs but they were actually task items or work items
11   that we managed through this particular Bugzilla system
12   to actually even build the system. So that is what I
13   was looking at.
14     Q. Okay. Did you find any bugs or defects that
15   had any impact on the experience that the plaintiff,
16   Bill Dominguez, experienced in this case?
17       MS. MANTELL: Objection; vague.
18       THE WITNESS: What, what was -- not sure I
19   understand what, what does, what you're asking.
20   BY MR. FRANCIS:
21     Q. Okay. Well, let me ask you this: As part of
22   your, your investigation in connection with this case,
23   did you learn about the allegations that the plaintiff
24   in this case, Bill Dominguez, had made against Yahoo?

Page 42

1      A. That --
2        MS. MANTELL: Objection just to the extent he
3    may not understand the language you're using.
4        MR. FRANCIS: Okay. Okay. Okay.
5      Q. Did you, did you, did you -- in order to
6    execute this declaration, did you try to become familiar
7    with or learn about the experience of the plaintiff in
8    this case, Bill Dominguez? Did you know what happened
9    to him?
10     A. Yes, I did.
11     Q. Okay. What did you do to learn that? Did you
12   look at the complaint, did you go into the system and
13   see what happened? I mean, how did you, what did you
14   learn about it?
15     A. So I tried to understand how the system
16   actually worked in the first place, tried to get all the
17   documentation and any other knowledge that is there
18   about the system either through this particular document
19   or through screen shots and mocks that were, that was
20   available. Because none of this -- this system is
21   already being end of life, so none of it is actually
22   still maintained.
23       So the only way one could find information
24   around it is to look at whatever was the existing

Page 43

1    documentation that was still on, that were, the pages
2    that were still hosted. And to also look at our defect
3    management system, which is Bugzilla, which also tracks
4    any work item when you actually create a product.
5      Q. Okay. Did you review any records or
6    information pertaining to any communications that
7    Mr. Dominguez had had with Yahoo?
8      A. There were, there was -- whatever was filed by
9    the customer care team, I looked at that particular
10   defect as well.
11     Q. Okay. And did you find something in the
12   customer care team that pertained to him?
13       MS. MANTELL: To the extent that it was not
14   filed as a result of the lawsuit.
15       THE WITNESS: So I, I don't know, I can't, I
16   can't, I don't know if it was related, I mean, if it was
17   before or for as a result of this lawsuit, so i can't
18   know actually as far as what circumstances before or
19   after. If there was a bug, I looked at it. There was,
20   there was a -- the customer care team created it and I
21   -- I looked it.
22   BY MR. FRANCIS:
23     Q. Okay. So you found one or more bugs, you just
24   don't know whether or not those bugs were created in

Page 44

1    response to the lawsuit or prior to the lawsuit,
2    correct?
3      A. Yes.
4      Q. Okay. How many bugs did you find?
5      A. So there -- I, I don't remember. There were
6    multiple bugs that I found related to the service, and
7    some like-I said they were not actual defects, but they
8    were work items. So I don't have an exact number with
9    me right now as to how many did I find for the entire
10   SMS service.
11     Q. Okay. Did you find any bugs that were related
12   to a situation where a customer were to buy a, a mobile
13   phone that had a recycled number or had a number from
14   somebody else who had authorized SMS messaging and that
15   customer couldn't get it, the previous current owner's
16   messages to stop, did you see any bugs related to that?
17       MS. MANTELL: Other than this lawsuit?
18       MR. FRANCIS: I don't know about the lawsuit or
19   not, but did you see any bugs related at all to that and
20   then we can take it from there.
21       MS. MANTELL: Okay. Objection to the extent
22   that that describes the lawsuit and there was
23   potentially some sort of privileged information in the
24   system related to the claims alleged in this lawsuit.

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Dominguez, et al. v. Yahoo, Inc.                                      AJAY GOPALKRISHNA, 10/18/13

Page 45

1    So if you saw bugs relating to the scenario
2    that he's describing other than the lawsuit, you can
3    answer.
4    BY MR. FRANCIS:
5        Q.  Well, if you know.  If you don't know, I want
6    to know whether or not you know it's related to the
7    lawsuit or not, because if he doesn't know, then it's
8    not necessarily privileged.
9        So let's first find out, sir, did you discover
10   any bugs at all which pertained to the situation I
11   outlined?  Somebody gets a recycled number, the previous
12   owner had enabled SMS forwarding, and now the existing
13   owner can't get it to stop.  Did you see any bugs
14   related to that situation?
15       A.  No, I did not see any bugs related to that --
16   similar bugs related to that.
17       Q.  Okay.  Okay.  Do you know whether or not that
18   was a problem that Yahoo had identified prior to this
19   lawsuit?
20       A.  I do not know.
21       Q.  Okay.  Now, I asked you before about whether or
22   not you had accessed any information or seen any records
23   pertaining to communications between Bill Dominguez, the
24   plaintiff in this case, and the, and Yahoo.

Page 46

1        Were you able to discover whether any records
2    existed concerning communications between Mr. Dominguez
3    and Yahoo?
4        MS. MANTELL:  Again, other than any privileged
5    communications about this lawsuit.
6    BY MR. FRANCIS:
7        Q.  Right.  I don't want -- not counsel, but any --
8    did you -- were you able to discover whether or not
9    there were any communications of Mr. Dominguez himself
10   contacting Yahoo or any communications with Yahoo, not
11   counsel?
12       A.  No, I did not.
13       Q.  Okay.  Do you -- sir, are you aware that one of
14   the allegations in this case is that Mr. Dominguez tried
15   repeatedly to get Yahoo to stop sending these texts to
16   him and yet they continued to be sent?
17       Are you aware of that?
18       MS. MANTELL:  Objection for several reasons,
19   but also beyond the scope of the topics outlined for
20   this deposition.
21   BY MR. FRANCIS:
22       Q.  Are you -- are you aware of that, sir?
23       A.  So I was, I mean, it was only in the context of
24   this case that I was made to -- I was aware of, not

Page 47

1    prior to that.
2        Q.  Okay.  My question is simply whether you were
3    able to discover whether they were -- actually let's
4    just go through the declaration, that's probably the
5    easy way to do it.  Okay.  Okay.
6        Okay.  If you look, if you look at the first
7    page of Paragraph 4, your declaration references that
8    prior to June of 2001 Yahoo offered e-mail account
9    holders a feature, and it goes on, right?  They offered
10   that service.  Do you see that?
11       MS. MANTELL:  It's 2011.
12       MR. FRANCIS:  What?
13       MS. MANTELL:  2011.
14       MR. FRANCIS:  I'm sorry.  2011.  What did I
15   say?
16       Q.  Do you see that?
17       A.  Yes.
18       Q.  Okay.  What happened in June of 2011?
19       A.  So in 2011, the way to actually register a
20   phone number for this service, that particular site was
21   end of life, so taken down, so there was no way to
22   actually register any new service.
23       Q.  Okay.  And were you involved at all in the
24   termination of the service?

Page 48

1        A.  No, because the, the site, that was maintained
2    by some other team.  The actual site where you actually
3    go in and register a phone number for a person, that
4    site was maintained by somebody else and that was end of
5    life.
6        Q.  Okay.  What's the name of that site, or what
7    was the name of that site?
8        A.  I do not recollect.  It is, it was called Yahoo
9    Mobile something.  It was basically a mobile site.  So
10   I, I do not have, I do not recollect the name of that
11   site, but it was a mobile, SMS mobile site and it was
12   available through, through Yahoo and through Yahoo Mail.
13       Q.  Okay.  Are you saying that prior to June of
14   2011 there was this SMS mobile site where people could
15   go and enter their cell phone numbers which would enable
16   them to get e-mails sent by way of SMS to their phones?
17       A.  Yes.
18       Q.  Okay.  And starting in June of 2011, that site
19   was shut down?
20       A.  Yes.
21       Q.  Okay.  So would I be correct in stating that
22   people who had already signed up for the service prior
23   to June of 2011 after June of 2011 would continue to get
24   messages, but no new people could sign up, correct?

12  (Pages 45 to 48)

Dominguez, et al. v. Yahoo, Inc.                                    AJAY GOPALKRISHNA, 10/18/13

| Page 49 |
|---|
| 1   A. Yes, correct. |
| 2   Q. Okay. Did there come a point when even the |
| 3   people who had signed up stopped getting SMS messages? |
| 4   A. Yes. |
| 5   Q. When was that? |
| 6   A. To the -- as I looked at it and to the best of |
| 7   my knowledge it, it was, we actually just released a, |
| 8   did a release two days ago to discontinue any of the |
| 9   service. |
| 10   Q. Are you saying the company issued an Internet |
| 11   release of some sort which states that the service was |
| 12   discontinued two days ago? |
| 13   MS. MANTELL: Objection. |
| 14   BY MR. FRANCIS: |
| 15   Q. Is that what you said? |
| 16   MS. MANTELL: Objection. |
| 17   THE WITNESS: No, I did not say that. |
| 18   BY MR. FRANCIS: |
| 19   Q. All right. Can you tell me what you said, |
| 20   then. |
| 21   A. What I said was the mechanism to send out any |
| 22   SMS service based on the e-mail filter was discontinued |
| 23   two days ago. |
| 24   Q. Okay. Now, the site that you said got shut |

| Page 50 |
|---|
| 1   down in 2000 -- in June of 2011, you don't know where |
| 2   that site was, correct? |
| 3   A. Correct. It is, it was some, it was a Yahoo |
| 4   Mobile site. I don't recollect where the, the site was. |
| 5   I don't have the exact URL of that site. |
| 6   Q. Okay. And do you know who was responsible, |
| 7   who -- for maintaining that site prior to June of 2011? |
| 8   A. I do not know. I, yeah -- |
| 9   Q. Okay. |
| 10   A. -- I do not know. |
| 11   Q. Do you -- do you -- okay. Do you know |
| 12   specifically what type of information was stored in that |
| 13   site as it pertained to the -- a customer inputting |
| 14   their mobile phone number? |
| 15   MS. MANTELL: Objection; vague. |
| 16   BY MR. FRANCIS: |
| 17   Q. You can answer. |
| 18   A. Could, would you elaborate what, what, what are |
| 19   you actually wanting to know? |
| 20   Q. Sure. Sure. Maybe this will help. So there |
| 21   was a site, right, that you said was an SMS mobile site |
| 22   where consumers or Yahoo Mail holders could enter in |
| 23   information in order to turn on the e-mail SMS service, |
| 24   correct or activate it, correct? |

| Page 51 |
|---|
| 1   A. So, yes. The -- so let me clearly explain |
| 2   this. So, so the site was to register a phone number |
| 3   for that particular person. |
| 4   Q. Right. Right, so in terms of that site, |
| 5   registering the phone number to make it eligible for SMS |
| 6   alert service, do you know what information that site |
| 7   stored about those customers? |
| 8   MS. MANTELL: Objection. |
| 9   You can answer if you know. |
| 10   THE WITNESS: All right. |
| 11   BY MR. FRANCIS: |
| 12   Q. Do you know? |
| 13   A. It, it, it stored the, the phone number and it |
| 14   stored -- so you had to first register your phone number |
| 15   for that site and then as, as far as the flow goes you |
| 16   had to enter, you had the ability to enter e-mail |
| 17   addresses of people who you would want to get e-mail |
| 18   alerts from. |
| 19   Q. Right. |
| 20   A. So that was -- |
| 21   Q. Would I be correct in stating that what was |
| 22   stored at that site among other things was, were the |
| 23   actual mobile numbers of the customers who wanted to get |
| 24   the service? |

| Page 52 |
|---|
| 1   A. Yes, customers intended to get that service, |
| 2   and they provided their phone numbers by themselves. |
| 3   Q. Right. So that site, I know you don't know |
| 4   where it was or who was in charge of it, there were |
| 5   servers that the company maintained to operate that, |
| 6   correct? |
| 7   A. Correct. |
| 8   Q. And those servers would store the numbers of |
| 9   the customers who wanted to receive SMS service alerts, |
| 10   correct? |
| 11   A. Correct. |
| 12   Q. Okay. So stored within those servers were the |
| 13   mobile numbers of the customers who had elected to |
| 14   receive the Yahoo e-mail SMS alert service, correct? |
| 15   A. Yes. |
| 16   Q. Okay. But are you aware -- other than the |
| 17   phone numbers or the mobile numbers, are you aware of |
| 18   any other data that those servers stored which pertained |
| 19   to those customers? |
| 20   A. So there is also, if you look at in Page 2, |
| 21   the, the filter that sets up the conditions for which |
| 22   the, the, the person can get an e-mail alert, so, so if |
| 23   it is from a particular sender and if it contains a |
| 24   specific e-mail body and a subject, you could then send |

13 (Pages 49 to 52)

Dominguez, et al. v. Yahoo, Inc.                    AJAY GOPALKRISHNA, 10/18/13

## Page 53

1    the alert to the mobile device. So you set up the
2    filter within Yahoo Mail. You had the ability to set up
3    the filter within Yahoo Mail.
4        Q. Right. I see. So the information contained in
5    Paragraph 5 of your declaration or -- and on page -- top
6    of Page 2, that information would also be stored in the
7    servers at the SMS mobile site that was shut down in
8    June of 2011, correct?
9        A. They are stored in different servers, not the
10   same ones.
11       Q. What do you mean different -- what did you say?
12   I couldn't hear.
13       A. So they are stored in a different server, not,
14   so it doesn't store all the, all this information in one
15   place. It -- then there is an e-mail coming in, it
16   actually looks up the particular number for that person
17   and if it matches this criteria for the sender, only
18   then the SMS alert is, the SMS message, message is sent
19   as an SMS to the recipient.
20       Q. I understand. Do you know how long the servers
21   stored the mobile numbers of the customers who elected
22   to receive the e-mail SMS alert service?
23       A. So that site also had an unsubscribe mechanism,
24   so until it was, it would be, would have been, it would

## Page 54

1    have to be initiated by a user to unsubscribe, so until
2    then that number would be stored.
3        Q. Okay. So that server or servers that we
4    mentioned that would store the mobile phone numbers,
5    they would hold the mobile phone numbers until a
6    customer went on or accessed the system and said I don't
7    want to be part of it anymore, correct?
8        A. Correct.
9        Q. Okay. Was there any record retention policy to
10   delete that information after a period of time or
11   transfer it from one server to another or did it just
12   remain on the same servers until the customer decided
13   they didn't want to be part of it anymore?
14           MS. MANTELL: Objection; vague.
15           THE WITNESS: There was none that I was aware
16   of.
17   BY MR. FRANCIS:
18       Q. Okay. For example, for a customer who had
19   elected initially to sign up for the service but then
20   never used their Yahoo e-mail again, they never got any
21   more e-mails so they were never getting SMS alerts, was
22   there any process by which that service would be shut
23   down for them or the information would be deleted,
24   anything like that?

## Page 55

1        A. It was only it had to be initiated by the user.
2        Q. Okay. Now, you say that; how do you know that?
3        A. Based on the site, based on the, the, the, the,
4    the flow of the site that it has an unsubscribe
5    mechanism in there, so....
6        Q. Right. And what are you basing your knowledge
7    of the flow of the site on, one of these documents?
8        A. So I don't know, I don't know which document
9    you are referring to. So there is a mockup of how the
10   flow works of the site, of the screen shot and that,
11   based on that. That's, that's, that's where I'm getting
12   my information from.
13       Q. Okay.
14       A. So --
15       Q. Okay.
16       A. So that is, so let me also add to that point
17   that there is another way to stop this service by going
18   into, it, it had this particular option, it's no longer
19   available, but you could have gone into Yahoo Mail and
20   removed that filter for, for that particular sender. So
21   in that way then the user can stop getting the service.
22   So it has to be use -- user initiated.
23       Q. Right. Let me ask you this: For somebody like
24   Mr. Dominguez who had gotten a phone with a number where

## Page 56

1    the previous owner had authorized the, the, the service,
2    the sending of alerts, what was the method for someone
3    like him to stop the, the, the texts?
4        A. So if he was, if he was the one who set it up,
5    if it was his account, he could have gone into the, to
6    the options page in mail and removed the filter, or he
7    could have unsubscribed it from the, from that mobile
8    site. So the two, two options there.
9        Q. Right. But what about the person who didn't
10   know who had the previous number, didn't know what the
11   previous e-mail address was, how would they stop the
12   texts?
13       A. They would have to contact Yahoo customer care
14   to get --
15       Q. Okay. And if they contact Yahoo customer care,
16   was there a method by which they could get the texts to
17   stop?
18       A. So the, the person had to, if you actually --
19   if it was your account, then you could have done it. If
20   the person doesn't own the account, that, that is an
21   exception. And that is, that's what the customer care
22   team -- I -- and I don't know what the process of the
23   customer care team is at that point.
24       Q. Right. So if a customer knew the e-mail

14  (Pages 53 to 56)

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Dominguez, et al. v. Yahoo, Inc.                          AJAY GOPALKRISHNA, 10/18/13

Page 57

1   address and/or could provide access to the customer
2   care, they might be able to get it to stop, but what if
3   they didn't know what the e-mail address was or even the
4   name of the previous owner, how would they get it to
5   stop?
6       MS. MANTELL: Objection; asked and answered.
7   BY MR. FRANCIS:
8       Q. You can answer.
9       A. I, I'm sorry I didn't get the questions. I
10  didn't understand.
11      Q. Do you know -- okay. Do you know of any method
12  that exists back in 2011 or 2012 which would allow a
13  customer who bought a number that had been previously
14  owned by somebody else, and for which that person had
15  authorized SMS service to get the texts to stop, was
16  there a method at Yahoo to get that to stop?
17      MS. MANTELL: Objection; asked and answered.
18  BY MR. FRANCIS:
19      Q. You can answer.
20      A. So like I had mentioned earlier as well, if the
21  person owns the account, there was a process. This was
22  an exception. And I'm not clear on what the process for
23  the exception is with, from -- and what the customer
24  care team follows in that case.

