UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BILL H. DOMINGUEZ, on behalf of himself and all others similarly situated, | ) ) ) | CLASS ACTION |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C. A. No. 13-1887 |
| YAHOO!, INC. | ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) ) | |

## AMENDED COMPLAINT - CLASS ACTION

### INTRODUCTION

1.  This is a consumer class action brought on behalf of consumers against an Internet company for sending unsolicited text messages in violation of the Telephone Consumer Protection Act, 47 U.S.C. §§ 227, *et seq.* (TCPA).

### JURISDICTION AND VENUE

2.  Jurisdiction of this Court arises under 47 U.S.C. § 227(b).

3.  Venue lies in this district pursuant to 28 U.S.C. § 1391(b).

### PARTIES

4.  Plaintiff Bill H. Dominguez is an adult residing in Philadelphia, Pennsylvania.

5.  Defendant YAHOO!, Inc. (Yahoo!) is a Delaware corporation which regularly conducts business in the Eastern District of Pennsylvania, and which has a principal place of business located at 701 First Avenue, Sunnyvale, California 94089.

**FACTUAL ALLEGATIONS**

A.  **Yahoo!'s Common Practice**

6. During the relevant time period, Defendant Yahoo! provided its users with a series of "free, personalized notification service[s] that instantly inform [Yahoo! users] of what [they] consider important and relevant…." Defendant called these notification services "Yahoo! Alerts." *See* http://help.yahoo.com/l/us/yahoo/alerts/about/alerts-19.html (last visited May 9, 2013).[1]

7. Yahoo! advised its users that "to take advantage of this service, you can sign in (or sign up to get a Yahoo! account) and customize your Yahoo! Alerts content and how it is delivered to you." *Id*.

8. Yahoo! Alerts provided Yahoo! users with its Email SMS Service (SMS Service).

9. SMS - short messaging service - is commonly known as text messaging. SMS is defined as a communications system and method designed to enable an individual cellular telephone subscriber to send, or originate, a short text message communication (typically no more than 160 characters) from his or her cellular telephone to another individual subscriber's cellular telephone that is the intended destination of the message, *i.e*., the message recipient.

10. SMS text messages are sent individually from one subscriber to another using a cellular telephone number as the destination address of the message.

11. The message sender's cellular telephone number is preserved as part of the message at the destination cellular telephone where the message is received so that the message recipient knows the cellular telephone number of the message sender text message when the consumer receives a new email to his or her Yahoo! email account.

---

[1]   Yahoo!'s 2013 website describing the Yahoo! Alerts service has been discontinued. Upon information and belief, copies of the relevant website pages have been archived by Yahoo! and can be produced.

12. The Yahoo! Alert text message contained the email address of the sender, the subject line for the email and as much of the body of the email as could fit in a single text message. *See* http://www.ehow.com/how_6155778_yahoo-email-cell-text-message.html (last visited November 16, 2015).

13. The Yahoo! Alert text messages were sent by means of an automatic telephone dialing system (ATDS) that has the capacity to store and produce telephone numbers to be called, using a random or sequential number generator, and to dial those numbers.

14. The SMS Service can send thousands of messages per day to the telephone numbers that were preselected by Defendant.

15. Defendant was aware during the relevant time period that "[b]ecause many phone companies recycle phone numbers, it is possible for users who purchase a new phone to receive alerts that the previous owner had subscribed to." *See* http://info.yahoo.com/privacy/us/yahoo/alerts/details.html (last visited February 19, 2013).

16. Despite this knowledge, during the relevant time period, Defendant did not have an effective method for stopping Yahoo! Alerts from being sent to the cellular phones of new mobile telephone number owners who were assigned a recycled telephone number, and who had not consented to receipt of such messages.

17. During the relevant time period, Defendant required a consumer who wanted to stop Yahoo! Alerts being sent to his/her cellular telephone to enter a password and access a Yahoo! account in order to turn off the Alerts.

18. During the relevant time period, Defendant had no procedure or means for consumers with recycled phone numbers who do not consent to receiving the text messages to turn off the Alerts set up by the prior holder of the telephone number.

3

19. As a result, these consumers received thousands of unsolicited text message Yahoo! Alerts from Defendant.

20. On July 10, 2015, the Federal Communications Commission (FCC) issued a Declaratory Ruling and Order clarifying the meaning of an ATDS. *In the Matter of Rule and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 2015 WL 4387780 (F.C.C. July 10, 2015) ("2015 FCC Ruling").