Page 58

1       Q. Okay. Is it your testimony that you don't know
2   whether or not there was a method to stop the sending of
3   texts to someone like Mr. Dominguez who had bought a, a
4   number which had, where the owner had previously
5   authorized or elected to receive SMS texts but for
6   whom wanted the texts to stop?
7       A. So --
8       MS. MANTELL: Objection. Asked and answered
9   and getting argumentative.
10  BY MR. FRANCIS:
11      Q. Go ahead. You can answer.
12      A. Yeah. Like I said, it could have been a
13  judgment call based on the, the customer care agent who
14  answered the call. But I am not aware of what the
15  process was. But --
16      Q. Okay. So you know -- did you know whether or
17  not the customer care team had the ability to stop texts
18  in the situation like that?
19      MS. MANTELL: Objection; asked and answered.
20  This is also beyond the scope of topics listed for the
21  deposition.
22      THE WITNESS: I, I mean, they have the ability
23  but again, I don't know what the, the process is for the
24  exception. It -- and it could be based on one of cases,

Page 59

1   and it, it, it's a call, it's a call from a customer
2   care agent's standpoint at that point.
3   BY MR. FRANCIS:
4       Q. Okay. I just wanted to make sure that I
5   understand your testimony. You're saying they had the
6   ability, they physically could do it, but you don't know
7   what the protocols or policies were that they followed
8   in their department, correct?
9       A. Yes. And it also involves privacy because it
10  is somebody else's account and not the person who's
11  calling in. So there is, there is a privacy issue there
12  as well. So there are multiple --
13      Q. I understand.
14      A. -- issues going on.
15      Q. How do you know that they had the ability to do
16  it?
17      ████████████████████████████████████████
    ██ ████████████████████████████████████████
    ██ ████████████████████████████████████████
    ██ █████████████████
23      Q. Okay. And for a situation like Mr. Dominguez's
24  where he bought this phone and the number belonged to

Page 60

1   somebody who previously elected to have the SMS service,
2   would they be able to shut that down, i.e., have the
3   ability just based upon the number alone or would he
4   have to give them more information?
5       MS. MANTELL: Objection; vague.
6       THE WITNESS: Yeah. I -- sorry, I don't, I
7   don't know how, how they come to the conclusion that
8   it's not the number. They might have other ways. I'm
9   not aware of it in terms of how they --
10  BY MR. FRANCIS:
11      Q. Okay.
12      A. -- arrive at that decision.
13      Q. Okay. All right. I want to turn your
14  attention to Paragraph 10, of your declaration, which is
15  Gopalkrishna 1.
16      Are you there?
17      A. Yes, I am.
18      Q. Okay. Your declaration reads that, "Based on
19  this information, I reviewed records that had been
20  maintained in the ordinary course of business at Yahoo,
21  and determined that the user of the account associated
22  with plaintiff's mobile number created the account in
23  March of 2009, and that the user made an affirmative
24  request to sign up for the e-mail SMS service at some

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com



Page 61

1  point prior to June of 2011." Do you see that?
2      A. Yes.
3      Q. Okay. First, what are the -- what are the
4  records that you referenced there that enabled you to
5  determine that the previous user made an affirmative
6  request to sign up for the e-mail SMS service? What
7  records are you referring to there?
8      A. So, the, this was from what I got information
9  from the customer care team, and they're the ones who
10 looked at the -- and provided this information.
11     Q. Okay. What records did you get from customer
12 care?
13     A. As far as when this, when this -- when was the,
14 when was the service set up. And that was the
15 information that I got. That was in March 2009.
16     Q. How was the information communicated to you?
17 Was that -- was it e-mailed to you? Did they show you a
18 record on a screen, did they send you a screen print?
19 Did they put it in an e-mail? How did you, how did you
20 get that information?
21
22
23

Page 62

21     A. Yes.
22     Q. Okay. Now, what I had asked you a few moments
23 ago, and I don't think you've, you've answered it, is
24 this information that customer care was able to derive

Page 63

1  or obtain regarding the creation of the account, how was
2  that transmitted to you? Did they tell you over the
3  phone, you know, the guy created the account in March of
4  2009, here's the number? Or did they send you an
5  e-mail? How did you get the information from customer
6  care?
7      A. I think it was, I'm trying to see if, I'm
8  trying to remember if it was in an e-mail but I cannot
9  recollect. It could have been in an e-mail.
10     Q. Okay. And through the information you received
11 you were able to determine as you set forth in
12 Paragraph 10 that the previous user of the account
13 associated with Mr. Dominguez's mobile number created an
14 account in March of 2009 and signed up for the EMS [sic]
15 service, correct?
16     A. Yes.
17     Q. Okay. Now, you never saw any information that
18 Mr. Dominguez himself elected to receive the e-mail SMS
19 service, correct?
20        MS. MANTELL: Objection.
21        THE WITNESS: What kind of information or
22 what --
23 BY MR. FRANCIS:
24     Q. You, you -- well, you -- correct me if I'm

Page 64

1  wrong, your declaration among other things here states
2  that the previous user of the account that was
3  associated with the plaintiff's mobile phone number
4  affirmatively requested to sign up for the e-mail SMS
5  service, correct?
6      A. Mm-hmm, yes, correct.
7      Q. Okay. You don't have any information at all
8  that Mr. Dominguez, the plaintiff in this case, ever
9  requested e-mail SMS service, correct?
10     A. No. I don't have any information.
11     Q. Okay. Right. You never saw any record that
12 Mr. Dominguez himself affirmatively made any type of
13 request to Yahoo that he wanted e-mail SMS service,
14 correct?
15        MS. MANTELL: Objection; asked and answered.
16 Do we need to ask every question twice?
17 BY MR. FRANCIS:
18     Q. You can answer.
19     A. Yes. As I said, I didn't see anything.
20     Q. Right. In fact, you have no knowledge
21 whatsoever or any information that Mr. Dominguez signed
22 up for the e-mail SMS service at any time, correct?
23        MS. MANTELL: Again asked and answered. Move
24 on.

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

**Dominguez, et al. v. Yahoo, Inc.**                    **AJAY GOPALKRISHNA, 10/18/13**

---

Page 65

1        THE WITNESS: Yes.
2    BY MR. FRANCIS:
3        Q. You can answer.
4        A. Yes.
5        Q. Correct?
6        A. Yes.
7        Q. Okay. Just to be clear, the only information
8    that you know about is what the previous owner and user
9    of the account did, correct?
10       A. Yes, correct.
11       Q. Okay. Gotcha. Now, in the records that you --
12   strike that.
13       In the records that the customer care
14   department reviewed, was there any indication of any
15   attempts by Mr. Dominguez to stop the service, and by
16   service I mean the e-mail SMS service?
17       MS. MANTELL: Objection; vague and misstates
18   testimony.
19   BY MR. FRANCIS:
20       Q. You can answer.
21       A. I am not sure what -- so you mean calling
22   customer care?
23       Q. No, let me try again. You base Paragraphs 10,
24   probably, and 11 and -- Paragraphs 10 and 11 of your

---

Page 66

1    declaration on information you learned from customer
2    care, correct?
3        MS. MANTELL: Objection; misstates testimony.
4    BY MR. FRANCIS:
5        Q. Among other things you learned it from customer
6    care, right?
7        A. Well --
8        MS. MANTELL: Objection; misstates testimony.
9    We're talking about Paragraph 10. If you want to talk
10   about Paragraph 11, let's move to Paragraph 11.
11   BY MR. FRANCIS:
12       Q. All right. Fine. Paragraph 10. Right? You
13   based at least part of your statement here on
14   information you learned from customer care, correct?
15       A. Yes.
16       Q. Okay. And customer care was able to access
17   some type of record, correct?
18       A. Yes.
19       Q. In the customer care records, were there any --
20   was there any documentation of calls from Mr. Dominguez
21   or communications from him trying to get Yahoo to stop
22   sending the text messages?
23       MS. MANTELL: Objection. Beyond the scope of
24   this deposition, and also asking things beyond what

---

Page 67

1    he -- his personal knowledge.
2    BY MR. FRANCIS:
3        Q. You can answer.
4        A. So I don't know if -- I think there is no such
5    record in -- like for the customer care reviews the UDB
6    record, the UDB database, and there is no such record in
7    that database around what the customer care, customer
8    calls or anything of that sort.
9        So the association of this, for Mr. Dominguez
10   in, in the, in that UD -- there's no such association
11   there in that UDB database. And I'm not sure how
12   customer care, if he has -- had contacted customer care
13   and what was that interaction. I, I, I'm not aware of
14   that at all.
15       Q. Okay. Are you saying you don't know whether or
16   not customer care records documented any communications
17   for Mr. Dominguez, or I know they don't exist?
18       MS. MANTELL: Objection; compound and misstates
19   testimony.
20   BY MR. FRANCIS:
21       Q. You can answer.
22       A. So what I'm saying is the record that customer
23   care looks at which is the UDB record, there is no,
24   there is no, there is no customer specific information

---

Page 68

1    there. It is, it is more associated to an ID. As far
2    as if Mr. Dominguez had contacted customer care that
3    is -- I don't know. I don't know that part.
4        Q. Okay. You don't know, correct?
5        A. Yes.
6        Q. All right. Okay. I'd like to turn your
7    attention to Paragraph 13 of your declaration. Okay?
8        A. Yes.
9        Q. Would you just read that to yourself and tell
10   me when you're finished.
11       A. Yes, I'm done.
12       Q. Okay. Did you write that or did somebody write
13   that for you?
14       A. I did not -- somebody did write it.
15       Q. Somebody wrote it for you, correct?
16       A. Yes.
17       Q. Okay. Now, what did you do before you signed
18   this declaration on June 14th, what did you do or what
19   investigation did you conduct to determine that that
20   statement in Paragraph 13 is, is truthful?
21       A. So the way the service works, it's only based
22   on when a -- there is a e-mail that comes in. Whenever
23   there's an e-mail coming in and, and it is initiated by
24   that. And based on that e-mail and if that, this filter

---

17 (Pages 65 to 68)

**Dominguez, et al. v. Yahoo, Inc.**                                **AJAY GOPALKRISHNA, 10/18/13**

Page 69

1  is set up, only then does the SMS go out. There is no
2  automated -- automated in the sense of just random or
3  sequential number that gets generated and, and SMS is
4  sent out. There is no such thing like that in the
5  system.
6       I mean, it is -- the software is designed in
7  such a way that only when there is an e-mail that comes
8  in and it satisfies the require -- the triggering
9  criteria of that particular filter, only then does the
10  SMS go out. So that's how the system works.
11       So this statement is accurate because it does
12  not, there is no random or sequential number generation
13  to call any of these numbers.
14       Q. Okay. Would you agree with me that the process
15  is automated?
16       MS. MANTELL: Objection; vague.
17       THE WITNESS: What --
18  BY MR. FRANCIS:
19       Q. You can answer.
20       A. What process?
21       Q. Sending the, the SMS e-mail service or the
22  e-mail SMS service that the forwarding of the texts is
23  determined by the computer?
24       A. It is determined by the computer, but it is

Page 70

1  initiated by an event, and that event is an e-mail being
2  sent to that particular e-mail address.
3       Q. Right. So the termination of -- for the system
4  to send an SMS text to a user's phone is determined by
5  the computer system itself, correct? Not a human
6  person. Correct?
7       MS. MANTELL: Objection; vague.
8  BY MR. FRANCIS:
9       Q. You can answer.
10       A. So the determination of -- can you -- so are
11  you asking that can the computer system send the SMS to
12  the intended recipient on its own? Is that what you're
13  asking?
14       Q. No, what I'm saying is the process of the
15  forwarding of a message by way of SMS occurs on an
16  automated fashion by the computer itself. There is no
17  human intervention making decisions along the way, let's
18  forward this e-mail this particular day, it's all
19  automated by the computer, correct?
20       MS. MANTELL: Objection; vague and misstates
21  testimony.
22  BY MR. FRANCIS:
23       Q. You can answer.
24       A. The human decision is made by the actual user

Page 71

1  who sets up the filter. So they make the decision, send
2  me an e-mail from this person and if it contains this
3  subject, or send me an e-mail from everybody that sends
4  me an e-mail. So it depends on how they set up the
5  filter for themselves. And then the e-mail is sent out
6  to -- the SMS -- I'm sorry -- is sent out to the
7  intended recipient. So they --
8       Q. Right. Do you agree --
9       MS. MANTELL: Uh --
10  BY MR. FRANCIS:
11       Q. Go ahead. So would you -- would you agree with
12  me that the user --
13       MS. MANTELL: --
14  BY MR. FRANCIS:
15       Q. -- doesn't have to -- the user doesn't have to
16  make that request every, with every e-mail, right? Once
17  they tell Yahoo I want it to happen this way, they're
18  done, right?
19       A. Yes.
20       Q. Okay. Once they have elected to receive the
21  service the texts are sent automatically by the Yahoo
22  system, correct?
23       MS. MANTELL: Objection; vague. I'm just
24  getting --

Page 72

1       MR. FRANCIS: You can answer.
2       MS. MANTELL: -- word that we have ten minutes
3  left on the video, just so you know.
4       MR. FRANCIS: Okay.
5       Q. Correct?
6       A. It is, yes, it is a software program. There
7  is, that runs, the system is supposed to do that. That
8  is how it is designed.
9       Q. Right. Once the person signs up and elects to
10  receive the e-mail SMS service, the computer does the
11  rest, correct?
12       MS. MANTELL: Objection; misstates testimony.
13  BY MR. FRANCIS:
14       Q. You can answer.
15       A. So there's -- yes. So there is a lot of
16  systems involved. There is lookups involved. And this
17  is all based on after the user has actually set it up
18  and agreed to voluntarily sign up for the service, then,
19  yes.
20       Q. Okay. And likewise, once a customer or a user
21  has elected to receive the e-mail SMS service. After
22  that point when an e-mail comes in, there's nobody from
23  Yahoo, a person that has to make any individual decision
24  to forward that e-mail by way of SMS, correct?

18 (Pages 69 to 72)

Dominguez, et al. v. Yahoo, Inc.                              AJAY GOPALKRISHNA, 10/18/13

Page 73

1           MS. MANTELL: Objection; vague.
2    BY MR. FRANCIS:
3       Q. You can answer.
4       A. Correct. Yes.
5       Q. Yes?
6       A. Yes.
7       Q. Okay. The system does it automatically,
8    correct?
9           MS. MANTELL: Objection; vague.
10   BY MR. FRANCIS:
11      Q. You can answer.
12      A. Yes. That's, that's what -- that is how it is
13   supposed to.
14      Q. Yes.
15      A. And how -- and it is based on a triggering
16   event, which is sending of an e-mail from a particular
17   sender.
18         MR. FRANCIS: Okay. Wendy, thank you for
19   pointing out that the videotape is about to go. I'm
20   fine taking a short break now if you are.
21         MS. MANTELL: Yes, that's fine with me.
22         MR. FRANCIS: Why don't we do that, switch the
23   tape. We've been going for a while.
24         THE VIDEOGRAPHER: This marks the end of tape

Page 74

1    1.
2           MR. FRANCIS: Are you okay with that?
3           MS. MANTELL: Yes.
4           THE VIDEOGRAPHER: We're off the record. The
5    time is 11:56 a.m.
6           (Recess.)
7           THE VIDEOGRAPHER: This marks the beginning of
8    tape 2, Volume I in the deposition of Ajay Gopalkrishna.
9    We're on the record. The time is 12:13 p.m.
10          MR. FRANCIS: Okay. At this time I'd ask the
11   Court Reporter to take the document which has the
12   heading "SMS Subscription gateway," for the record it's
13   Yahoo 16 through Yahoo 31, and mark that as Gopalkrishna
14   2, and then hand it to the witness, please.
15          (WHEREUPON, PLAINTIFF'S EXHIBIT 2
16          WAS MARKED FOR IDENTIFICATION.)
17   BY MR. FRANCIS:
18      Q. Okay. Mr. Gopalkrishna, would you take a
19   moment to look at and familiarize yourself with the
20   document that's been handed to you that's marked as
21   Gopalkrishna No. 2.
22      A. Yes.
23      Q. And let me know when you're finished, please.
24      A. Okay.

Page 75

1       Yes, I'm ready.
2       Q. Okay. Great. Sir, are you able to identify
3    this document?
4       A. Yes.
5       Q. What is it?
6       A. It is the, the document that describes the
7    subscription gateway for SMS service.
8       Q. Okay. This is a Yahoo-created document,
9    correct?
10      A. Yes.
11      Q. Okay. And this is a -- would I be correct in
12   stating that this document among other things
13   demonstrates the flow of information as it pertained to
14   the Yahoo e-mail SMS alert service?
15      A. Yes.
16      Q. Okay. Under the heading "SMS Subscription
17   Gateway" on Page 1, there's a "Version 1.3" in smaller
18   font. Do you see that?
19      A. Yes. I'm sorry --
20      Q. Okay.
21      A. No. Hold on. Under -- sorry, which page?
22      Q. If you just look at this -- at the first cover
23   page, the title?
24      A. Okay, yes.

Page 76

1       Q. Under that, under that there's a reference to
2    "Version 1.3." Do you see that?
3       A. Yes, I do.
4       Q. Okay. Do you know whether there were other
5    versions of this document that were used in the past?
6    Was there 1.2, 1.1, 1.4?
7       A. I do not know. There might have been, but
8    this, this was -- I was not involved in this, either
9    design or building this document at all, so I, I'm not
10   aware.
11      Q. Right. Right. So would I be correct in
12   stating what we're looking at in Gopalkrishna 2 is the
13   only version of the SMS subscription gateway you have
14   ever seen, correct?
15      A. Yes.
16      Q. Okay. If there were changes to this manual in
17   subsequent versions or prior versions, you wouldn't have
18   any knowledge of those changes, correct?
19      A. I -- no, I was not involved in it and I don't
20   have knowledge about it.
21      Q. Okay. Okay. And do you know who actually
22   created this document?
23      A. The author of this document was Vijay Aggarwal,
24   as it says there on Page --

19  (Pages 73 to 76)

Dominguez, et al. v. Yahoo, Inc.

AJAY GOPALKRISHNA, 10/18/13



Page 77

1    Q. Okay. On Page --
2    A. -- 2.
3    Q. The second -- right. For -- and just for the
4    sake of our talking today, I'm going to refer not to
5    the page numbers of the document itself, but to the,
6    what lawyers call the Bates numbers on the lower right,
7    Yahoo 0017. Do you see that?
8    A. Yes.
9    Q. The bigger stamped numbers. Let's just use
10   that, okay?
11   A. Okay.
12   Q. It's the easier way to do it.
13   A. Okay.
14   Q. So is it your testimony that Vijay Aggarwal,
15   who is referenced on Yahoo 17, was the creator and
16   drafter of this document?
17   A. Yes.
18   Q. Have you ever spoken with Mr. Aggarwal?
19   A. No, I don't know him.
20   Q. Okay. Do you know what this document was used
21   for by the company or what, what its purpose is or was?
22

Page 78

1    Q. Okay. Specifically for the e-mail SMS alert
2    service, correct?
3    A. Yes.
4    Q. Okay. And is this the document that you
5    reviewed and used to gain your knowledge as to the
6    information flow of the e-mail SMS alert service and its
7    infrastructure that I asked you about previously?
8    A. This is -- yes, this is the document, and I
9    also spoke with, like I said, the person who was in
10   China.
11   Q. Right. I under- -- and I know, and I don't
12   want to repeat all that, but I know you spoke to the two
13   other individuals. But is this the actual physical
14   document that you reviewed which formed the basis of
15   your knowledge today?
16   A. Yes.
17   Q. Okay. Okay. I'd like to turn your attention
18   to Yahoo 19 of Gopalkrishna 2.
19   A. Yes.
20

Page 79

Page 80

20  (Pages 77 to 80)

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Dominguez, et al. v. Yahoo, Inc.                    AJAY GOPALKRISHNA, 10/18/13



21  (Pages 81 to 84)

**Dominguez, et al. v. Yahoo, Inc.**            **AJAY GOPALKRISHNA, 10/18/13**



Page 85

Page 87

1    what you're asking. This is a -- can you explain that.
2         MR. FRANCIS: Sure. I mean, look, I think it's
3    very relevant here, what the information flow is. I
4    mean, it's -- he's already testified about it, he's --
5    he has lent himself to this, this document, so I just
6    want to know how that information flow is processed and
7    how it goes as it, as it relates to the e-mail SMS
8    service.
9         MS. MANTELL: Okay.
10        MR. FRANCIS: Right? So I want to just figure
11   out each point of the, of the process. Right?