21. The FCC stated in the 2015 FCC Ruling, in pertinent part, as follows:

(a) "We reaffirm our previous statements that dialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of "autodialer") even if it is not presently used for that purpose, including when the caller is calling a set list of consumers." 2015 FCC Ruling, ¶ 10.

(b) "We agree with commenters who argue that the TCPA's use of 'capacity' does not exempt equipment that lacks the 'present ability' to dial randomly or sequentially. We agree that Congress intended a broad definition of autodialer, and that the Commission has already twice addressed the issue in 2003 and 2008 stating that autodialers need only have the 'capacity' to dial random and sequential numbers, rather than the "present ability" to do so. Hence, any equipment that has the requisite 'capacity' is an autodialer and is therefore subject to the TCPA." *Id*., ¶ 15 (citing to previous Declaratory Rulings in 2003 and 2008).

(c) "By finding that, even when the equipment presently lacked the necessary software, it nevertheless had the requisite capacity to be an autodialer, the Commission implicitly rejected any 'present use' or 'current capacity' test. In other words, the capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities." *Id*., ¶ 16.

(d) "the Commission has also long held that the basic functions of an autodialer are to 'dial numbers without human intervention' and to 'dial thousands of numbers in a short period of time.'" *Id*., ¶ 17.

(e) "the Commission has found that a piece of equipment can possess the requisite 'capacity' to satisfy the statutory definition of 'autodialer' even if, for example, it requires the addition of software to actually perform the functions described in the definition." *Id*., ¶ 18.

(f) "This broad interpretation of 'capacity' to include 'potential ability' is consistent with formal definitions of 'capacity,' one of which defines 'capacity'

4

as 'the potential or suitability for holding, storing, or accommodating.' Furthermore, interpreting 'capacity' as limited to 'current capacity' or 'present ability,' for which Petitioners and some commenters here argue, could create problems for enforcing the TCPA's privacy protections with regard to proving how a system with multiple functions was actually used for multiple calls. As the Commission has previously recognized, 'the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the restriction on autodialed calls not be circumvented.'" *Id.*, ¶ 19 (citing to *2003 TCPA Order,* 18 FCC Rcd at 14092-93, para. 133).

(g) "PACE, TextMe, and others argue that a broad interpretation of 'capacity' could potentially sweep in smartphones because they may have the capacity to store telephone numbers to be called and to dial such numbers through the use of an app or other software. Even though the Commission has interpreted 'capacity' broadly since well before consumers' widespread use of smartphones, there is no evidence in the record that individual consumers have been sued based on typical use of smartphone technology. Nor have these commenters offered any scenarios under which unwanted calls are likely to result from consumers' typical use of smartphones. We have no evidence that friends, relatives, and companies with which consumers do business find those calls unwanted and take legal action against the calling consumer." *Id.*, ¶ 21.

22. The 2015 FCC Ruling thus clarified that neither present ability nor the use of a single piece of equipment is required for an ATDS. So long as the equipment is part of a system that has the potential capacity to place autodialed calls, the statutory definition is satisfied. *Dominguez v. Yahoo, Inc.*, ___ Fed. App'x ___, 2015 WL 6405811 (3d Cir. Oct. 23, 2015).

23. The equipment that operates Yahoo!'s SMS Service has the potential capacity to place autodialed calls.

24. Random number generators are either already incorporated, or can be incorporated, into Yahoo!'s computers and computerized devices.

25. A computer programmer of normal skill could easily configure Yahoo!'s equipment to cause text messages to be sent based on integrating a simple software program to act as a sequential number generator or to cause text messages to be sent based on integration of a commonly available random number generator program.

26. Any one or more sub-systems or databases within a sub-system that may interface with the Yahoo! SMS Service via standard protocols such as HTTP, or proprietary protocols, could contain software programming to support the potential capacity to store or produce cellular telephone numbers to be called, and have the potential capacity to use a random or sequential number generator.

27. For example, Yahoo!'s computers contain Microsoft's® Excel® spreadsheet programs, which are commonly used to generate random numbers using the "RAND" function.