Page 86

7         Q. Okay. Let's use the plaintiff in this case,
8    Bill Dominguez, and let's pick 2011, okay. Or just pick
9    somebody who -- forget the plaintiff because that's
10   going to create other issues. Let's just take the
11   information flow for a normal person who had elected to
12   receive the e-mail SMS service. Okay?
13        A. Sure.
14        Q. That person receives an e-mail, right, in their
15   Yahoo Mail, correct?
16        A. Correct. Yes.
17        Q. Where is that, where was, where would that mail
18   have been stored?
19        MS. MANTELL: Objection. We're talking
20   hypothetically here? You're asking hypothetically?
21        MR. FRANCIS: I'm talking about how the process
22   works.
23        MS. MANTELL: Okay. I just want to make sure
24   we understand, everyone understands the parameters of

Page 88

**SUMMIT COURT REPORTING, INC.**
**215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com**

Dominguez, et al. v. Yahoo, Inc.                    AJAY GOPALKRISHNA, **10/18/13**



SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

**Dominguez, et al. v. Yahoo, Inc.**                    **AJAY GOPALKRISHNA, 10/18/13**



Page 93

Page 95

1   gateway is designed, that those are the internal or
2   design of the gateway.
3       Q. Okay. And the queue meaning the order in which
4   they'll go out, correct?
5       A. Yes.
6       Q. Okay. And what determines the order in which
7   they go out?
8           MS. MANTELL: Objection; vague.
9   BY MR. FRANCIS:
10      Q. You can answer.
11          MS. MANTELL: What are we talking about? Okay.
12          THE WITNESS: It, it's, it's based on the order
13  in which the messages have arrived.
14  BY MR. FRANCIS:
15      Q. Right. Kind of a first come, first served,
16  right?
17      A. Yeah.
18      Q. The sooner -- right?
19      A. Yep.
20      Q. Okay. So the -- correct me if I'm wrong, the
21  SMS subscription gateway is programmed with a queue to
22  send out the texts based upon the order in which they
23  come in, correct?
24          MS. MANTELL: Objection; vague and misstates

Page 94

Page 96

1   testimony.
2           THE WITNESS: So, so that's --
3   BY MR. FRANCIS:
4       Q. You can answer.
5       A. That's one way of doing it. It's also
6   sometimes if the, if the carrier is down or if there are
7   some issues, then the queuing system maintains it, and
8   then once the service is up, then it actually sends the
9   messages out. So it's got, it's got multiple purposes.
10  This is one purpose of that queue.
11      Q. Okay. So one purpose of the SMS gateway is to
12  determine whether or not to send out a message right now
13  or wait because of something like you just mentioned,
14  correct?
15      A. Yeah.
16      Q. Okay. And does it ever make a decision to hold
17  back on sending a text if, for example, there's a high
18  degree of volume?
19          MS. MANTELL: Objection; vague.
20  BY MR. FRANCIS:
21      Q. You can answer.
22      A. There are volume limits in the system, so which
23  I'm not necessarily aware of the specific limits per se.
24      Q. Right. So are you familiar with a term called

20      Q. All right. And then you mentioned something
21  happens on queue. What did you mean about, by queue?
22      A. So it's just a queuing system, so it just puts
23  it in the queue, and then the queue sends it out, sends
24  it out to the different carriers. So that's how the

**SUMMIT COURT REPORTING, INC.**
**215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com**

Dominguez, et al. v. Yahoo, Inc.                    AJAY GOPALKRISHNA, 10/18/13

Page 97

1    "traffic throttling"?
2        A. In multiple contexts, yes, but -- I am
3    familiar, but for in this particular case, I don't know
4    if it's, if it was using the traffic throttling, any
5    kind of traffic throttling.
6        Q. Okay. Is it your testimony that you're not
7    certain whether or not the SMS subscription gateway was
8    programmed to have a traffic throttling feature?
9        A. I don't know.
10       Q. But you're familiar with that, that feature in
11   general that some systems and infrastructures use,
12   correct?
13       A. The concept of it, yes.
14       Q. Okay. All right. But I think you said before,
15   though, that you do know that there were times where the
16   SMS gateway, subscription gateway would not send the
17   message out immediately, that it would wait, right?
18       MS. MANTELL: Objection; vague.
19       THE WITNESS: That was just a hypothetical
20   situation in the sense I was just explaining the need
21   for that queue, as one of the reasons why that queue
22   existed. Not necessarily anything else. My, my only
23   explanation for that was just as to understand, to
24   explain the purpose of what that queue was for.

Page 98

1    BY MR. FRANCIS:
2        Q. Okay. So the SMS subscription gateway was
3    programmed with a queue to forward the texts on in the
4    sequence in which they were delivered, unless one of
5    those other things occur, right, such as the system was
6    down and then it would hold them, correct?
7        A. Yeah.
8        MS. MANTELL: Objection; vague.
9    BY MR. FRANCIS:

Page 99

3        Q. Okay. All right. Before we move on to the
4    next page, I just have one or two questions, maybe just
5    one about the queue that you mentioned that occurs at
6    the SMS subscription gateway.
7        When you refer to a queue -- correct me if I'm
8    wrong -- you're referring to a, something preprogrammed
9    in, correct?
10       MS. MANTELL: Objection; vague.
11   BY MR. FRANCIS:
12       Q. A programmed rule, right, that tells the
13   computer what to do, right?
14       MS. MANTELL: Objection; vague.
15       THE WITNESS: That's a queue, I mean a queue --
16   there is, there are multiple types of programs. You can
17   program a queue as well. So that's what it does, yeah.
18   BY MR. FRANCIS:
19       Q. Right. So the queues you're referring to which
20   results in determining the sequence of the texts that
21   are being sent to the carriers, that is determined by
22   the computer, not a person, correct?
23       MS. MANTELL: Objection; vague.
24       THE WITNESS: It's designed --

Page 100

1    BY MR. FRANCIS:
2        Q. You can answer.
3        A. It's written by a person, it's a computer code.
4    And there are standard software for that.
5        Q. Okay. So the computer itself determines the
6    order in which the messages get sent to the carrier,
7    correct?
8        MS. MANTELL: Objection; misstates testimony.
9    Asked and answered.
10       MR. FRANCIS: You can answer.
11       THE WITNESS: Yeah. So it is, it, the queue --
12   the purpose of the queue as I said, it was to, to, if
13   there are any issues with the downstream systems, then
14   it holds it and then sends it once the downstream
15   systems are operational again. So, and that's, that's a
16   software design. That's how the software is designed.
17   BY MR. FRANCIS:
18       Q. If the -- okay. And just to follow up on that,
19   if, if there was a situation where a system was down and
20   the queue said hold these messages until the system came
21   back up, when the queue resumes sending the messages,
22   would it send those messages at that time?
23       A. Yes.
24       Q. Okay. If you'd turn to Yahoo 21, please.

25  (Pages 97 to 100)

Dominguez, et al. v. Yahoo, Inc.                    **AJAY GOPALKRISHNA, 10/18/13**



Page 101

1    A. Okay.

13   Q. Okay. Now, I asked you before about the
14   process of when the SMS subscription gateway queue sends
15   the messages out, and I think you mentioned -- correct
16   me if I'm wrong -- that sometimes the messages are sent
17   to an SMS aggregator, correct?
18       MS. MANTELL: Objection; vague.
19       THE WITNESS: It depends on the service. Some
20   services use an aggregator, some do not.
21   BY MR. FRANCIS:
22   Q. Okay. As far as the e-mail SMS service at
23   issue in this case that we've been talking about, did
24   the, did Yahoo use an SMS aggregator or did it send it

Page 102

1    directly to -- send a message directly to the carrier?
2    A. My understanding, the messages were sent
3    directly to the carrier. There was no aggregator used
4    for this particular service.
5    Q. I'm sorry. There was not or there was?
6    A. There was no aggregator used for the SMS
7    service, for e-mail SMS service.
8    Q. Okay. So the SMS message would go directly to
9    the carrier?
10   A. Yes.
11   Q. Okay.
12   A. For this particular --
13   Q. For --
14   A. For this particular service. Sorry. For this
15   particular service.
16   Q. I'm sorry. Would you say it again.
17   A. For this --
18   Q. For this particular, right?
19   A. Yes.
20   Q. Okay. So just to be clear, I'm not trying to,
21   you know, beat a dead horse but I'm having a tough time
22   with the delay.
23       You are saying or you're -- it's your testimony
24   that as far as the e-mail SMS service was concerned that

Page 103

1    we've been talking about for the last few hours, Yahoo
2    did not use an SMS aggregator, correct?
3    A. Correct.
4    Q. Gotcha. And as far as the messages that the
5    queue would send to a carrier, am I correct that Yahoo
6    used a short message code?
7        MS. MANTELL: Objection; vague. Are you
8    talking in connection with this service?
9        MR. FRANCIS: Yes.
10       THE WITNESS: Yes, it did use a short message
11   code. You have to use a short message code for sending
12   SMS, so....
13   BY MR. FRANCIS:
14   Q. And are you familiar with the short message
15   codes that Yahoo used in connection with the SMS --
16   e-mail SMS service?
17       MS. MANTELL: Objection; misstates testimony.
18       THE WITNESS: I am not, I don't know the, the
19   specific short message codes used.
20   BY MR. FRANCIS:
21   Q. Do you know any of them or you have no idea
22   whatsoever?
23   A. I don't have an idea which ones are used.
24   Q. Okay. All right. So I'm just going to ask the

Page 104

1    Court Reporter if you would, please, just mark as
2    Gopalkrishna No. 3 the last series of pages that -- in
3    the FedEx. They look like screen shots.
4        Debby, do you see them?
5        THE REPORTER: Yes. Two pages --
6        MR. FRANCIS: There are two screen shots --
7    there are two screen shots and a picture of a table.
8        THE REPORTER: Can we go off for a second,
9    because it's hard to do this and talk.
10       MR. FRANCIS: Sure.
11       THE VIDEOGRAPHER: Going off the record, the
12   time is 12:56 p.m.
13       (Off the record discussion.)
14       (WHEREUPON, PLAINTIFF'S EXHIBIT 3
15       WAS MARKED FOR IDENTIFICATION.)
16       THE VIDEOGRAPHER: We're on the record. The
17   time is 12:58 p.m.
18       MS. MANTELL: And the Court Reporter has asked
19   me to say that she has marked the exhibit as
20   Gopalkrishna 3.
21       MR. FRANCIS: Great. Okay. So that exhibit is
22   three pages, right? Two screen shots and a table,
23   correct?
24       THE WITNESS: Yes.

26  (Pages 101 to 104)

Dominguez, et al. v. Yahoo, Inc.                          AJAY GOPALKRISHNA, 10/18/13

Page 105

1      /
2      BY MR. FRANCIS:
3          Q.  Okay.  Mr. Gopalkrishna, you have Gopalkrishna
4      No. 3 in front of you, correct?
5          A.  Correct.
6          Q.  I will, I will represent to you that the first
7      two pages are screen shots of messages that
8      Mr. Dominguez, the plaintiff in this case took of
9      messages that were on his phone.  If you look in the
10     upper left-hand side of the first one, there's a number,
11     92,500.  Do you see that?
12         A.  Yes.
13         Q.  Do you know whether or not that was a short
14     code that Yahoo used in connection with e-mail SMS
15     messages back in 2012?
16         A.  I do not know.  There are -- Yahoo uses a lot
17     of SMS short codes for other services as well.  I mean,
18     I'm, I looked at these, they look familiar.  But I, I
19     can't, I don't know each one of them.  Or I don't know
20     specifically how many were allocated for this service or
21     what were --
22         Q.  Okay.
23         A.  -- what were the numbers allocated for the
24     service.

Page 106

1          Q.  Okay.  If you turn to the next page, same
2      question, there's a number there 92,466.  Do you see
3      that?
4          A.  Yes.
5          Q.  Do you know if that was a short code that Yahoo
6      used back in September of 2012?
7          A.  It might have.  I, I don't know.
8              MS. MANTELL:  Objection to the extent that this
9      screen shot does not show a full, what would you call
10     it, a full -- the full extent of the messages on the
11     screen.
12     BY MR. FRANCIS:
13         Q.  Okay.  And then turning your attention to the
14     third page of Gopalkrishna 3.  I will represent to you
15     that this is just an excerpt of an Excel document from
16     T-Mobile which outlines the SMS numbers of texts that
17     Mr. Dominguez had received.
18             Do you know whether or not the number of 2278
19     was a, a Yahoo short code?
20         A.  No, I do not know.
21             MR. FRANCIS:  Okay.  Wendy, let's go off the
22     record.
23             THE VIDEOGRAPHER:  We're off the record.  The
24     time is 1:01 p.m.

Page 107

1              (Off the record discussion.)
2              THE VIDEOGRAPHER:  We're on the record.  The
3      time is 1:07 p.m.
4      BY MR. FRANCIS:
5          Q.  Mr. Gopalkrishna, I just have a few questions
6      to follow up on some of the things I asked you about
7      before and which you responded to.
8              Earlier today I asked you questions about what
9      a consumer would have to do in order to have Yahoo cease
10     sending text messages from the e-mail SMS services, and
11     you outlined what they would have had to do.  Couple
12     followup questions on that.
13             First, was there any way for a user to stop the
14     e-mail SMS service from forwarding an e-mail to a phone
15     by text using the phone itself?
16         A.  So that particular functionality, and as I
17     understand it, never got implemented.
18         Q.  So was your answer -- is your answer no?
19             MS. MANTELL:  Objection; misstates testimony.
20             THE WITNESS:  So there, there wasn't a way with
21     the phone because that never, it was -- you could have,
22     you could have potentially done it if you went to the
23     mobile page on the phone and unsubscribed, but not
24     directly from an SMS message.

Page 108

1      BY MR. FRANCIS:
2          Q.  Okay.  So if texting stopped or ceased or
3      anything like that, that would not stop the messages,
4      correct?
5          A.  Yes.  Correct.  That was not implemented.
6          Q.  Okay.  How do you know that that was not
7      implemented?
8          A.  That is what I understood from when I was
9      talking to my engineers.
10         Q.  Okay.  Do you know whether or not it would have
11     been possible to implement that?
12             MS. MANTELL:  Objection; vague.
13             THE WITNESS:  It would have, could have been,
14     would have been possible to implement the stop through
15     the SMS, if that's what you're asking.
16     BY MR. FRANCIS:
17         Q.  Yes.  That could have been designed, from a
18     technical standpoint it was possible, correct?
19         A.  Yes.
20         Q.  But it just wasn't implemented, correct?
21         A.  Yes.
22         Q.  Gotcha.  And other than logging on to the
23     e-mail account at issue, was there any other way for a
24     consumer or a user to get the messages to stop?

27  (Pages 105 to 108)

Dominguez, et al. v. Yahoo, Inc.                          AJAY GOPALKRISHNA, 10/18/13

Page 109

1        MS. MANTELL: Objection; vague.
2        THE WITNESS: So instead of the e-mail account
3    they could also unsubscribe through that mobile page
4    where they could actually unsubscribe from that service,
5    so the two ways. One is you can change it in the filter
6    in, in Yahoo Mail, or you can unsubscribe from the
7    service itself on that mobile page that you had
8    subscribed before.
9    BY MR. FRANCIS:
10        Q. Right. But you -- was there any way for
11   somebody to do it who didn't have the access information
12   in order to access the account?
13        MS. MANTELL: Objection; asked and answered.
14        THE WITNESS: They would have to call customer
15   care.
16   BY MR. FRANCIS:
17        Q. Okay. Now, earlier I had asked you about the
18   process and the relay of information from the receipt of
19   the original e-mail to the stripping-down process and
20   the forwarding of the stripped-down 140-character
21   information to the SMS subscription gateway.
22        What caused the stripping-down process; was
23   that a, a protocol of some sort that was programmed or
24   how did -- was it protocol that determined that?

Page 110

1        MS. MANTELL: Objection; vague.
2        THE WITNESS: There's a limit to the, to how
3    much you can send in an SMS. So that is the limit that
4    it was programmed to do. You can't send more than X
5    number of characters in an SMS message.
6    /
7    BY MR. FRANCIS:
8        Q. No, I understand. But what if an e-mail was
9    very long, right? Something had to determine which
10   characters to include and which characters not to
11   include, right? It wouldn't just cut off, or would it
12   just cut off the -- it would go to 140 characters and
13   cut it off?
14        A. Yeah, so the from, from who the message came
15   from, and this part of the subject line -- the subject
16   line, and whatever, and remaining whatever could be
17   included as part of that 140 characters of the message
18   was included and it was cut off. The rest was cut off.
19        Q. Okay. And what, and what determined that? Was
20   that a preprogrammed protocol?
21        MS. MANTELL: Objection; vague.
22        THE WITNESS: There is -- so it was part of the
23   program that actually decided, okay, it cuts off at 140
24   characters, and that's the program that made that

Page 111

1    decision. So it could be that the subject itself was
2    filling up the 140 characters. In that case nothing of
3    the message would have been sent.
4    BY MR. FRANCIS:
5        Q. I understand.
6        A. So the limit was --
7        Q. Sir, thank you very much.
8        Go ahead.
9        A. Sure. Sorry. So the limit was 140. Beyond
10   that there was nothing, so that was the only
11   restriction.
12        MR. FRANCIS: I understand.
13        Sir, thank you very much. I have no further
14   questions.
15        THE WITNESS: Thank you.
16        THE VIDEOGRAPHER: Do you have anything?
17        MS. MANTELL: I have no questions. Do you want
18   to just put on the record a stipulation as to reading
19   and signing?
20        MR. FRANCIS: If you would like to reserve that
21   I'm fine with that. You can read and sign.
22        MS. MANTELL: Yeah, we absolutely would like to
23   review the transcript and we'll have the witness do that
24   and forward any changes to the Court Reporter, and

Page 112

1    that's it.
2        THE VIDEOGRAPHER: This marks the end --
3        MR. FRANCIS: That's fine. I'm just trying to
4    think. Do we have any pressing deadlines that would get
5    in the way of -- I have no problem with that in general,
6    right. I'm just trying to think if we have any
7    deadlines that's going -- just so it would hold up
8    our -- let's put it this way: I have no problem with
9    that at all. If that process takes forever and causes
10   us to not be able to get this transcript, would you
11   agree to a brief extension while we, you know, if we
12   need one?
13        MS. MANTELL: Well, we -- let's discuss off the
14   record. I don't think we're going to have that issue
15   with the time frames we have, but let's discuss off the
16   record and we can decide --
17        MR. FRANCIS: Okay.
18        MS. MANTELL: -- a fair way to do that.
19        MR. FRANCIS: Sure. Okay.
20        THE VIDEOGRAPHER: This marks the end of Tape
21   2, and we'll conclude today's deposition. All tapes
22   will be held by Summit Court Reporting.
23        We're off the record at 1:15 p.m.
24        (Thereupon the deposition was recessed at 1:15 p.m.)