28. Spreadsheet software programs are commonly used in enterprises worldwide and can be incorporated into any ATDS, including off-the-shelf enterprise computer servers, personal computers, laptop computers, tablet computers and smartphones. The programs are commonly known to run on any Microsoft Windows® or Apple operating system.

29. Other examples include both the UNIX® and Linux® operating systems, which incorporate the programmatic function "dev/random" commonly used in the software engineering industry.

30. Other common examples of random number generators that are incorporated in computer systems, including Yahoo!'s equipment, are those that comprise functions for security, encryption and authentication. These functions include password encryption, sensitive data encryption, database encryption, the encrypted secure file transfer protocol and secure socket layer encrypted communications used for Internet Protocol connectivity in nearly all enterprises worldwide.

31. Any security functions that exist within Yahoo!'s computer systems necessarily incorporate a random number generation function. Examples of these functions are secure communications among the system components, secure passwords to access the system

components, secure data encrypted within the system databases and user authentication. Each of these functions uses a random number generator and could not function properly without it.

32.     Since Yahoo!'s equipment can store telephone numbers in, and dial telephone numbers from, memory storage or a database, telephone numbers that are produced using the random number generation function within those systems can also be stored in, and dialed from, memory storage or a database.

B.      **Experience of the Representative Plaintiff**

33.     Mr. Dominguez purchased a Samsung Gravity smart phone from a T-Mobile store in Philadelphia, Pennsylvania in late December 2011. The telephone number assigned to his new phone was a telephone number that he had never had before. He learned later that the phone number had been previously held by an individual he did not know.

34.     Shortly after purchasing the new phone, Plaintiff began to receive unsolicited text messages from Yahoo! advising him that he had received an e-mail.

35.     The content of the messages generally advertised certain products or invited Plaintiff to sign up for some service.

36.     Examples of some of the text messages are described below:

(a)     A text sent on November 21, 2012 at 7:51 a.m. stated "Eat Yourself Skinny," presumably an advertisement for a weight loss product;

(b)     A text sent December 4, 2012 at 3:41 a.m. concerned "The Childrens Place," and advertised "Today: Extra 30% Off Everything";

(c)     A text sent at 9:50 a.m. on January 10 advertised "Clearance! B: Old Navy";

(d)     A text sent at 3:05 p.m. on February 26, relating to "directv.com, advertised "It's not too late to catch this Nominee!"

7

   (e) A text sent at 8:18 p.m. on March 16 advertised "Looking for up to date Computer Education;"

   (f) A text sent at 7:02 a.m. on April 1 stated "Apply for Section 8 Housing … Save Money;" and,

   (g) A text sent at 6:54 a.m. on May 8 stated "Date Beautiful Russian Girls."

  37. All the messages instructed Mr. Dominguez to "Read It: http://m.yahoo.com/mail."

  38. Mr. Dominguez has never had an email account with Yahoo! and did not sign up for any form of text message notification service through Yahoo!

  39. Mr. Dominguez never consented to the receipt of the text messages sent by Yahoo!

  40. The 2015 FCC Ruling clarified that "that the TCPA requires the consent not of the intended recipient of a call, but of the current subscriber (or non-subscriber customary user of the phone) and that caller best practices can facilitate detection of reassignments before calls." 2015 FCC Ruling, ¶ 72.

  41. Yahoo! has no record that Mr. Dominguez ever consented to receive text messages.

  42. The 2015 FCC Ruling also clarified that the technology used to originate internet-telephone text messages to wireless numbers via email is an ATDS. *Id.*, ¶¶ 108-116.

  43. According to the records of T-Mobile, the first such text arrived at 8:04:56 a.m. on December 29, 2011. Those records show that Yahoo! sent 21 texts throughout that day to Mr. Dominguez's phone.

  44. Yahoo! continued to send text messages to Mr. Dominguez many times throughout the day and night. For example, on September 9, 2012, the T-Mobile records show that Yahoo! sent 189 texts, beginning at 2:52:46 a.m. and concluding at 11:37:05 p.m.; on November 3, 2012,

the T-Mobile records show that Yahoo! sent 71 texts, from 12:09:34 a.m. through 11:44:12 p.m.; on January 29, 2013, the T-Mobile records show that Yahoo! sent 48 texts from 12:05:00 a.m. through 11:46:19 p.m.

45.     Mr. Dominguez eventually began to document the text messages from Yahoo! and has taken photographs of approximately 8,480 of the text messages sent from Yahoo! to his cell phone.