28   (Pages 109 to 112)

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Dominguez, et al. v. Yahoo, Inc.                              AJAY GOPALKRISHNA, 10/18/13

### Page 113

1
2          I, DEBBY CLARY, a Certified Shorthand Reporter
3     of the State of California, duly authorized to
4     administer oaths do hereby certify:
5          That I am a disinterested person herein; that
6     the Witness, named in the foregoing deposition was by me
7     duly sworn or affirmed to testify the truth, the whole
8     truth, and nothing but the truth; that the deposition
9     was reported in shorthand by me, DEBBY CLARY, a
10    Certified Shorthand Reporter of the State of California,
11    and thereafter transcribed into typewriting.
12         That before completion of the deposition,
13    review of the transcript [X] was [ ] was not requested.
14    If requested, any changes made by the deponent (and
15    provided to the Reporter) during the period allowed are
16    appended hereto.
17
18
19              DEBBY CLARY, CSR 9705
                Registered Merit Reporter
20
21
22
23
24

### Page 114

1     INSTRUCTIONS TO WITNESS FOR READING & SIGNING
2          Read your deposition over carefully.  It
3     is your right to read your deposition and make
4     changes in form or substance.  You should assign a
5     reason in the appropriate column on the errata
6     sheet for any change made.
7          After making any changes in form or
8     substance which have been noted on the following
9     errata sheet along with the reason for any change,
10    sign your name on the errata sheet and date it.
11         Then sign your deposition at the end of
12    your testimony in the space provided.  You are
13    signing it subject to the changes you have made in
14    the errata sheet, which will be attached to the
15    deposition before filing.  You must sign it in
16    front of a witness.  Have the witness sign in the
17    space provided.  The witness need not be a notary
18    public.  Any competent adult may witness your
19    signature.
20         Return the original errata sheet to your
21    counsel promptly.  Court rules require filing
22    within 30 days after you receive the deposition.
23    Counsel is asked to send a copy of the errata
24    sheet to Summit Court Reporting for our records.

### Page 115

1          ERRATA SHEET
2     Attach to Deposition of: Ajay Gopalkrishna
      Taken on: October 18, 2013
3     In the matter of: Dominguez, et al. v. Yahoo, Inc.
4     PAGE LINE NO.  CHANGE REASON
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____

### Page 116

1          SIGNATURE PAGE
2
3
4          I hereby acknowledge that I
5     have read the aforegoing transcript, dated
6     October 18, 2013, and the same is a true and
7     correct transcription of the answers given by
8     me to the questions propounded, except for
9     the changes, if any, noted on the errata
10    sheet.
11
12
13    SIGNATURE: _____
              AJAY GOPALKRISHNA
14
15    DATE: _____
16
17    WITNESSED BY: _____
18
19
20
21
22
23
24

29  (Pages 113 to 116)

**AJAY GOPALKRISHNA**

1                    SIGNATURE PAGE

2

3

              I hereby acknowledge that I
4
      have read the aforegoing transcript, dated
5
      October 18, 2013, and the same is a true and
6
      correct transcription of the answers given by
7
      me to the questions propounded, except for
8
      the changes, if any, noted on the errata
9
      sheet.
10

11

12

13      SIGNATURE:      _____
                        AJAY GOPALKRISHNA
14

15      DATE:           11/15/2013
16

17      WITNESSED BY:   _____

18

19

20

21

22

23

24

Dominguez, et al. v. Yahoo, Inc.                              AJAY GOPALKRISHNA, 10/18/13

**A**

A-j-a-y 5:11
A-v-a-n-i-s-h 26:3
a.m 1:15 4:2 31:21
  31:24 74:5
ability 6:8 51:16
  53:2 58:17,22
  59:6,15 60:3
able 7:13 21:21
  39:3 46:1,8 47:3
  57:2 60:2 62:24
  63:11 66:16 75:2
  112:10
absolutely 6:23
  111:22
abuse 10:11
access 35:18,24
  57:1 59:17,18
  66:16 98:22
  109:11,12
accessed 45:22
  54:6 98:13
account 47:8 56:5
  56:19,20 57:21
  59:10 60:21,22
  62:11 63:1,3,12
  63:14 64:2 65:9
  108:23 109:2,12
accurate 32:24
  69:11
accurately 7:14
acknowledge 116:3
Act 14:5,21,24 15:7
  15:11
activate 50:24
actual 7:7 44:7 48:2
  51:23 70:24 78:13
add 55:16
addition 10:12
  34:11 91:1
additional 33:23
address 36:23
  56:11 57:1,3 70:2
addresses 51:17
administer 113:4
administration 9:20
adult 114:18
affiliation 4:13
affirmative 60:23
  61:5
affirmatively 64:4
  64:12
affirmed 113:7
aforegoing 116:4
agent 58:13
agent's 59:2

Aggarwal 19:24
  76:23 77:14,18
aggregator 85:20
  101:17,20,24
  102:3,6 103:2
ago 20:3 27:4,6
  29:13 30:6 49:8
  49:12,23 62:23
agree 69:14 71:8,11
  112:11
agreed 72:18
ahead 40:3,24
  58:11 71:11 87:16
  111:8
Ajay 1:12 3:4 4:3
  5:1,11 30:16 32:6
  74:8 115:2 116:13
al 4:4 115:3
alert 16:8,10 18:4,9
  18:21 19:10 20:10
  20:22 21:5,10,16
  21:23 22:3,9 23:7
  23:18 25:13 26:21
  27:7 28:1,13
  29:15 33:10 37:21
  51:6 52:14,22
  53:1,18,22 75:14
  78:1,6 81:12
alerts 51:18 52:9
  54:21 56:2
allegations 41:23
  46:14
alleged 44:24
allocated 105:20,23
allow 57:12
allowed 15:16
  113:15
Alto 1:14 4:9
and/or 5:22 22:8
  25:13 57:1
Angeles 2:10
answer 6:4,12,24
  10:24 13:10 14:7
  18:15 19:14 20:24
  23:22 26:15 28:4
  28:19 29:19 37:14
  45:3 50:17 51:9
  57:8,19 58:11
  64:18 65:3,20
  67:3,21 69:19
  70:9,23 72:1,14
  73:3,11 94:5
  95:10 96:4,21
  100:2,10 107:18
  107:18
answered 20:12

57:6,17 58:8,14
  58:19 62:23 64:15
  64:23 79:24 100:9
  109:13
answering 6:8
answers 7:8 116:6
anybody 14:16
  22:17 25:10,12
  26:4
anymore 54:7,13
apart 7:19
apologize 83:2
appearance 4:12
APPEARANCES
  2:1
appended 113:16
application 81:23
  85:13 88:3
application/front
  84:10
applications 85:11
  85:12
appropriate 114:5
approximate 11:19
approximately
  11:16
architecture 21:4
  21:10 83:15 85:10
  101:12
area 38:20
argumentative 58:9
Aric 2:13 4:9
arisen 18:3
arrive 60:12
arrived 95:13
arrow 93:13
asked 20:12 27:13
  45:21 57:6,17
  58:8,19 62:22
  64:15,23 78:7
  79:24 100:9
  101:13 104:18
  107:6,8 109:13,17
  114:23
asking 6:22 14:11
  14:14,18 16:4
  41:19 66:24 70:11
  70:13 86:20 87:1
  108:15
asks 94:14
assign 12:11 114:4
assigned 80:11
assist 13:20
assisting 13:8
associated 23:9
  60:21 62:11 63:13

64:3 68:1 93:21
association 67:9,10
assume 6:7 18:23
assumes 84:17
Attach 115:2
attached 114:14
attempts 65:15
attention 12:17
  60:14 68:7 78:17
  106:13
ATTORNEY 2:3,9
author 76:23
authorized 44:14
  56:1 57:15 58:5
  113:3
automated 10:19
  69:2,2,15 70:16
  70:19
automatically
  71:21 73:7
available 16:14,18
  42:20 48:12 55:19
Avanish 25:24
Avenue 1:14 4:8
aware 46:13,17,22
  46:24 52:16,17
  54:15 58:14 60:9
  67:13 76:10 96:23

**B**

b 3:10 62:4
bachelor's 9:18,23
back 6:20 57:12
  80:4 81:15 94:18
  96:17 100:21
  105:15 106:6
background 9:17
backup 98:14
base 65:23
based 6:20 12:20
  20:2 24:12 33:5
  33:15,22 38:3,4,9
  49:22 55:3,3,11
  58:13,24 60:3,18
  66:13 68:21,24
  72:17 73:15 88:10
  88:13,17 89:8,23
  90:23 91:9,18
  94:6 95:12,22
basic 5:19
basically 48:9
  81:21 89:9
basing 55:6
basis 14:18,19
  22:13 23:6,17
  78:14

Bates 77:6
beat 102:21
becoming 8:14,19
  9:5
began 17:15,20
beginning 74:7
begins 101:2
behalf 1:3 4:18,20
belonged 59:24
best 6:8 49:6 81:18
better 29:3 30:1
  39:20
beyond 46:19 58:20
  66:23,24 111:9
bigger 77:9
Bill 1:3 4:4 41:16,24
  42:8 45:23 86:8
bit 10:4,5 80:5
  87:20
board 20:4
body 52:24
Bombay 9:19,23
bottom 32:14
bought 57:13 58:3
  59:24
boy 62:4
break 73:20
Brennan 2:14 4:16
brief 112:11
Broad 2:4
broader 11:8
brought 12:16
bug 35:19,21,22,22
  38:3,7 41:4 43:19
bugs 33:14,21,22
  33:22 34:1,2,3,5,8
  34:14,17,23 35:11
  35:13 36:24 37:9
  37:20,23 38:1,5
  38:17,18,21 39:1
  39:5,9 40:10,17
  40:21 41:10,14
  43:23,24 44:4,6
  44:11,16,19 45:1
  45:10,13,15,16
Bugzilla 36:4,5,10
  36:22 37:8,17
  41:7,11 43:3
build 41:12
building 2:4 21:3
  76:9
builds 11:24
built 33:15
business 9:20 10:1
  13:14 35:3 60:20
buy 44:12

Page 117

Dominguez, et al. v. Yahoo, Inc.                                    AJAY GOPALKRISHNA, 10/18/13

bytes 34:1

**C**
cache 92:18 98:14
cached 98:18
caching 98:13
California 1:14 2:10
  4:9 11:13 113:3
  113:10
call 15:21 16:5,5,7
  34:8,13 41:9
  58:13,14 59:1,1
  69:13 77:6 85:11
  106:9 109:14
called 14:4 24:8
  28:14 36:4,19
  48:8 62:2,2 94:13
  96:24 101:11,11
calling 59:11 65:21
calls 59:21 66:20
  67:8 89:9
care 35:5,9,11 43:9
  43:12,20 56:13,15
  56:21,23 57:2,24
  58:13,17 59:2,18
  61:9,12,23,24
  62:24 63:6 65:13
  65:22 66:2,6,14
  66:16,19 67:5,7
  67:12,12,16,23
  68:2 109:15
carefully 114:2
carrier 82:3 85:15
  88:19 91:13 96:6
  100:6 102:1,3,9
  103:5
carriers 94:24
  99:21
case 1:6 7:20 14:17
  17:21 20:11 21:13
  23:14 29:22 35:1
  38:6,12,14,18
  40:11,19 41:16,22
  41:24 42:8 45:24
  46:14,24 57:24
  64:8 83:3 86:7
  97:3 98:14 101:23
  105:8 111:2
cases 13:10 58:24
caused 109:22
causes 112:9
cease 107:9
ceased 108:2
cell 48:15 62:20
Century 2:9
certain 38:4 97:7

Certified 1:16,20
  113:2,10
certify 113:4
chain 86:3
change 109:5 114:6
  114:9 115:4
changes 76:16,18
  111:24 113:14
  114:4,7,13 116:8
characters 88:15
  89:13 110:5,10,10
  110:12,17,24
  111:2
charge 52:4
chart 79:11,21 80:5
China 25:16 26:6
  27:21 28:7,22
  78:10
chip 80:12
chosen 92:23
circumstances
  43:18
claims 44:24
Clara 9:21 10:2
Clary 1:16 4:11
  113:2,9,19
clear 20:8 29:12
  57:22 65:7 89:18
  102:20
clearly 51:1
clerk 4:16
clients 98:12
closely 26:17
coasts 7:19
code 100:3 103:6
  103:11,11 105:14
  106:5,19
codes 103:15,19
  105:17
column 114:5
come 29:23 49:2
  60:7 95:15,23
comes 68:22 69:7
  72:22 88:10
coming 53:15 68:23
  92:23
commencing 1:15
comment 17:8
Commission 15:12
communicate 13:4
communicated
  61:16
communicating
  81:20
communication
  12:1 15:2 94:9

communications
  11:9,17 14:7 15:12
  15:12 23:23 38:24
  43:6 45:23 46:2,5
  46:9,10 66:21
  67:16
company 8:16,17
  11:23 12:4 13:8
  13:20 16:19 21:22
  22:2 25:3 36:12
  36:12 38:11 49:10
  52:5 77:21
company's 21:16
compare 82:8
competent 114:18
complaint 42:12
completion 113:12
compliance 13:8,19
  13:22 14:1,21
complying 13:20
component 93:19
components 11:2,4
  39:17,19 83:14
compound 37:2,6
  67:18
computer 34:18,19
  34:21 69:23,24
  70:5,11,16,19
  72:10 88:21 89:23
  99:13,22 100:3,5
computers 83:18
  83:22
concept 97:13
concerned 102:24
concerning 15:10
  46:2
conclude 6:12
  112:21
conclusion 60:7
conditions 52:21
conduct 68:19
conference 7:18
confines 13:14
connection 21:17
  21:19 25:3 39:2
  41:22 84:3 103:8
  103:15 105:14
consultant 9:12
consulted 25:2
Consulting 9:13
consumer 14:4,21
  14:24 15:6,11
  107:9 108:24
consumers 16:6
  50:22
contact 12:11 56:13

56:15 92:5
contacted 13:5
  67:12 68:2
contacting 46:10
contained 32:23
  33:3,9 34:13 53:4
  62:5 79:11,20
  93:16
contains 52:23
  62:10 71:2
context 46:23 84:21
contexts 97:2
continue 48:23
continued 46:16
conversations
  14:15 22:17 27:4
conversely 6:23
converts 88:16
convey 9:8
copied 94:11
copy 114:23
correct 13:24 14:1
  15:7,8,9,14 16:11
  16:20,24 17:16,18
  18:4,11,21 19:2
  20:3,6,11,23,24
  21:2,6,14,17 22:1
  24:9,11,13,15,22
  24:23,24 25:1,3,4
  25:7,20 26:8 27:5
  27:8,9,22 28:1,15
  29:13,15 30:4,6
  30:11 32:11 33:2
  33:6,7,8,12 34:14
  35:17,20 37:19,21
  44:2 48:21,24
  49:1 50:2,3,24,24
  51:21 52:6,7,10
  52:11,14 53:8
  54:7,8 59:8 62:17
  62:20 63:15,19,24
  64:5,6,9,14,22
  65:5,9,10 66:2,14
  66:17 68:4,15
  70:5,6,19 71:22
  72:5,11,24 73:4,8
  75:9,11 76:11,14
  76:18 78:2 79:3
  79:15,23 80:8,9
  80:14,16,18,22
  81:1,10 82:6,7,24
  83:1,3,4,18 85:18
  86:15,16 87:23
  90:2,3 91:23 92:7
  92:9 94:15,16,18
  94:19 95:4,20,23

96:14 97:12 98:6
  99:7,9,22 100:7
  101:15,17 103:2,3
  103:5 104:23
  105:4,5 108:4,5
  108:18,20 116:6
correction 6:16
correctly 9:8
counsel 2:13 4:12
  5:22 22:12 23:23
  25:5,10 38:24,24
  46:7,11 114:21,23
country 15:3
couple 27:16
  107:11
course 6:11 13:13
  60:20
court 1:1,20,20 4:5
  4:10,11,21 5:16
  7:1,7 30:15 74:11
  104:1,18 111:24
  112:22 114:21,24
cover 75:22
create 35:5 41:9
  43:4 86:10
created 43:20,24
  60:22 63:3,13
  76:22
creation 24:17,19
  63:1
creator 77:15
criteria 53:17 69:9
  88:11,13
CSR 113:19
current 8:2 10:5
  44:15
cust 35:4
customer 35:5,9,11
  43:9,12,20 44:12
  44:15 50:13 54:6
  54:12,18 56:13,15
  56:21,23,24 57:1
  57:13,23 58:13,17
  59:1,17,18 61:9
  61:11,22,24 62:15
  62:24 63:5 65:13
  65:22 66:1,5,14
  66:16,19 67:5,7,7
  67:12,12,16,22,24
  68:2 72:20 109:14
customers 12:19
  16:10 17:20 18:10
  51:7,23 52:1,9,13
  52:19 53:21 59:22
  62:19 81:12
cut 110:11,12,13,18

Dominguez, et al. v. Yahoo, Inc.                                      AJAY GOPALKRISHNA, 10/18/13