46.     The photographs and the T-Mobile records show that text messages were sent from numbers that appeared on Mr. Dominguez's cell phone as 92000, 92466 or 92500. The numbers, known as "short codes," are registered to Yahoo! by the Common Short Code Association.

47.     Mr. Dominguez attempted many times to stop the text messages sent by Yahoo!, all without success.

48.     On a number of occasions, including but not limited to September 8, 2012 at 8:56 a.m., 8:57 a.m., 9:01 a.m., 9:02 a.m. and 9:03 a.m., and again on September 9, 2012 at 5:54 a.m., 5:55 a.m., 6:51 a.m. and 8:56 a.m., Mr. Dominguez responded to the text messages by texting back the words "stop" or "help," which he had been told would stop the texts, and which had worked for him in response to unwanted text messages from other companies.

49.     Instead of stopping the texts, however, Yahoo! texted back an immediate, automatic reply in the nature of asking Mr. Dominguez to sign in with a Yahoo i.d. password, or stating that "Unfortunately we were unable to understand your request. Please try again."

50.     In September 2012, Mr. Dominguez contacted the Federal Communications Commission to get assistance about how to stop the text messages.

51.     Mr. Dominguez spoke with a FCC representative named Kevin, who advised him, before filing a complaint with the FCC, to try to resolve the problem by contacting Yahoo! directly

9

to stop the texting, and Kevin provided Mr. Dominguez with telephone numbers for Yahoo!

52. Mr. Dominguez then telephoned Yahoo! and spoke to a representative named Chad. Chad suggested that Mr. Dominguez try texting the word "Help" to Yahoo!'s number 92466.

53. Mr. Dominguez followed the Yahoo! representative's instructions, but that did not stop the text messages.

54. Mr. Dominguez again telephoned Yahoo! and spoke to a woman named Denise, and explained the problem with the unsolicited text messages.

55. Denise responded that there was nothing that could be done to stop the texts unless the former owner of the telephone number accessed the password-protected account and authorized Yahoo! to stop the messages.

56. Mr. Dominguez then asked to speak with a supervisor. The supervisor, who identified himself as Castro, told Mr. Dominguez the same thing – that the unsolicited text messages would only stop if the former owner of the account so authorized. Castro stated that "As far as Yahoo! is concerned, that number will always belong to Jose Gonzalez."

57. Since Mr. Dominguez did not know the whereabouts of the former owner of the telephone number, Mr. Dominguez suggested that litigation might be his only option. Castro replied "so sue me."

58. Mr. Dominguez then asked to speak to Castro's supervisor. Castro at first resisted letting Mr. Dominguez speak to his supervisor but eventually referred Mr. Dominguez to a person named Jessie, who repeated Yahoo!'s position that Yahoo! would only recognize a request from the former owner of the telephone number to stop texting the messages.

59. Mr. Dominguez again contacted the FCC to see if it could help, and again spoke to the representative named Kevin.

60. Kevin called Yahoo! himself with Mr. Dominguez on the line, and Mr. Dominguez could hear Kevin's side of the conversation. Kevin asked the Yahoo! representative to stop the texting.

61. Kevin told Mr. Dominguez that the Yahoo! representative repeated the company's position that Yahoo! did not have to stop the texts.

62. Mr. Dominguez filed two complaints with the FCC relating to the text messages, submitted on September 11, 2012, and September 28, 2012.

63. Mr. Dominguez also filed a complaint concerning Yahoo!'s texting with the Federal Trade Commission on September 11, 2012.

64. None of Mr. Dominguez's many efforts to get Yahoo! to cease texting him were successful.

65. As the actual recipient of the text messages from Yahoo!, Mr. Dominguez is within the zone of interests intended to be protected by the TCPA. *Leyse v. Bank of America, N.A.*, 2015 WL 5946456, * 5-7 (3d Cir. Oct. 14, 2015).

66. Mr. Dominguez filed this lawsuit in April, 2013. After the Complaint was served, Yahoo! finally stopped texting Mr. Dominguez at the end of May, 2013.

67. Yahoo! announced the discontinuance of the SMS Alerts program as of the end of April, 2013. *See* htttp://yodel.yahoo.com/blogs/general/sharpening-focus-bring-yahoo-products-010032874.html (last visited May 9, 2013).