110:18
cuts 110:23

**D**

D 3:1 62:4
daily 14:18
data 25:13 36:9
37:8 52:18 78:22
79:6,6,8,14,18,20
79:21,22 84:13,16
86:4 88:2,8 92:4
93:16,20 94:7
database 35:24
36:3,5,10,20,23
37:9,18 61:21,22
61:23,24 62:1,6,8
62:12,14 67:6,7
67:11 92:3,6,15
92:21 93:1,10,13
93:16,22,24 94:14
94:18 101:10
databases 92:21
101:10
date 114:10 116:15
dated 116:4
day 26:16 70:18
89:20
days 49:8,12,23
114:22
dead 102:21
deadlines 112:4,7
Debby 1:16 4:11
104:4 113:2,9,19
decide 112:16
decided 54:12
110:23
decision 60:12
70:24 71:1 72:23
88:20,21,22 89:3
89:23 90:4 96:16
111:1
decisions 70:17
90:20
declaration 30:15
32:6 33:4 39:3
42:6 47:4,7 53:5
60:14,18 64:1
66:1 68:7,18
defect 35:2,5,6,19
36:19 41:4 43:2
43:10
defects 34:2,2,9,20
36:11,14,15 37:9
37:20,24 38:2,18
39:21,24 40:10,17
41:5,7,8,14 44:7

defendant 1:8 4:18
DEFENDANTS 2:7
defending 14:17
21:17
degree 9:23 10:2,18
96:18
delay 102:22
delete 54:10
deleted 54:23
delivered 12:21
90:21 98:4
delivering 10:13,15
delivery 10:17,20
11:4 12:5,9,16
25:24
Deloitte 9:13,14
demonstrates
75:13
department 11:6,8
11:17,23 59:8
65:14
depends 71:4 84:20
101:19
deponent 113:14
deposition 1:12 4:3
4:7 5:14,20 6:12
7:6,18,20 15:20
46:20 58:21 66:24
74:8 112:21,24
113:6,8,12 114:2
114:3,11,15,22
115:2
derive 62:24
derived 33:11
describe 9:16 81:18
83:6
describes 44:22
75:6
describing 45:2
82:12
design 21:3,10 76:9
95:2 100:16
designated 22:14
designed 40:9 69:6
72:8 95:1 99:24
100:16 108:17
detail 10:5 92:13
detailed 29:13
83:12,12 92:12,14
details 28:10,11,24
33:24
determination
70:10
determine 32:23
61:5 63:11 68:19
96:12 110:9

determined 60:21
69:23,24 70:4
99:21 109:24
110:19
determines 95:6
100:5
determining 99:20
device 53:1 84:24
88:19
diagram 81:19 82:6
82:8,8 83:11,13
83:14,17,18 84:2
84:6 85:23 92:12
diagrams 83:7
difference 81:7
different 53:9,11,13
80:6 87:14 90:14
94:24 101:9
direct 18:20
directly 35:10 102:1
102:1,3,8 107:24
discontinue 49:8
discontinued 20:6
49:12,22
discover 38:18 39:1
40:18 45:9 46:1,8
47:3
discuss 39:13
112:13,15
discussed 29:7
87:14
discussion 25:12
29:11 104:13
107:1
disinterested 113:5
District 1:1,2 4:5,6
document 23:13
24:13,17,20 30:6
32:10,13,18,20,22
33:13 34:18 42:18
55:8 74:11,20
75:3,6,8,12 76:5,9
76:22,23 77:5,16
77:20 78:4,8,14
82:16 87:5,13
101:12 106:15
documentation
19:23 23:9,12
24:6 29:1,24,24
30:2 33:13 42:17
43:1 66:20
documented 67:16
documents 23:24
55:7
dog 62:4
doing 10:20 96:5

domain 18:11
domestic 15:4
Dominguez 1:3 4:4
40:19 41:16,24
42:8 43:7 45:23
46:2,9,14 55:24
58:3 63:18 64:8
64:12,21 65:15
66:20 67:9,17
68:2 86:8 105:8
106:17 115:3
Dominguez's 36:22
59:23 63:13
downstream
100:13,14
draft 24:21
drafter 77:16
drawing 92:16
duly 5:1 113:3,7
duties 10:6 19:1

**E**

E 3:1,10 16:6
e-mail 12:18,19,24
15:22,24 16:1,6,8
16:10 17:4 18:4,8
18:21 19:10 20:10
20:21 21:5,10,16
21:23 22:3,8 23:7
23:18 25:13 26:21
27:4,7 28:1,12,13
29:15 33:10 36:23
37:21 47:8 49:22
50:23 51:16,17
52:14,22,24 53:15
53:22 54:20 56:11
56:24 57:3 60:24
61:6,19 63:5,8,9
63:18 64:4,9,13
64:22 65:16 68:22
68:23,24 69:7,21
69:22 70:1,2,18
71:2,3,4,5,16
72:10,21,22,24
73:16 75:14 78:1
78:6 80:20,21
81:3,3,12 82:10
82:12,16,24 83:3
84:4,21 86:2,2,12
86:14 87:7,15,21
87:22 88:10,13,21
89:13 90:5,14
92:24 98:20 99:1
101:22 102:7,24
103:16 105:14
107:10,14,14

108:23 109:2,19
110:8
e-mailed 61:17
e-mails 15:16 48:16
54:21 85:2 89:21
89:21
earlier 28:8 29:8,20
29:24 57:20 92:3
107:8 109:17
easier 77:12
East 2:9
Eastern 1:2 4:5
easy 47:5
edit 24:24
educate 29:5,5
education 14:4
educational 9:17
14:20
effect 80:12
efficiency 98:12
either 12:3,23 27:6
38:3 42:18 76:8
elaborate 50:18
elected 52:13 53:21
54:19 58:5 60:1
63:18 71:20 72:21
80:18 81:12 86:1
86:11 87:21 90:1
electronics 9:18,19
elects 72:9
eligible 51:5
else's 59:10
employed 7:24 8:7
8:15,15,17,18,20
9:3 10:9 19:21
employees 11:16
employment 16:24
18:1 20:9 21:8
EMS 15:23 63:14
enable 48:15
enabled 45:12 61:4
enables 25:14
ended 18:18
engineer 9:18
12:13 25:23 27:19
29:8
engineering 9:19
25:15,20 26:11
engineers 108:9
enter 48:15 50:22
51:16,16
entire 15:24 36:11
44:9 62:13 94:10
entity 88:7
errata 114:5,9,10
114:14,20,23

Dominguez, et al. v. Yahoo, Inc.

AJAY GOPALKRISHNA, 10/18/13

115:1 116:8
et 4:4 115:3
event 70:1,1 73:16
everybody 71:3
exact 11:20 28:24
44:8 50:5
EXAMINATION 5:4
examined 5:2
example 12:15
23:12 36:15 54:18
84:1 96:17
Excel 106:15
exception 56:21
57:22,23 58:24
excerpt 106:15
exclusive 82:24
exclusively 36:6
excuse 9:6 28:12
execute 42:6
exhibit 3:13,14,15
30:18 74:15
104:14,19,21
exist 67:17
existed 46:2 97:22
existence 28:9
29:21
existing 42:24
45:12
exists 57:12
expected 11:5
experience 41:15
42:7
experienced 41:16
expert 13:16
explain 51:1 87:1
97:24
explaining 97:20
98:18
explanation 83:12
97:23
extension 12:11
extent 10:21 14:6
24:2 38:19 39:4
40:20 42:2 43:13
44:21 80:19 82:11
85:23 89:15 90:8
106:8,10
external 12:10,10
extracts 88:15

**F**

fact 64:20
facts 84:17
fair 17:24 112:18
familiar 42:6 96:24
97:3,10 103:14

105:18
familiarize 74:19
familiarized 31:1
far 18:17 19:22
43:18 51:15 61:13
68:1 79:17 101:22
102:24 103:4
fashion 70:16
feature 47:9 97:8
97:10
federal 7:20 13:8,12
15:12
FedEx 31:14 104:3
figure 87:10
figured 13:18
filed 33:14,18 35:12
35:12 39:22 40:22
43:8,14
filing 114:15,21
filling 111:2
filter 15:22,24 49:22
52:21 53:2,3
55:20 56:6 68:24
69:9 71:1,5 85:3,5
89:5,5,7,8,9 90:23
92:24 109:5
filters 92:24
finally 7:17
find 37:9 39:24 40:4
41:5,14 42:23
43:11 44:4,9,11
45:9
fine 31:17 66:12
73:20,21 111:21
112:3
finished 6:22,24
68:10 74:23
firm 4:10,13,15,16
5:23 22:18 25:11
first 16:23 42:16
45:9 47:6 51:14
61:3 75:22 78:20
79:12 83:13,16
89:2,4,13 90:7,14
94:13 95:15,15
98:21,23 105:6,10
107:13
fix 13:4 34:10
Fleming 1:22
Floor 2:4
flow 27:15,24 28:12
29:14 30:10 51:15
55:4,7,10 75:13
78:6 81:20 82:9
82:12 83:8 84:3
85:24 86:11 87:3

87:6
flows 21:1 84:7
folks 35:10
follow 100:18 107:6
followed 59:7
following 114:8
follows 5:2 57:24
98:12
followup 107:12
font 75:18
foregoing 113:6
forever 112:9
forget 86:9
form 82:1 114:4,7
formed 78:14
forth 6:20 63:11
80:4
forward 70:18
72:24 88:21 90:1
98:3 111:24
forwarded 15:16
forwarding 45:12
69:22 70:15
107:14 109:20
found 43:23 44:6
frames 112:15
Francis 2:3,3,14 3:5
4:14,14,15 5:8
10:23 14:13 18:7
18:14 19:13 20:13
22:21,23 23:1,4
23:21 24:4,7 25:9
26:14 28:3,18
29:18 30:20 31:16
31:19 32:1 37:5
37:13 38:22 39:23
40:16,23 41:20
42:4 43:22 44:18
45:4 46:6,21
47:12,14 49:14,18
50:16 51:11 54:17
57:7,18 58:10
59:3 60:10 63:23
64:17 65:2,19
66:4,11 67:2,20
69:18 70:8,22
71:10,14 72:1,4
72:13 73:2,10,18
73:22 74:2,10,17
79:19 80:3,22,24
82:14,20 83:23
84:8 85:7 86:21
87:2,10,18 88:24
89:19 90:12 91:4
93:11 94:4 95:9
95:14 96:3,20

98:1,9 99:11,18
100:1,10,17
101:21 103:9,13
103:20 104:6,10
104:21 105:2
106:12,21 107:4
108:1,16 109:9,16
110:7 111:4,12,20
112:3,17,19
frequently 98:13
Friday 1:14
front 30:21 85:11
85:12 88:3 105:4
114:16
full 5:10 106:9,10
106:10
function 11:22
36:18
functionality
107:16
further 111:13

**G**

G-o-p-a-l-k-r-i-s-h...
5:12
gain 21:21 78:5
gateway 23:13 24:9
24:18 29:3 30:5
34:12 74:12 75:7
75:17 76:13 77:23
78:21 80:17 81:11
82:2 85:14,14,17
88:16 89:11 90:2
91:3,6,6,8,15,22
91:24 92:5 93:18
93:20,21 94:1,9
94:13,14,18 95:1
95:2,21 96:11
97:7,16,16 98:2
98:22 99:6 101:3
101:14 109:21
general 97:11 112:5
generated 69:3
generation 69:12
gentleman 26:10
getting 26:21 38:20
49:3 54:21 55:11
55:21 58:9 71:24
give 5:24 6:1,15 7:9
7:9 12:15 31:12
36:14 60:4 83:9
given 5:14,16 7:21
10:22 14:3,20
23:6 94:17 116:6
giving 5:19
go 31:20 34:17 35:6

35:14 40:3,24
42:12 47:4 48:3
48:15 58:11 69:1
69:10 71:11 73:19
80:4 86:4 87:15
90:6 91:17 95:4,7
102:8 104:8
106:21 110:12
111:8
goes 5:20 47:9
51:15 87:7 94:7
94:13
going 5:24 12:14
22:15 31:2 55:17
59:14 73:23 77:4
80:4 86:10 103:24
104:11 112:7,14
Good 4:1 6:3
Gopalkrishna 1:12
3:4 4:3 5:1,11,13
30:16,16,21 32:2
32:3,7 33:9 60:15
74:8,13,18,21
76:12 78:18 104:2
104:20 105:3,3
106:14 107:5
115:2 116:13
Gotcha 65:11 91:5
103:4 108:22
gotten 55:24
great 5:13 6:19 16:9
31:11 75:2 83:5
104:21
Greenberg 1:13 2:8
4:8,17 5:23 22:18
25:6,11,11
group 18:19
Groups 12:2
GSM 80:12
guess 21:1
guidance 14:3
guy 63:3

**H**

H 1:3 3:10 4:4
H-s-u 26:5
half 9:2,7,15
Hammonton 1:22
hand 30:16 74:14
handed 74:20
handle 59:20 90:17
happen 71:17 90:7
90:20
happened 40:18
42:8,13 47:18
happening 92:11

Page 120

Dominguez, et al. v. Yahoo, Inc.

AJAY GOPALKRISHNA, 10/18/13

happens 88:9 90:20
  94:21
happy 6:15
hard 104:9
heading 74:12
  75:16
headquarters 11:14
hear 33:19 53:12
heard 5:21
held 1:13 4:7 8:5,22
  112:22
help 50:20 59:22
helped 29:5
hereto 113:16
hierarchical 101:9
high 96:17
hold 8:11 54:5
  75:21 96:16 98:6
  100:20 112:7
holders 47:9 50:22
holds 100:14
horse 102:21
host 81:23
hosted 43:2 84:22
hosts 81:23,24
hours 103:1
housed 36:9,12
  62:6 84:13,16
  90:6
Hsu 26:5 27:1
HTTP 98:24
huge 90:17
human 70:5,17,24
hypothetical 97:19
hypothetically
  86:20,20

**I**

i.e 60:2
ID 68:1 91:9,18 94:7
idea 103:21,23
IDENTIFICATION
  30:19 74:16
  104:15
identified 33:22
  45:18 85:5 88:10
identifies 88:12
  89:8 91:9,16,19
identify 11:1 12:21
  13:2 32:5 75:2
identifying 10:10
  12:4,12 13:16
immediately 8:18
  97:17
impact 41:15
implement 108:11

108:14
implemented
  107:17 108:5,7,20
implementing
  19:16
important 6:21 7:4
  7:8 38:16
imported 93:24
  94:3,6
improves 98:12
in-box 12:21
in-house 2:13
inaccurate 6:13
inbox 87:23 88:2
  90:22
include 10:10 12:1
  18:2 83:2 110:10
  110:11
included 110:17,18
incoming 90:17
Incorporated 4:4
  4:10
incorrect 6:13
independent 20:21
indication 65:14
individual 72:23
individuals 19:8
  26:7 27:7,23
  28:14 30:3,11,12
  33:12 34:12 78:13
influence 7:11
information 14:20
  17:19 26:21 27:10
  27:15,24 28:12
  29:14 30:9,10
  32:23 33:3,4,5,9
  33:11 37:10 42:23
  43:6 44:23 45:22
  52:12,23 51:6
  53:4,6,14 54:10
  54:23 55:12 60:4
  60:19 61:8,10,15
  61:16,20 62:1,5,7
  62:15,24 63:5,10
  63:17,21 64:7,10
  64:21 65:7 66:1
  66:14 67:24 75:13
  78:6,23 79:11,12
  80:6,7,8 81:20
  82:9 83:8 84:3
  85:14,24 86:3,11
  87:3,6 90:6 98:13
  98:18 109:11,18
  109:21
infrastructure 11:2
  11:3 77:23 78:7

78:21 80:17 81:8
  82:18
infrastructures
  97:11
initial 90:5
initially 54:19
initiated 54:1 55:1
  55:22 68:23 70:1
input 37:8
inputting 50:13
insect 34:5
instructed 89:24
instructions 5:20
  5:24 114:1
intended 52:1
  70:12 71:7 88:17
interaction 41:2
  67:13
interested 86:5
interface 40:7,8
internal 36:7 95:1
international 15:4
Internet 49:10
intervention 70:17
investigate 14:14
  13:2 20:16 21:13
investigated 29:22
investigation 41:22
  68:19
involve 12:3 13:7
involved 11:4 14:7
  14:16 15:1 17:4,6
  17:16 19:15 25:18
  27:16 47:23 72:16
  72:16 76:8,19
  83:15
involvement 10:19
  12:7 18:21 21:3
  21:15 24:16,19
involves 59:9
issue 12:23,24 13:1
  13:3 20:11,16,17
  29:22 30:13 35:1
  35:4 38:16 59:11
  82:10 83:3 101:23
  108:23 112:14
issued 49:10
issues 12:9 59:14
  86:10 96:7 100:13
item 13:11 43:4
items 10:11 41:10
  41:10 44:8

**J**

J-a-m-e-s 26:5
James 2:3 26:5

Jersey 1:22
jfrancis@consu...
  2:6
Jim 4:14 31:14
job 12:3 13:7 14:18
  20:23
joined 16:15 17:4
  18:18
joining 8:21 17:6
judge 7:19
judgment 32:8
  58:13
June 32:18 47:8,18
  48:13,18,23,23
  50:1,7 53:8 61:1
  68:18
jury 7:19

**K**

keep 33:21
kept 94:8
Kerhoulas 2:15 4:9
key 38:9
keyword 38:6
keywords 38:4
kind 5:17 7:15
  33:23 63:21 95:15
  97:5
kinds 36:11
knew 28:5,7,7,8,20
  38:3 56:24
know 5:23 6:4,15
  7:4 11:19 17:15
  18:24 19:8,19,20
  22:2,4,4,6,7,10,11
  22:13,20 27:24
  28:7,9,11,22
  29:20 31:2 38:23
  42:8 43:15,16,18
  43:24 44:18 45:5
  45:5,6,6,7,17,20
  50:1,6,8,10,11,19
  51:6,9,12 52:3,3
  53:20 55:2,8,8
  56:10,10,22 57:3
  57:11,11 58:1,16
  58:16,23 59:6,15
  60:7 63:3 65:8
  67:4,15,17 68:3,3
  68:4 72:3 74:23
  76:4,7,21 77:19
  77:20 78:11,12
  84:14,15 85:22
  86:3 87:6 97:3,9
  97:15 98:17
  102:21 103:18,21

105:13,16,19,19
  106:5,7,18,20
  108:6,10 112:11
knowledge 21:21
  22:14 24:3 33:1,2
  33:15 42:17 49:7
  55:6 64:20 67:1
  76:18,20 78:5,15
  79:2

**L**

lack 29:3
Land 2:4
language 42:3
  98:22
Lauren 2:14 4:16
law 1:13 2:3,9 4:15
  4:16 13:13,15,16
  13:17 14:4 15:6,7
  15:10
laws 13:9,21
lawsuit 14:12,16
  20:18,20,21 21:17
  21:21 24:11 38:21
  39:6,10 40:21
  43:14,17 44:1,1
  44:17,18,22,24
  45:2,7,19 46:5
lawyer 25:6
lawyers 5:22 77:6
lead 87:20
learn 21:20 27:11
  38:17 40:10 41:23
  42:7,11,14
learned 14:8 17:21
  33:4,5 66:1,5,14
left 19:4,18 72:3
left-hand 105:10
lent 87:5
let's 45:9 47:3
  66:10 70:17 77:9
  83:16 84:9 86:7,8
  86:10 87:12,16
  106:21 112:8,13
  112:15
level 92:13
life 16:17 42:21
  47:21 48:5
likewise 15:9 21:7
  72:20
limit 89:11 110:2,3
  111:6,9
limits 96:22,23
line 110:15,16
  115:4
listed 58:20