68. By the time Yahoo! discontinued its text message practice, the T-Mobile records show that Mr. Dominguez had received 27,809 unsolicited text messages, or an average of roughly 54 per day.

69. Defendant's actions and failures to act were reckless, deliberate, willful or

11

knowingly in violation of the TCPA.

70. Defendant's actions and failures to act have caused Plaintiff damages.

## CLASS ACTION ALLEGATIONS

71. Plaintiff brings this action individually and as a class action, pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure, on behalf of the following Class: all persons residing within the territorial limits of the Court of Appeals for the Third Circuit who purchased a cellular telephone which, prior to its purchase, had been associated with a Yahoo! account belonging to another individual who had authorized the sending of text message Yahoo! Alerts to said telephone and to whom Yahoo! sent to the cellular telephone number at least one unsolicited text message, during the period beginning four (4) years prior to the filing of the Complaint and continuing through the date of the resolution of this case.

72. The Class is so numerous that joinder of all members is impracticable.

73. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class members. The principal common question is whether the Defendant's practice of sending unsolicited text messages violated the TCPA.

74. Plaintiff's claims are typical of the claims of the Class, which all arise from the same operative facts and are based on the same legal theories.

75. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is committed to vigorously litigating this matter and has retained counsel experienced in handling class actions and claims involving unfair and unlawful business practices. Neither Plaintiff nor his counsel has any interests which might cause them not to vigorously pursue this claim.

76. This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying

adjudications with respect to individual members which would establish incompatible standards of conduct for the parties opposing the Class, as well as a risk of adjudications with respect to individual members which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

77. A class action is a superior method for the fair and efficient adjudication of this controversy. The interest of Class members in individually controlling the prosecution of separate claims against Defendant is small because the maximum statutory damages in an individual action under the TCPA range from $500.00 to $1,500.00. Management of the Class claims is likely to present significantly fewer difficulties than those presented in many class claims. The identities of the Class members may be obtained from Defendant's records.

78. Defendant has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### Violations of the Telephone Consumer Protection Act

79. Plaintiff incorporates by reference all of the paragraphs above as though fully stated herein.

80. At all times herein, Plaintiff and the Class have been entitled to the rights, protections and benefits provided under the Telephone Consumer Protection Act, 47 U.S.C. § 227.

81. Negligently, recklessly, willfully and/or intentionally, Defendant directly and/or vicariously engaged in acts, omissions and/or other conduct as described herein that violated the TCPA.

82. Defendant directly and/or vicariously used an ATDS to initiate numerous unsolicited telephone calls to the cellular telephone numbers of Plaintiff and the Class. These telephone calls delivered unsolicited commercial text messages to the cellular telephones of Plaintiff and the Class.

83. Plaintiff and the Class are entitled to recover $500.00 in damages from Defendant for each violation of the TCPA. 47 U.S.C. § 227(b)(3)(B).

84. Plaintiff and the Class are entitled to treble damages, attorneys' fees, costs, injunctive relief prohibiting such conduct in the future and other remedies allowed by the TCPA or otherwise permitted by law.

85. In the absence of a judicial declaration of the illegality of Defendant's conduct and an injunction barring Defendant from engaging in such illegal conduct in the future, Defendant will continue its unlawful conduct in the future.

## JURY TRIAL DEMAND

86. Plaintiff demands trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that relief be granted as follows:

A. That an order be entered certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the Class;

B. That judgment be entered against Defendant for statutory damages pursuant to 47 U.S.C. § 227(b)(3)(B);

C. That judgment be entered against Defendant for treble damages pursuant to 47 U.S.C. § 227(b)(3)(C);

D. That the Court award costs and reasonable attorneys' fees to Plaintiff's counsel;

  E. That the Court enter a declaration that Defendant's conduct is in violation of the TCPA;

  F. That the Court enjoin Defendant from further violations of the TCPA; and,

  G. That the Court grant such other and further relief as may be just and proper.

Date: December 4, 2015

            *s/ James A. Francis*
            FRANCIS & MAILMAN, P.C.
            James A. Francis
            Mark D. Mailman
            John Soumilas
            Geoffrey Baskerville
            David A. Searles
            Land Title Building, 19th Floor
            100 South Broad Street
            Philadelphia, PA 19110
            (215) 735-8600

            Attorneys for Plaintiff and the Class