**Dominguez, et al. v. Yahoo, Inc.**                                          AJAY GOPALKRISHNA, 10/18/13

| | | | | |
|---|---|---|---|---|
| **little** 6:20 10:4,5 30:1 37:7 80:5 83:11 87:20 | **maintaining** 50:7 **maintains** 11:24 92:22 96:7 | **March** 60:23 61:15 63:3,14 **mark** 30:15 74:13 | 108:3,24 **messaging** 44:14 **Messenger** 10:12 | **MySQL** 93:13 |
| **local** 92:20,20 **locally** 98:13 | **majority** 19:17 **making** 19:10 70:17 | 104:1 **marked** 3:11 30:19 | 12:2 **method** 56:2,16 | **N** |
| **logging** 108:22 **long** 8:5,11,24 9:14 | 114:7 **manage** 41:8 | 74:16,20 104:15 104:19 | 57:11,16 58:2 **minutes** 31:17 72:2 | **N** 3:1 **name** 4:9 5:10 19:24 20:1 25:24 |
| 53:20 110:9 **longer** 55:18 | **managed** 41:11 **management** 18:11 | **marketers** 12:18 **marks** 73:24 74:7 | **Mishra** 26:1 **misstates** 18:12 | 32:14 36:3,22 37:17 48:6,7,10 |
| **look** 31:1 32:13 35:3,6 36:21 37:4 | 43:3 **manager** 8:4,10,12 | 112:2,20 **Martell** 5:22 14:16 | 28:2,16 29:16 37:12 65:17 66:3 | 57:4 61:22 114:10 **named** 113:6 |
| 38:5,13 42:12,24 43:2 47:6,6 52:20 | 8:14,19,23 9:6,6 9:10 10:7,9,13 | 22:12,17 **master's** 9:20 | 66:8 67:18 70:20 72:12 94:2 95:24 | **names** 19:8,20 **naturally** 21:1 |
| 74:19 75:22 80:5 82:5 83:16 87:2 | 20:5 25:17 27:20 **managing** 18:2 | **matches** 53:17 **material** 17:11 | 100:8 103:17 107:19 | **necessarily** 45:8 83:21 87:15 96:23 |
| 98:10 104:3 105:9 105:18 | **Mantell** 2:9 4:17,17 10:21 14:6,11 | **materials** 23:5,17 **matter** 4:3 115:3 | **mitigate** 12:24 13:5 **mitigating** 10:11 | 97:22 **necessary** 88:7 |
| **looked** 33:23 34:12 34:24 35:1 37:1 | 18:5,12 19:12 20:12 22:19,19,22 | **MDBM** 92:18,21 93:1 101:7 | **Mm-hmm** 64:6 **mobile** 44:12 48:9,9 | **need** 10:11 14:9 64:16 97:20 |
| 37:19,20 38:9,15 39:2 43:9,19,21 | 22:24 23:3,20 24:2 25:5,8,9 | **MDM** 93:1 **mean** 10:18 13:19 | 48:11,11,14 50:4 50:14,21 51:23 | 112:12 114:17 **never** 18:16,20 |
| 49:6 61:10,21 105:18 | 26:12 28:2,16 29:16 31:14,18 | 19:22 20:18 23:12 24:17 32:9 35:1 | 52:13,17 53:1,7 53:21 54:4,5 56:7 | 24:13 54:20,20,21 63:17 64:11 |
| **looking** 21:16 24:5 31:6,9 32:9 38:20 | 37:2,12 38:19 39:4,9,12 40:13 | 42:13 43:16 46:23 53:11 58:22 65:16 | 60:22 63:13 64:3 78:23 80:14,17 | 107:17,21 **new** 1:22 47:22 |
| 39:21 41:13 76:12 87:16 | 40:20 41:17 42:2 43:13 44:17,21 | 65:21 69:6 87:2,4 89:17 94:21 99:15 | 81:11,23 82:1,3 84:10,22,23 85:11 | 48:24 **normal** 13:13 35:3 |
| **looks** 53:16 67:23 91:9,10,18 94:7 | 46:4,18 47:11,13 49:13,16 50:15 | 101:6 105:17 **meaning** 95:3 | 87:14 88:3,19 91:16,22,23 92:1 | 35:4 86:11 **notary** 114:17 |
| **lookups** 72:16 **Los** 2:10 | 51:8 54:14 57:6 57:17 58:8,19 | **means** 17:12 98:17 **meant** 31:9 | 92:1 93:6,8,9 94:15,17 107:23 | **noted** 114:8 116:8 **number** 3:11 11:20 |
| **lot** 19:3 38:10 59:17 59:18 62:7 72:15 | 60:5 63:20 64:15 64:23 65:17 66:3 | **mechanism** 49:21 53:23 55:5 | 109:3,7 **mocks** 42:19 | 22:10 36:23 38:3 38:7,7 44:8,13,13 |
| 80:6 105:16 **lower** 77:6 | 66:8,23 67:18 69:16 70:7,20 | **medication** 7:12,15 **mention** 36:14 | **mockup** 55:9 **mockups** 23:8 | 45:11 47:20 48:3 50:14 51:2,5,13 |
| | 71:9,13,23 72:2 72:12 73:1,9,21 | **mentioned** 2:22 25:19 54:4 57:20 | 33:14 **moment** 74:19 83:9 | 51:14 53:16 54:2 55:24 56:10 57:13 |
| **M** | 74:3 79:16,24 80:19 82:11,15 | 94:20 96:13 99:5 101:15 | **moments** 20:3 31:12 62:22 | 58:4 59:24 60:3,8 63:13 64:3 69:3 |
| **M** 2:9 **M-i-s-h-r-a** 26:3 | 83:19 84:5,17 86:19,23 87:9,12 | **Merit** 1:17 113:19 **message** 16:1,2 | **month** 27:3,6,24 29:12 30:6 | 69:12 80:11,13,14 82:1,3 85:11 |
| **mail** 8:4 10:12,13 10:14,15 12:2,5,9 | 88:23 89:15 90:8 90:15 93:7 94:2 | 53:18,18 70:15 88:16 89:10 91:2 | **monthly** 14:19 **morning** 4:1 | 87:17 90:17 91:10 91:11,13,16,19 |
| 12:16 29:9 48:12 50:22 53:2,3 | 95:8,11,24 96:19 97:18 98:8 99:10 | 91:2,5,7,8,20 92:24 94:12 96:12 | **motion** 32:7 **move** 64:23 66:10 | 92:8 94:15,17 105:10 106:2,18 |
| 55:19 56:6 59:19 85:4,13 86:15,17 | 99:14,23 100:8 101:18 103:7,17 | 97:17 102:1,8 103:6,10,11,14,19 | 99:3 **moved** 19:4 | 110:5 **numbers** 48:15 |
| 88:8,14 89:7 90:17,18,21 92:21 | 104:18 106:8 107:19 108:12 | 107:24 110:5,14 110:17 111:3 | **MSISDN** 80:7,10,11 **mult** 27:16 | 51:23 52:2,8,13 52:17,17 53:21 |
| 109:6 **mailbox** 91:1 | 109:1,13 110:1,21 111:17,22 112:13 | **messages** 15:17 44:16 48:24 49:3 | **multi-purpose** 85:9 **multiple** 19:15 28:5 | 54:4,5 62:20 69:13 77:5,6,9 |
| **Mailman** 2:3,14 4:15 | 112:18 **mantellw@gtlaw....** | 66:22 95:13 96:9 100:6,20,21,22 | 37:3 44:6 59:12 81:9 84:18,19 | 80:17 81:11 91:22 91:23 92:1,1 93:4 |
| **maintained** 21:22 22:8 36:6 42:22 | 2:11 **manual** 29:3 76:16 | 101:15,16 102:2 103:4 105:7,9,15 | 90:16,19 96:9 97:2 98:20 99:16 | 93:6,8,9,23 105:23 106:16 |
| 48:1,4 52:5 60:20 62:1 93:17 | **map** 10:10 | 106:10 107:10 | 101:8 | |

Dominguez, et al. v. Yahoo, Inc.                    AJAY GOPALKRISHNA, 10/18/13

**O**

oaths 113:4
objection 10:21
  14:6 18:5,12
  19:12 20:12 23:20
  24:2 26:12 28:2
  28:16 29:16 37:2
  37:12 38:19 41:17
  42:2 44:21 46:18
  49:13,16 50:15
  51:8 54:14 57:6
  57:17 58:8,19
  60:5 63:20 64:15
  65:17 66:3,8,23
  67:18 69:16 70:7
  70:20 71:23 72:12
  73:1,9 79:16,24
  80:19 82:11 83:19
  84:5,17 86:19
  88:23 89:15 90:8
  90:15,15 93:7
  94:2 95:8,24
  96:19 97:18 98:8
  99:10,14,23 100:8
  101:18 103:7,17
  106:8 107:19
  108:12 109:1,13
  110:1,21
obtain 63:1
obviously 10:18
occur 84:3 86:1
  89:1,3,3,13,14
  98:5
occurs 70:15 91:15
  99:5
October 1:15 4:2
  115:2 116:5
offered 15:15 16:6
  16:9,23 17:20
  18:10 28:6,7 47:8
  47:9 78:23 89:23
offers 38:11
office 4:7 11:12
  35:15,16
Offices 1:13
official 7:6
oh 22:21 31:11
  33:21 34:3 88:12
  92:4
okay 5:16,19 6:1,2
  6:11,17,18 7:4,11
  7:17,24 8:2,11,14
  8:18,21,24 9:5,11
  9:22 10:4 11:6,22
  12:7,15 13:7
  14:10,23 15:5,9

15:14 16:9,9,22
  17:2,24 18:23
  19:6,8 20:2,8,20
  21:1,7,19 22:1,7
  22:18,22 23:11,16
  24:4,15 25:19
  26:4,7,10,20,24
  27:5,10,22 29:2
  29:12 30:8,14
  31:4,11,18 32:2
  32:22 33:2,8 34:3
  34:7,11,22 35:8
  35:13,17,24 36:5
  36:9,14,21 37:6
  37:23 38:5,13,17
  38:23 39:11,14,24
  40:10 41:5,14,21
  42:4,4,11 43:5,11
  43:23 44:4,11,21
  45:17,17,21 46:13
  47:2,5,5,6,18,23
  48:6,13,18,21
  49:2,24 50:6,9,11
  52:12,16 54:3,9
  54:18 55:2,13,15
  56:15 57:11 58:1
  58:16 59:4,23
  60:11,13,18 61:3
  61:11 62:5,22
  63:10,17 64:7,11
  65:7,11 66:16
  67:15 68:4,6,7,12
  68:17 69:14 71:20
  72:4,20 73:7,18
  74:2,10,18,24
  75:2,8,11,16,20
  75:24 76:4,16,21
  76:21 77:1,10,11
  77:13,20 78:1,4
  78:17,17,20 79:10
  80:4,14 81:15,17
  82:5 83:5,16 84:2
  84:9,13 85:8,16
  85:22 86:5,6,7,8
  86:12,23 87:9,20
  87:22 88:1,20
  89:12,20 91:5,14
  92:4,4,10,15
  93:12,23 95:3,6
  95:11,20 96:11,16
  97:6,14 98:2,10
  98:10 99:3 100:5
  100:18,24 101:1
  101:13,22 102:8
  102:11,20 103:24
  104:21 105:3,22

106:1,13,21 108:2
  108:6,10 109:17
  110:19,23 112:17
  112:19
once 71:16,20 72:9
  72:20 84:24 89:5
  89:7 96:8 100:14
ones 40:3,3 53:10
  61:9 103:23
operate 21:23 22:3
  22:8 52:5
operated 36:6,7
operation 25:13
  35:3
operational 100:15
opportunity 6:16
  32:3
option 55:18
options 56:6,8
Oral 1:12
order 35:13 36:24
  42:5 50:23 95:3,6
  95:12,22 100:6
  107:9 109:12
ordinary 60:20
organization 11:10
  11:17 19:18
organizations
  12:10,11
original 109:19
  114:20
outlined 45:11
  46:19 107:11
outlines 77:22
  106:16
outside 14:11 15:3
overseeing 18:2
  19:9 20:10
overview 83:13
owned 57:14
owner 45:12,13
  56:1 57:4 58:4
  65:8
owner's 44:15
owns 57:21

**P**

P.C 2:3
p.m 74:9 104:12,17
  106:24 107:3
  112:23,24
page 3:3 15:19
  32:13 47:7 52:20
  53:5,6 56:6 75:17
  75:21,23 76:24
  77:1,5 79:21

81:24 84:22,23
  85:13,16 99:4
  106:1,14 107:23
  109:3,7 115:4
  116:1
pages 43:1 88:2
  104:2,5,22 105:7
Palo 1:14 4:9
paper 34:18
paragraph 47:7
  53:5 60:14 63:12
  66:9,10,10,12
  68:7,20 79:13
  98:11 101:2
Paragraphs 65:23
  65:24
parameters 86:24
Park 2:9
part 11:7,9 12:3
  13:7 14:18 16:1,1
  17:4,6,7 20:22
  24:21,24 25:17,17
  25:18,24 27:18,18
  27:19 28:6 29:10
  41:21 54:7,13
  66:13 68:3 83:17
  84:10,13,15 88:14
  91:14 110:15,17
  110:22
particular 12:12
  13:12,16 16:17
  18:19 20:16,17
  21:13 22:5 28:9
  28:24 29:22 30:13
  35:1 37:15 38:3
  38:12,14 39:18,22
  41:11 42:18 43:9
  47:20 51:3 52:23
  53:16 55:18,20
  69:9 70:2,18
  73:16 82:1,3
  88:12 91:9,12
  92:22 93:21 97:3
  102:4,12,14,15,18
  107:16
parts 28:21 41:4
party 85:17
patch 12:22
penalty 7:22
Pennsylvania 1:2
  1:21 2:5 4:6
people 11:21 12:11
  13:19 16:10 19:4
  19:15 33:5 35:8
  48:14,22,24 49:3
  51:17 80:18 89:20

period 9:7 15:15
  16:11,13 18:10
  54:10 89:22
  113:15
perjury 7:22
person 13:22 14:1
  19:7,19 25:16
  48:3 51:3 52:22
  53:16 56:9,18,20
  57:14,21 59:10
  70:6 71:2 72:9,23
  78:9 86:11,14
  87:20 91:10,19
  92:22,23 99:22
  100:3 113:5
personal 67:1
pertained 21:9 38:6
  40:18 43:12 45:10
  50:13 52:18 75:13
pertaining 43:6
  45:23 62:8
pertains 33:10 82:9
phased 20:5
Philadelphia 1:21
  2:5
phone 27:3 44:13
  47:20 48:3,15
  50:14 51:2,5,13
  51:14 52:2,17
  54:4,5 55:24
  59:24 62:10,20
  63:3 64:3 70:4
  80:12,13 88:17,22
  91:10,11,13,19
  93:4 105:9 107:14
  107:15,21,23
phones 15:17 48:16
physical 11:12
  78:13
physically 59:6
pick 86:8,8
picture 104:7
pictures 88:1
piece 80:7
Pike 1:22
place 42:16 53:15
  90:4,5,5 92:2
  93:10
places 90:19
plaintiff 1:5 2:2
  4:15 40:19 41:15
  41:23 42:7 45:24
  64:8 86:7,9 105:8
plaintiff's 10:18
  36:22 60:22 64:3
  74:15 104:14

Dominguez, et al. v. Yahoo, Inc.                                       AJAY GOPALKRISHNA, 10/18/13

platform 81:2,7
  82:18 84:19
please 4:12,22 5:7
  5:9 6:4 9:16 26:2
  26:2 30:15 32:5
  74:14,23 81:16
  83:9 100:24 104:1
point 8:9 20:8 30:14
  32:10 49:2 55:16
  56:23 59:2 61:1
  72:22 87:11
pointing 73:19
points 93:13
policies 59:7
policy 54:9
portion 90:21
position 8:3,5,9,10
  8:11,22,23 9:5,9
  10:6
possible 108:11,14
  108:18
potentially 44:23
  107:22
practices 12:20
precise 23:16 37:7
  87:12,17
predated 16:23
  17:5
preferences 62:9,9
preparation 25:3
preprogrammed
  99:8 110:20
present 2:13
pressing 112:4
presumably 7:5
previous 24:12
  44:15 45:11 56:1
  56:10,11 57:4
  61:5 63:12 64:2
  65:8
previously 6:13
  57:13 58:4 60:1
  78:7 89:24
print 61:18
prior 8:7,10,14,19
  8:21 9:3,5,12
  16:15,18 17:12
  20:20 24:11 27:6
  27:23 28:13 29:12
  30:6 32:20,22
  39:5,21,21 44:1
  45:18 47:1,8
  48:13,22 50:7
  61:1 76:17
prioritize 11:2
privacy 59:9,11

privileged 14:7
  38:20 44:23 45:8
  46:4
probably 5:21
  13:19 47:4 65:24
problem 6:19 12:12
  12:15 41:6 45:18
  112:5,8
problems 12:4 18:3
  21:9
proceed 5:7
process 5:20 10:17
  10:20 54:22 56:22
  57:21,22 58:15,23
  69:14,20 70:14
  77:22,24 81:22
  84:14,15 85:1
  86:21 87:11 89:1
  89:2,12 91:15
  101:14 109:18,19
  109:22 112:9
processed 86:4
  87:6
produced 23:13
product 8:4 9:6
  10:7,9,13 20:4,21
  20:22 25:16 27:20
  36:17 37:24 38:2
  41:9 43:4 59:19
  87:15
products 12:1
  16:11 36:12 78:23
program 72:6 99:17
  110:23,24
programmed 95:21
  97:8 98:3 99:12
  109:23 110:4
programs 99:16
project 8:10,12,14
  8:19,23 9:6,10
  20:4
promptly 114:21
properly 19:11
propounded 116:7
Protection 14:5,21
  14:24 15:6,11
protocol 109:23,24
  110:20
protocols 59:7
provide 12:22 21:4
  23:17 57:1
provided 16:20
  17:11 28:21 35:23
  52:2 61:10 113:15
  114:12,17
provides 81:8

providing 98:14
proxy 98:24 99:2
public 114:18
publications 29:4
published 15:12
pull 38:1
pulled 38:4
purpose 77:21
  96:10,11 97:24
  98:20 100:12
purposes 96:9
purview 18:16
  27:18,20
put 37:10 61:19
  111:18 112:8
puts 94:22

_____ Q _____

queries 94:14
question 6:3,5,7,22
  6:24 15:5 40:14
  47:2 64:16 89:2
  106:2
questions 22:15
  31:3 57:9 85:24
  87:13,17 99:4
  107:5,8,12 111:14
  111:17 116:7
queue 91:12 94:21
  94:21,23,23 95:3
  95:21 96:10 97:21
  97:21,24 98:3
  99:5,7,15,15,17
  100:11,12,20,21
  101:14 103:5
queues 99:19
queuing 94:22 96:7
quick 31:15
quite 40:5

_____ R _____

raised 35:2,4
random 69:2,12
read 14:23 15:7,10
  15:13 32:20 68:9
  111:21 114:2,3
  116:4
reading 111:18
  114:1
reads 60:18 98:11
ready 31:5 75:1
really 18:20 29:13
reason 7:12 12:22
  13:3 114:5,9
  115:4
reasons 46:18

97:21
receipt 109:18
receive 9:22 10:1
  52:9,14 53:22
  58:5 63:18 71:20
  72:10,21 80:18
  81:12 86:1,12
  87:21,22 90:1
  114:22
received 14:2,19
  63:10 89:14
  106:17
receives 86:2,14
  87:22
receiving 85:2,4
Recess 31:22 74:6
recessed 112:24
recipient 53:19
  70:12 71:7 88:13
recollect 48:8,10
  50:4 63:9
record 4:2,13 5:10
  6:16 31:20,23
  34:13 54:9 61:18
  64:11 66:17 67:5
  67:6,6,22,23 74:4
  74:9,12 104:11,13
  104:16 106:22,23
  107:1,2 111:18
  112:14,16,23
recorded 7:7 34:9
  34:20 36:19 38:21
  39:5,10 40:21
records 39:21 43:5
  45:22 46:1 59:18
  59:18 60:19 61:4
  61:7,11 65:11,13
  66:19 67:16 94:10
  114:24
recycled 44:13
  45:11
refer 77:4 85:19,21
  88:2 92:19 99:7
reference 76:1
  79:14 85:17 88:6
  92:18 98:11 101:3
  101:7
referenced 61:4
  77:15 80:6 92:15
references 47:7
  78:20 79:5
referred 29:8 79:12
  79:22
referring 55:9 61:7
  79:7 99:8,19
refers 87:14

reflect 84:2
reflects 81:19 83:18
regarding 12:5 14:4
  14:20 17:19 18:3
  21:21 25:12 29:4
  63:1 81:20
register 47:19,22
  48:3 51:2,14
  84:23
registered 1:17
  88:18 113:19
registering 51:5
registration 85:1
regulations 13:9
  15:10
relate 83:7
related 40:6,7,11
  43:16 44:6,11,16
  44:19,24 45:6,14
  45:15,16
relates 87:7
relating 12:16 45:1
relay 109:18
release 49:8,11
released 49:7
relevant 87:3
remain 54:12
remaining 110:16
remember 44:5
  63:8
removed 55:20
  56:6
repeat 39:7 40:13
  78:12
repeatedly 46:15
rephrase 6:5 17:3
report 35:22,23
reported 35:21
  113:9
Reporter 1:16,17
  4:11,21 7:1,7
  30:15 74:11 104:1
  104:5,8,18 111:24
  113:2,10,15,19
Reporters 1:20
Reporting 1:20
  4:10 112:22
  114:24
represent 83:21
  105:6 106:14
request 60:24 61:6
  64:13 71:16
requested 64:4,9
  113:13,14
require 15:2 69:8
  114:21

Dominguez, et al. v. Yahoo, Inc.

AJAY GOPALKRISHNA, 10/18/13

required 11:2,3
  93:19
reserve 111:20
resolved 13:1
respond 6:22
responded 107:7
responding 12:4
  18:3 21:9
response 44:1
responsibilities
  10:7,10 19:1
responsibility 18:2
  19:9 20:10 21:8
responsible 12:13
  50:6
rest 72:11 110:18
restriction 111:11
result 38:21 39:6,10
  40:21 43:14,17
results 99:20
resumes 100:21
retention 54:9
retrieve 78:22
Return 114:20
review 29:4 32:3
  34:23 35:13 43:5
  111:23 113:13
reviewed 22:16
  23:6,17 29:23
  30:5 35:11 60:19
  65:14 78:5,14
reviews 67:5
right 13:18,21 14:2
  15:14 16:4 17:22
  18:20 19:20 20:18
  21:14 22:7 24:21
  25:5,6,7,10 28:11
  30:4,14,24 31:9
  31:19 34:8 37:6
  40:8 44:9 46:7
  47:9 49:19 50:21
  51:4,4,10,19 52:3
  53:4 55:6,23 56:9
  56:24 60:13 64:11
  64:20 66:6,12,12
  68:6 70:3 71:8,16
  71:18 72:9 76:11
  76:11 77:3,6
  78:11 79:5,20
  80:5 81:18 82:14
  82:21 84:9,10
  85:22 86:14 87:10
  87:11,19 88:20
  89:6,21 90:7,13
  91:21 92:8 93:2
  94:12,20 95:15,16

95:18 96:12,24
  97:14,17 98:5
  99:3,12,13,19
  102:18 103:24
  104:22 109:10
  110:9,11 112:6
  114:3
road 10:10
Rob 4:19 14:8
Robert 2:13
role 10:17 11:1
  16:16 24:16
rolled 17:20
rooms 7:18
roughly 9:15
route 90:24
routed 91:12
routes 89:9 90:24
  91:1,5
rule 99:12
rules 114:21
runs 72:7

_____
        S
_____
s 3:10 32:7
sake 77:4
Santa 9:21 10:2
satisfies 69:8
saw 17:11 24:13
  39:12 45:1 63:17
  64:11
saying 17:14 30:5
  48:13 49:10 59:5
  67:15,22 70:14
  91:14 102:23
says 76:24 98:22
  98:23
scenario 45:1
scope 46:19 58:20
  66:23
screen 7:5 23:8
  33:14 42:19 55:10
  61:18,18 104:3,6
  104:7,22 105:7
  106:9,11
se 96:23
search 37:16
second 31:15 77:3
  83:11,14 98:24
  99:1 104:8
see 7:5 26:18 32:14
  34:17 35:19,21,23
  36:1,24 37:19
  38:12 42:13 44:16
  44:19 45:13,15
  47:10,16 53:4

61:1 63:7 64:19
  75:18 76:2 77:7
  78:24 83:16 84:11
  85:17 91:21 92:4
  93:13 98:15,21
  101:4 104:4
  105:11 106:2
seen 23:24 45:22
  76:14
send 12:19 49:21
  52:24 61:18 63:4
  70:4,11 71:1,3
  88:12 92:23 95:22
  96:12 97:16
  100:22 101:24
  102:1 103:5 110:3
  110:4 114:23
sender 12:23,24
  13:4 52:23 53:17
  55:20 73:17 85:4
senders 12:19
  92:22
sending 46:15 56:2
  58:2 66:22 69:21
  73:16 96:17
  100:21 103:11
  107:10
sends 71:3 85:13
  85:15 88:15,17,18
  91:11,20 94:23,23
  96:8 100:14
  101:14
senior 8:4 9:12 10:7
  10:9 20:4
sense 69:2 97:20
sent 16:1,2 46:16
  48:16 53:18 69:4
  70:2 71:5,6,21
  82:2 99:21 100:6
  101:16 102:2
  111:3
sentence 78:20
separate 7:18 88:9
September 106:6
sequence 98:4
  99:20
sequential 69:3,12
series 19:1 104:2
served 95:15
server 34:20 53:13
  54:3,11 88:8 90:6
  90:13,13,14
servers 21:22 22:2
  22:5,7 52:5,8,12
  52:18 53:7,9,20
  54:3,12 83:18,22

84:14,16 88:9
  90:16,17
service 15:16,20,21
  16:5,6,7,10,14,17
  16:20,23 17:7,19
  18:4,9,18,21
  19:10,16,17 20:5
  20:11 21:5,11,16
  21:20,23 22:3,5,9
  23:7,9,10,18
  25:13,17,18 26:22
  27:2,7,11,12,14
  27:17 28:1,6,9,13
  28:21,23,24 29:5
  29:6,9,15,21
  33:10,16 37:16,17
  37:17,21 39:22
  40:1,6 41:2,3,6
  44:6,10 47:10,20
  47:22,24 48:22
  49:9,11,22 50:23
  51:6,24 52:1,9,14
  53:22 54:19,22
  55:17,21 56:1
  57:15 60:1,24
  61:6,14 63:15,19
  64:5,9,13,22
  65:15,16,16 68:21
  69:21,22 71:21
  72:10,18,21 75:7
  75:14 78:2,6,21
  80:21 81:4,4,13
  82:4,10,13,16,24
  83:3 84:4,7,21,21
  86:2,12 87:8,21
  89:22 96:8 98:21
  99:1 101:19,22
  102:4,7,7,14,15
  102:24 103:8,16
  105:20,24 107:14
  109:4,7
services 28:5,8,23
  38:10 41:2 81:3,8
  81:9 82:19 84:20
  87:15 98:20
  101:20 105:17
  107:10
session 94:8
set 40:6,8 53:1,2
  56:4 61:14 63:11
  69:1 71:4 72:17
  88:11 89:7
sets 52:21 71:1
  89:4
setting 85:3
sheet 114:6,9,10,14

114:20,24 115:1
  116:9
SHM 98:24 99:2
short 73:20 103:6
  103:10,11,14,19
  105:13,17 106:5
  106:19
shorthand 1:16
  113:2,9,10
shot 55:10 106:9
shots 42:19 104:3,6
  104:7,22 105:7
show 61:17 92:10
  106:9
showing 81:21,22
shows 37:23 83:14
  84:6
shut 48:19 49:24
  53:7 54:22 60:2
sic 5:22 6:4 63:14
  92:5
side 12:24 13:3
  105:10
sift 38:11
sign 23:8 32:18
  39:3 41:3 48:24
  54:19 60:24 61:6
  64:4 72:18 81:24
  111:21 114:10,11
  114:15,16
signature 32:16
  114:19 116:1,13
signed 32:10 48:22
  49:3 63:14 64:21
  68:17
signing 32:20,22
  41:6 111:19 114:1
  114:13
signs 72:9
similar 45:16
similarly 1:4
simply 17:14 47:2
sir 5:9 7:11,24 9:1
  14:14 15:14 21:14
  30:21 45:9 46:13
  46:22 75:2 87:19
  111:7,13
site 47:20 48:1,2,4
  48:6,7,9,11,11,14
  48:18 49:24 50:2
  50:4,4,5,7,13,21
  50:21 51:2,4,6,15
  51:22 52:3 53:7
  53:23 55:3,4,7,10
  56:8 89:14,17
situated 1:4

Dominguez, et al. v. Yahoo, Inc.                                   AJAY GOPALKRISHNA, 10/18/13

situation 44:12
   45:10,14 58:18
   59:23 97:20
   100:19
six 16:18 17:12
SM 28:12 33:10
   82:24
small 16:1
smaller 75:17
SMS 15:2,17,22,22
   15:24 16:3,6,8,8
   16:10 18:4,9,21
   19:10 20:10,21
   21:5,10,16,23
   22:3,8 23:7,12,18
   24:8,17 25:13
   26:21 27:7 28:1
   28:12,13 29:2,15
   30:5 33:10 34:11
   37:21 38:10,10
   44:10,14 45:12
   48:11,14,16 49:3
   49:22 50:21,23
   51:5 52:9,14 53:7
   53:18,18,19,22
   54:21 57:15 58:5
   60:1,24 61:6
   63:18 64:4,9,13
   64:22 65:16 69:1
   69:3,10,21,22
   70:4,11,15 71:6
   72:10,21,24 74:12
   75:7,14,16 76:13
   78:1,6,21 80:16
   80:18,20,21 81:3
   81:10,12 82:2,10
   82:12,16,24 83:3
   84:4,21 85:19
   86:2,12 87:7,15
   87:21 88:16 89:11
   90:2 91:3,6,6,8,15
   91:21,24 92:5
   93:24 94:13,14
   95:21 96:11 97:7
   97:16 98:2,20,22
   99:6 101:14,17,22
   101:24 102:6,7,8
   102:24 103:2,12
   103:15,16 105:14
   105:17 106:16
   107:10,14,24
   108:15 109:21
   110:3,5
snippet 16:2
software 69:6 72:6
   100:4,16,16

somebody 18:23
   25:19 44:14 45:11
   48:4 55:23 57:14
   59:10 60:1 68:12
   68:14,15 86:1,9
   109:11
sooner 95:18
sorry 15:23 22:21
   31:8 33:17,17
   34:4 39:7 40:13
   47:14 57:9 60:6
   71:6 75:19,21
   93:5 102:5,14,16
   111:9
sort 11:7 13:11,14
   44:23 49:11 67:8
   90:19 109:23
South 2:4
space 114:12,17
spam 10:12
speak 26:10,16,20
   27:1 35:8,10
speaking 27:11,23
   28:13 34:12
specific 13:11
   19:19 41:5 52:24
   67:24 85:4 91:13
   91:13 93:18 94:7
   96:23 103:19
specifically 15:5
   26:20 30:10 50:12
   78:1 93:17 105:20
spell 5:9 26:2
spoke 25:19,22
   26:5,7 27:19,20
   30:2,8,8,11,12
   78:9,12
spoken 27:3,6
   77:18
stage 91:16
stamped 77:9
standard 100:4
standpoint 59:2
   108:18
start 5:19 17:20
   83:17 84:9
started 16:23 18:17
starting 48:18
state 4:12 5:9 13:9
   13:13 17:24 113:3
   113:10
statement 66:13
   68:20 69:11 79:2
states 1:1 4:5 15:6
   32:6 49:11 64:1
stating 20:3 21:2,14

22:1 24:12,15
   27:5,22 33:3,8
   35:17 48:21 51:21
   75:12 76:12
statute 14:23
step 82:4 89:4
   92:10
stipulation 111:18
stop 44:16 45:13
   46:15 55:17,21
   56:3,11,17 57:2,5
   57:15,16 58:2,6
   58:17 65:15 66:21
   107:13 108:3,14
   108:24
stopped 16:16 49:3
   108:2
storage 101:9,9
store 52:8 53:14
   54:4 78:22 90:18
   91:24
stored 50:12 51:7
   51:13,14,22 52:12
   52:18 53:6,9,13
   53:21 54:2 79:8
   84:16 86:18 88:2
   88:8 92:1 93:1,4,6
   93:9,10,21
stores 62:19 80:17
   81:11 91:22
Street 1:21 2:4
strike 65:12
stripped-down
   90:1,24 91:2
   94:12 109:20
stripping 89:10,12
stripping-down
   109:19,22
subject 7:21 52:24
   71:3 110:15,15
   111:1 114:13
subscribed 109:8
subscription 23:13
   24:9,18 29:2
   34:11 74:12 75:7
   75:16 76:13 77:22
   77:23,24 78:21
   79:8 80:16 81:11
   81:22 91:15,22,24
   92:5 93:24 94:13
   94:18 95:21 97:7
   97:16 98:2 99:6
   101:3,14 109:21
subscription-rela...
   78:22 79:6,14,22
subsequent 76:17

substance 114:4,8
subsystem 90:19
suggesting 80:20
Suite 1:21 2:9
summary 32:8
Summit 1:20 4:10
   4:11 112:22
   114:24
Sunnyvale 11:13
support 32:7
supposed 36:18,18
   72:7 73:13
supposedly 40:9
sure 5:21 9:8 11:3
   13:19 19:10 23:24
   40:17 41:18 50:20
   50:20 59:4 65:21
   67:11 83:10 86:13
   86:23 87:2 104:10
   111:9 112:19
swear 4:22
switch 73:22
sworn 113:7
sworn/affirmed 5:2
system 11:4 21:4
   27:15 33:15,19,23
   34:9,19,21 35:2,7
   35:18,22 36:13
   39:2,5,17,18,19
   39:20 41:8,11,12
   42:12,15,18,20
   43:3 44:24 54:6
   69:5,10 70:3,5,11
   71:22 72:7 73:7
   88:14 89:7 94:22
   96:7,22 98:5,14
   98:19,22 100:19
   100:20
systems 27:16
   72:16 97:11
   100:13,15

                T

T 3:10
T-Mobile 106:16
table 79:20 104:7
   104:22
take 7:1 30:24
   31:13,15,16 44:20
   74:11,18 86:10
   90:4,5
taken 1:15 7:20
   47:21 115:2
takes 31:19 91:8
   112:9
talk 14:9 23:6 66:9

104:9
talked 18:9 92:2
talking 20:18 36:15
   37:10 66:9 77:4
   86:19,21 89:16
   90:9 95:11 101:23
   103:1,8 108:9
tape 73:23,24 74:8
   112:20
tapes 112:21
target 12:19
task 41:10
team 25:16,20,24
   26:11 28:22 35:5
   35:9,11 43:9,12
   43:20 48:2 56:22
   56:23 57:24 58:17
   61:9
technical 23:9,11
   25:12 29:1,3,4
   108:18
Teleconference 2:2
   2:14
Telephone 14:4,20
   14:24 15:6,11
tell 8:2 10:6 12:8
   16:13 22:16 23:16
   27:10 34:16 49:19
   63:2 68:9 71:17
tells 99:12
temporary 94:8
ten 72:2
term 15:20 29:3
   62:2 96:24
termination 47:24
   70:3
terms 27:13 30:9
   51:4 60:9 62:9
   83:8
testified 87:4
testify 7:13 22:14
   25:14 113:7
testifying 23:18
testimony 5:16
   7:21 10:22 18:12
   24:12 28:2,17
   29:16 37:12 58:1
   59:5 65:18 66:3,8
   67:19 70:21 72:12
   77:14 79:10 94:2
   96:1 97:6 100:8
   102:23 103:17
   107:19 114:12
text 66:22 70:4
   91:17 96:17
   107:10,15

Dominguez, et al. v. Yahoo, Inc.                                    AJAY GOPALKRISHNA, 10/18/13

| | | | | |
|---|---|---|---|---|
| texting 108:2 | Traurig 1:13 2:8 4:8 | 42:15 53:20 57:10 | 101:18 103:7 | 77:12 84:23 96:5 |
| texts 46:15 56:3,12 | 4:17 5:23 | 59:5,13 81:6,10 | 108:12 109:1 | 98:23 107:13,20 |
| 56:16 57:15 58:3 | tried 37:16 42:15,16 | 83:2,5,24 84:2 | 110:1,21 | 108:23 109:10 |
| 58:5,6,17 69:22 | 46:14 | 86:24 87:16 89:6 | vast 90:18 | 112:5,8,18 |
| 71:21 80:18 95:22 | triggering 69:8 | 97:23 107:17 | verbally 7:9 | ways 59:20 60:8 |
| 98:3 99:20 106:16 | 73:15 | 110:8 111:5,12 | verification 82:4 | 98:23 109:5 |
| thank 5:13 73:18 | troubleshooting | understandable 6:6 | Verisign 8:20,22,24 | we'll 6:19 31:20 |
| 111:7,13,15 | 21:9 | understanding | 9:7,9 | 111:23 112:21 |
| thing 24:8 69:4 | true 79:2 116:5 | 11:20 16:21 29:14 | version 7:7 75:17 | we're 15:19 20:18 |
| things 17:21 37:3 | truth 113:7,8,8 | 30:2 39:16,20 | 76:2,13 90:2,24 | 31:23 66:9 74:4,9 |
| 51:22 62:19 64:1 | truthful 6:14 32:24 | 79:17 80:1,2 | 91:2 | 76:12 86:19 89:16 |
| 66:5,24 75:12 | 68:20 | 102:2 | versions 76:5,17,17 | 90:9 104:16 |
| 84:19 98:5 107:6 | truthfully 7:13 | understands 86:24 | versus 4:4 | 106:23 107:2 |
| think 6:12,19 7:12 | try 6:5,23 18:8 37:7 | understood 6:7 | video 7:5 72:3 | 112:14,23 |
| 23:1,2 30:5 62:23 | 42:6 65:23 87:19 | 108:8 | videographer 2:15 | we've 6:20 18:9 |
| 63:7 67:4 87:2 | trying 63:7,8 66:21 | United 1:1 4:5 15:6 | 4:1,21 5:7 31:20 | 73:23 79:13 |
| 97:14 101:15 | 102:20 112:3,6 | University 1:14 4:8 | 31:23 73:24 74:4 | 101:23 103:1 |
| 112:4,6,14 | turn 50:23 60:13 | 9:19,21,23 10:2 | 74:7 104:11,16 | web 84:10 85:12,12 |
| third 85:17 106:14 | 68:6 78:17 81:15 | 106:23 107:2 | 106:23 107:2 | 88:4 |
| three 83:18,22,22 | 100:24 106:1 | unsubscribe 53:23 | 111:16 112:2,20 | week 26:23,24 |
| 84:15 104:22 | Turner 2:13 4:19,19 | 54:1 55:4 77:24 | Videographers | Wendy 2:9 4:17 |
| throttling 97:1,4,5,8 | turning 106:13 | 109:3,4,6 | 1:20 | 22:21 37:6 73:18 |
| time 6:11 7:2 9:7 | twice 64:16 | unsubscribed 56:7 | videotape 73:19 | 106:21 |
| 15:15 16:11,13,15 | two 7:18,18 8:6 | 107:23 | videotaped 1:12 | went 28:24 39:12 |
| 17:13 18:1,10,18 | 26:7 27:23 28:14 | upper 105:10 | 4:3 | 54:6 79:13 107:22 |
| 20:4,15 21:7 | 30:11,12 31:16 | URL 50:5 | Vijay 19:24 76:23 | weren't 25:2 |
| 29:23 31:13,21,24 | 34:12 49:8,12,23 | use 38:6 55:22 77:9 | 77:14 | whatsoever 64:21 |
| 34:24 54:10 64:22 | 56:8,8 78:12 83:7 | 84:20 86:7 97:11 | volume 74:8 96:18 | 103:22 |
| 74:5,9,10 89:22 | 88:1 98:23 99:4 | 101:20,24 103:2 | 96:22 | wiped 98:15 |
| 90:23 100:22 | 104:5,6,7,22 | 103:10,11 | voluntarily 72:18 | witness 3:3 4:22 |
| 102:21 104:12,17 | 105:7 109:5 | user 40:8 41:2 54:1 | vs 1:6 | 14:10 18:6 24:5 |
| 106:24 107:3 | type 7:12 14:3,3 | 55:1,21,22 60:21 | | 26:13 30:17 37:3 |
| 112:15 | 34:13 35:18 36:9 | 60:23 61:5 62:9 | **W** | 39:7,11,14 40:15 |
| times 97:15 | 36:15 50:12 64:12 | 63:12 64:2 65:8 | wait 6:21,23 96:13 | 41:18 43:15 49:17 |
| title 2:4 75:23 | 66:17 | 70:24 71:12,15 | 97:17 | 51:10 54:15 58:22 |
| today 4:11 7:14,21 | types 79:6 99:16 | 72:17,20 78:22 | Walnut 1:21 | 60:6 63:21 65:1 |
| 22:14 23:19 25:14 | 101:9 | 79:6,14 81:24 | want 5:19 9:8 10:4 | 69:17 74:14 79:17 |
| 77:4 78:15 107:8 | typewriting 113:11 | 88:11,18 89:4 | 10:5 13:18 22:11 | 80:2,23 82:17 |
| today's 112:21 | typo 101:6,8 | 107:13 108:24 | 22:13,16 23:24 | 83:20 84:6,18 |
| told 5:24 | | user's 70:4 80:14 | 31:15 38:23 45:5 | 89:17 90:10,16 |
| tool 36:7 | **U** | users 15:15 62:8 | 46:7 51:17 54:7 | 93:8 94:3 95:12 |
| tools 59:21 | U 62:2 | 99:1 101:3 105:16 | 54:13 60:13 66:9 | 96:2 97:19 99:15 |
| top 53:5 83:17 84:9 | UBD 62:3 92:5 | usually 6:1 | 71:17 78:12 86:3 | 99:24 100:11 |
| topics 46:19 58:20 | UD 67:10 | | 86:23 87:6,10 | 101:19 103:10,18 |
| tough 102:21 | UDB 62:2,4,6,7,12 | **V** | 111:17 | 104:24 107:20 |
| track 33:21 | 62:14 67:5,6,11 | v 115:3 | wanted 27:13 30:1 | 108:13 109:2,14 |
| tracks 43:3 | 67:23 92:2,3,4,15 | vague 18:5 19:12 | 51:23 52:9 58:6 | 110:2,22 111:15 |
| traffic 97:1,4,5,8 | 93:10,23 94:14,17 | 26:12 28:16 29:17 | 59:4 64:13 | 111:23 113:6 |
| training 14:2,19 | Uh 71:9 | 41:17 50:15 54:14 | wanting 50:19 | 114:1,16,16,17,18 |
| transcribed 113:11 | ultimately 88:19 | 60:5 65:17 69:16 | wasn't 107:20 | **WITNESSED** |
| transcript 7:6 | underlying 77:23 | 70:7,20 71:23 | 108:20 | 116:17 |
| 111:23 112:10 | understand 6:4,5,9 | 73:1,9 79:16 84:5 | way 6:6 13:11 38:1 | witnesses 6:1 |
| 113:13 116:4 | 7:2,9,22 16:4 | 88:23 89:15 90:8 | 42:23 47:5,19,21 | word 34:1 38:9 72:2 |
| transcription 116:6 | 17:10,14,18 29:1 | 93:7 95:8,24 | 48:16 55:17,21 | words 11:7 14:14 |
| transfer 54:11 | 29:9 38:15 39:8 | 96:19 97:18 98:8 | 68:21 69:7 70:15 | 88:3 |
| transmitted 63:2 | 39:18 41:19 42:3 | 99:10,14,23 | 70:17 71:17 72:24 | work 7:16 10:11 |

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Dominguez, et al. v. Yahoo, Inc.                                      AJAY GOPALKRISHNA, 10/18/13

11:3,4,6,11,16
12:11 13:14,20
25:23 26:16,19
29:9 36:17 41:10
43:4 44:8 90:20
**worked** 27:12 29:6
29:15 30:10 33:11
42:16
**working** 17:9 19:10
19:17 93:20
**works** 55:10 68:21
69:10 86:22 93:18
**worries** 22:24 23:3
23:3
**wouldn't** 22:4 76:17
110:11
**write** 68:12,12,14
**written** 100:3
**wrong** 6:14 30:4
37:20 64:1 95:20
99:8 101:16
**wrote** 68:15
**www.summitrep...**
1:23

**X**

**X** 3:1,10 110:4
113:13

**Y**

**Yahoo** 1:7 2:13 4:4
4:18,19,20 8:1,3,4
8:7,15,15,19,21
10:8,10,12,12,14
11:7,10,14,18,23
12:1,2,2,2 13:20
15:15 16:5,9,11
16:24 17:5 18:1,9
18:23 19:9 20:9
21:8 22:8 25:12
36:6,8 41:24 43:7
45:18,24 46:3,10
46:10,15 47:8
48:8,12,12 50:3
50:22 52:14 53:2
53:3 54:20 55:19
56:13,15 57:16
60:20 62:13,13
64:13 66:21 71:17
71:21 72:23 74:13
74:13 75:14 77:7
77:15 78:18,23
79:9,11,21,22
81:15 82:5,9
86:15 87:14 89:20
92:11,16 98:10

100:24 101:24
103:1,5,15 105:14
105:16 106:5,19
107:9 109:6 115:3
**Yahoo's** 32:7
**Yahoo-created**
75:8
**YDBM** 101:3,10
**yeah** 14:13 18:8
24:5 31:16 34:4
39:14 40:15 50:8
58:12 60:6 82:17
95:17 96:15 98:7
99:17 100:11
110:14 111:22
**year** 9:7
**years** 8:6 9:2,15
16:18 17:12
**Yep** 95:19

**Z**

**0**

**0017** 77:7
**0021** 79:9
**08037** 1:22

**1**

**1** 3:13 30:16,18,21
32:3 33:9 60:15
74:1 75:17
**1.1** 76:6
**1.2** 76:6
**1.3** 75:17 76:2
**1.4** 76:6
**1:01** 106:24
**1:07** 107:3
**1:15** 112:23,24
**10** 60:14 63:12
65:23,24 66:9,12
**10:07** 1:15 4:2
**10:51** 31:21
**10:57** 31:24
**100** 2:4
**104** 3:15
**11** 65:24,24 66:10
66:10
**11:56** 74:5
**12:13** 74:9
**12:56** 104:12
**12:58** 104:17
**13** 68:7,20
**140** 88:15 89:13
110:12,17,23
111:2,9
**140-character**

89:10 109:20
**14th** 32:18 68:18
**1500** 1:21
**16** 74:13
**1610** 1:21
**17** 77:15
**18** 1:15 115:2 116:5
**1840** 2:9
**18th** 4:2
**19** 78:18 79:22
81:15 82:9 83:7
**1900** 1:13 2:9 4:8
**19102** 1:21
**19110** 2:5
**1994** 9:24
**19th** 2:4

**2**

**2** 3:14 52:20 53:6
74:8,14,15,21
76:12 77:2 78:18
98:11 112:21
**2.1.1** 98:24
**2.2.1** 98:24
**2.2.1.1** 98:11
**2.2.3** 101:2
**2:13-cv-01887** 1:6
**20** 82:5 83:7 92:11
92:16 98:10
**200** 11:21
**2000** 50:1
**2001** 47:8
**2004** 10:3
**2005** 16:19
**2007** 8:13,19 17:5
**2009** 60:23 61:15
63:4,14
**2011** 8:13 16:17,18
16:19 47:11,13,14
47:18,19 48:14,18
48:23,23 50:1,7
53:8 57:12 61:1
86:8
**2012** 57:12 105:15
106:6
**2013** 1:15 4:2 32:18
115:2 116:5
**21** 79:11,21 100:24
**215** 1:22 2:5
**2278** 106:18

**3**

**3** 3:15 32:13 104:2
104:14,20 105:4
106:14
**30** 3:13 114:22

**31** 74:13
**310** 2:10

**4**

**4** 47:7
**424** 1:22
**447-8648** 1:22

**5**

**5** 3:5 53:5
**567-3315** 1:22
**586-6522** 2:10

**6**

**609** 1:22

**7**

**735-8600** 2:5
**74** 3:14

**8**

**800** 1:22

**9**

**90067** 2:10
**92,466** 106:2
**92,500** 105:11
**9705** 113:19
**985-2400** 1:22

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BILL H. DOMINGUEZ, on behalf of himself
and all others similarly situated,

        Plaintiff,

    v.                           C.A. No. 2:13-cv-01887

YAHOO!, INC.

        Defendant.

DECLARATION OF AJAY GOPALKRISHNA IN SUPPORT OF YAHOO! INC.'S
MOTION FOR SUMMARY JUDGMENT



## DECLARATION OF AJAY GOPALKRISHNA

I, Ajay Gopalkrishna, declare as follows:

1.     I am the Senior Product Manager for Yahoo! Mail Anti-Spam and Delivery, at Yahoo!, Inc. ("Yahoo!"), the defendant in this action. I am over eighteen years of age and am fully competent to make this declaration. I have personal knowledge of the matters stated below or am informed of and believe them to be true based on my review of documents that were maintained in the ordinary course of business at Yahoo!. If called as a witness, I could and would competently testify regarding such matters.

2.     I have been employed by Yahoo! since 2007. Prior to my current position, I was a program manager for Yahoo! Mail, which is a free web-based email service accessible over the Internet at mail.Yahoo.com.

3.     Yahoo! is an internet company that is widely known for its free consumer services, including personalized news and financial websites, Yahoo! Messenger, Yahoo! search and the Yahoo! email client and associated protocol provided by Yahoo!. Yahoo! email accounts are offered free of charge and can be obtained and used by anyone simply by registering as a user with a Yahoo! ID.

4.     Prior to June 2011, Yahoo! offered Yahoo! email account holders a feature that allowed registered Yahoo! users to forward new, incoming email messages to a mobile phone (the "Email SMS Service"). In the days prior to widespread access to smart phones, this service allowed users to receive notification of new emails, including sender and subject information, without logging into a computer.

5.     To sign up for the Email SMS Service, a Yahoo! user would create an email "filter" to forward new messages to his or her mobile phone by manually inputting the mobile telephone number and checking a box to enable email alerts to that telephone number as shown below:

1



6.      Yahoo!'s Email SMS Service was configured to automatically convert email messages into a format that could then be forwarded to a user's wireless carrier (such as Verizon, AT+T, T-Mobile and other similar companies), which in turn then sent an SMS message to the user's mobile device. SMS stands for short message service, which is a text messaging service component of phone, web, or mobile communication system, using standardized communications protocols that allow the exchange of short text messages between devices.

7.      The SMS message ultimately received by a user included a truncated version of the email communication, including the identity of the sender, the subject line, and the body of the message up to a combined total of 140 characters, so that the recipient would know whether it was important or could be reviewed later (or ignored).

8.      Yahoo! users were never required to sign up for this service; it was entirely voluntary. Unless a Yahoo! user affirmatively signed up for the Email SMS Service, he or she would not receive a text message version of new emails.

2

9.      I understand that in this case, the plaintiff alleges that he bought a new phone and was assigned a new phone number, 215-543-4361, which previously had been held by someone named Jose Gonzalez.

10.     Based on this information, I reviewed records that have been maintained in the ordinary course of business at Yahoo! and determined that the user of the account associated with Plaintiff's mobile number created the account in March 2009, and that the user made an affirmative request to sign up for up for the Email SMS Service in at some time prior to June 2011, which is prior to the time plaintiff alleges that he was assigned that same phone number.

11.     The person who signed up for the Email SMS Service to receive text messages to the mobile phone number 215-543-4361 could have done so only by entering his mobile phone number directly into the Yahoo! Email SMS Service sign up form (where he could changes the preferences associated with his Yahoo! email account) and affirmatively electing to receive truncated versions of emails via text message when he received emails in his Yahoo! email account inbox.

12.     Messages sent through the Email SMS Service were not sent randomly, in bulk or to sequential numbers – only to specific phone numbers, affirmatively selected by individual Yahoo! users, when email messages were received.

13.     The servers and systems affiliated with the Email SMS Service did not have the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to call those numbers.


I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct and that this Declaration was executed on June 14, 2013 in Sunnyvale, California.

Ajay Gopalkrishna

## CERTIFICATE OF SERVICE

I, Brian T. Feeney, attorney for Defendants, hereby certify that on June 18, 2013, I served

a true and correct copy of the foregoing Motion of Defendant YAHOO! Inc. for Summary

Judgment and Memorandum in Support, together with all exhibits via this Court's Electronic

Court Filing System upon the following counsel of record:

> James A. Francis, Esquire
> Mark D. Mailman, Esquire
> Geoffrey Baskerville, Esquire
> David A.Searles, Esquire
> Francis & Mailman, P.C.
> Land Title Building – 19th Floor
> 100 South Broad Street
> Philadelphia, PA 19110
> (215) 735-8600

> *Attorneys for Plaintiff*

> /s/ Brian T. Feeney
> Brian T. Feeney, Esquire

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BILL H. DOMINGUEZ, on behalf of himself and all others similarly situated, ) | CLASS ACTION |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C. A. No. 13-1887 |
| ) | |
| YAHOO!, INC. ) | |
| ) | |
| Defendant. ) | |

# EXHIBIT 2 TO DEPOSITION OF AJAY GOPALKRISHNA, October 18, 2013

## (Filed Under Seal)







Subscriber Detail

| Sub ID | MSISDN | Date Of Call (PDT) | Called Number | Call Direction | Event Description | Billed Duration (Min) |
|--------|--------|-------------------|---------------|----------------|-------------------|-----------------------|
| 60821928 | (215)543-4361 | 10/23/2012 04:03:42 PM | 2278 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 10/23/2012 05:00:15 PM | 2278 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 10/23/2012 06:11:17 PM | 2278 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 10/23/2012 09:45:26 PM | 2278 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 10/23/2012 09:54:18 PM | 2278 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 10/23/2012 09:55:49 PM | 2278 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 10/23/2012 10:05:51 PM | 2278 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 10/23/2012 10:07:00 PM | 2278 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 10/23/2012 10:07:35 PM | 2278 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 03:17:54 AM | 92000 | Outgoing | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 03:17:55 AM | 92000 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 03:19:38 AM | 92000 | Outgoing | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 03:19:38 AM | 92000 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 05:56:54 AM | 92000 | Outgoing | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 05:56:55 AM | 92000 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 05:57:34 AM | 92000 | Outgoing | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 05:57:36 AM | 92000 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 06:01:19 AM | 92000 | Outgoing | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 06:01:20 AM | 92000 | Outgoing | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 06:01:20 AM | 92000 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 06:02:05 AM | 92000 | Outgoing | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 06:02:06 AM | 92000 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 06:02:51 AM | 92000 | Outgoing | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 06:02:52 AM | 92000 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 06:03:29 AM | 92000 | Outgoing | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 06:03:30 AM | 92000 | Terminating | SMS | 0 |
| 60821928 | (215)543-4361 | 09/08/2012 06:03:51 AM | 92000 | Outgoing | SMS | 0 |