

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BILL DOMINGUEZ, on behalf of himself and all others similarly situated, **Plaintiff** | **CIVIL ACTION** |
| v. | **NO. 13-1887** |
| YAHOO!, INC., **Defendant** | FILED JAN 27 2017 KATE BARKMAN Clerk By___ Dep. Clerk |

## MEMORANDUM – YAHOO MOTION FOR SUMMARY JUDGMENT

Baylson, J.                                              January 27 2017

## I.      Introduction

On remand from the Third Circuit, this case relates to an alleged violation of the Telephone Consumer Protection Act ("TCPA"). In the initial phase of this case, this Court granted summary judgment in favor of Defendant Yahoo!, Inc. ("Yahoo" or "Defendant"), and Plaintiff appealed. In part due to a new ruling by the FCC regarding the TCPA that was issued as the appeal was pending, the Third Circuit remanded the case for further proceedings and factual development.

Before the Court are two motions: Yahoo's Renewed Motion for Summary Judgment, and Yahoo's Motion to Exclude Plaintiff's experts. For the reasons outlined below, both of Yahoo's Motion will be GRANTED.

## II.      Background of the Case

### A.      Factual Background

Plaintiff alleges that Yahoo violated the TCPA, enacted by Congress in 1991. Plaintiff purchased a used cellular telephone with an assigned phone number. The previous owner of the telephone number had subscribed to Yahoo's email service and also enrolled the number in the

x c: Legal

Defendant's E-mail SMS Service, through which the phone would receive text messages upon receiving an e-mail at the owner's Yahoo e-mail account. Plaintiff, on behalf of himself and other similarly situated consumers, initiated this class action lawsuit against Defendant Yahoo to challenge Yahoo's practice of sending unsolicited text messages to cellular telephone numbers owned by individuals who never consented to receive such text messages.

It is undisputed that Plaintiff received text messages solely because the previous owner of Plaintiff's mobile phone number was a Yahoo subscriber who affirmatively signed up to receive text messages each time he received an email in his Yahoo email inbox. Yahoo has consistently, without dispute, asserted it could not "disarm" the system. Yahoo denies liability and argues that the TCPA only prohibits unsolicited automated telemarketing and bulk communications sent via an Automatic Telephone Dialing System ("ATDS"), which means a system that has the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and dial those numbers. <u>See</u> 47 U.S.C. § 227(b)(3).

Yahoo contends that its system is not an ATDS because the system lacks the capacity to store or produce telephone numbers to be called, using a random or sequential number generator.

**B.    Law**

The TCPA prohibits any person from making:

> Any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any [ATDS] . . .
>
> (iii) to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call . . .

47 U.S.C. § 227(b)(1)(A).

2

The statute defines an ATDS as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (b) to dial such numbers." Id. § 227(a)(1).

### C.    Prior District Court Opinions

In granting Yahoo's first motion for summary judgment (ECF 55), this Court held that Plaintiff has not offered any evidence to show that Yahoo's system had the capacity to randomly or sequentially generate telephone numbers (as opposed to simply storing telephone numbers), and call those numbers, as required by the statutory definition of ATDS. The Court thus found that Yahoo did not send text messages to Plaintiff via an ATDS and, therefore, granted judgment in favor of Yahoo. See Dominguez v. Yahoo!, Inc., 8 F. Supp. 3d 637 (E.D. Pa. 2014).

### D.    Third Circuit Opinion (629 F. App'x 369)

The Third Circuit agreed with this Court's definition of "random or sequential" number generation (i.e., "the phrase refers to the numbers themselves rather than the manner in which they are dialed") and its holding that the statutory definition does in fact include such a requirement. However, the Third Circuit reversed the grant of summary judgment as follows:

> We disagree that the record supports entry of summary judgment in Yahoo's favor. The only evidence Yahoo can point to that is probative of whether its equipment has the requisite capacity is the conclusory affidavit of its expert Ajay Gopalkrishna, who states that "[t]he servers and systems affiliated with the Email SMS Service did not have the capacity to store or produce numbers to be called, using a random or sequential number generator, and to call those numbers." Not only does this restating of the statutory definition amount to nothing more than a legal conclusion couched as a factual assertion, *compare with* 47 U.S.C. § 227(a)(10 ("The term 'automatic telephone dialing system' means equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."), it begs the question of what is meant by the word "capacity."

3

629 F. App'x. at 373.

The Third Circuit also remanded for consideration of an FCC ruling in 2015, Rules &
Regulations Implementing Tel. Consumer Protection Act of 1991, 30 FCC Rcd. 7961, 8074;
2015 WL 4387780, at *81 (2015) [hereinafter 2015 Ruling], that impacted the definition of
"capacity." The Circuit Court noted changes in telephone technology in the context of the
TCPA, the evolution of the FCC regulations, and a dispute in the industry about the scope of its
regulations:

> In a series of declaratory rulings – the most recent being the one
> referred to above in July 2015, *see* 2015 FCC Ruling, 2015 WL
> 4387780, at *5-*6 – the FCC appeared to take a middle-of-the-
> road view. Although hardly a model of clarity, its orders (as we
> interpret them) hold that an autodialer must be able to store or
> produce numbers that *themselves* are randomly or sequentially
> generated "even if [the autodialer is] not presently used for that
> purpose." *Id.* at *5. But importantly, in the most recent ruling the
> FCC also clarified that neither "present ability" nor the use of a
> single piece of equipment is required. Thus, so long as the
> equipment is part of a "system" that has the latent "capacity" to
> place autodialed calls, the statutory definition is satisfied.

## III.  Summary

The Court will discuss the concept of "capacity" in the context of FCC regulations,
determine whether there are any genuine issues of fact requiring that Yahoo's motion for
summary judgment be denied, and consider other legal issues. Below is a summary of the
Court's decisions.

1.  As the Third Circuit specifically noted that this Court's prior opinion did not have
a detailed discussion of "capacity," a descriptive definition of this term will precede the
discussion of the other issues in the case. The definition will describe the meaning of "capacity"
in the context of this case, relying on FCC rulings and any applicable case law. In this

4

discussion, the Court will consider the 2015 Ruling, which in relevant part was adopted by a 3-2 vote,[1] and is currently on appeal before the Court of Appeals for the District of Columbia Circuit.

2.      The Court determines that the applicable standard to apply is the concept of "present capacity" because that was the governing principal of communications law at the time that Plaintiff bought his telephone and this case was filed.

a.      Under a standard of "present capacity," the Yahoo system did not qualify under the TCPA's requirements.   The Third Circuit affirmed this Court's interpretation of statutory language, which, in the absence of any other evidence, requires granting Yahoo's motion for summary judgment.

3.      The Court concludes that the 2015 Ruling should not be applicable to this case under any principle of retroactivity, Supreme Court decision or Third Circuit precedential opinion, and finds that it would not be fair to Yahoo to apply the 2015 Ruling to this case.

4.      Alternatively, if the Court were to consider the 2015 Ruling, then Plaintiff would have the burden of showing that the Yahoo system could meet the statutory definition, and that concepts of "latent capacity" or "potential capacity" must be considered.

a.      Plaintiff has proffered the opinions of four separate experts and argues that these expert reports show a genuine issue of fact requiring a jury trial that the Yahoo system meets the concepts of "latent capacity" or "potential capacity."

i.      After detailed consideration of the expert reports, and Yahoo's Daubert motion to exclude them, the Court concludes that the Daubert motion should be granted because the Plaintiff's experts have not shown that their opinions are reliable or "fit" the facts of this case and also, their opinions are not

---

[1] On the issues relevant in this case, Commissioners Pai and O'Rielly dissented from the Commission's decision

supported by any empirical testing, which is an important requirement under Daubert and subsequent Third Circuit cases.

b.   Without the expert testimony, Plaintiff has failed to show a genuine issue of fact so as to defeat summary judgment.

5.   Even if admissible, Plaintiff's experts' reports fail to show the Yahoo system was capable of generating random/sequential numbers and "calling" those numbers, and are therefore insufficient to defeat summary judgment.

6.   On the issue of waiver, the record shows the Plaintiff relied on a theory of "present capacity" when the case was originally filed. However, the Plaintiff, promptly after the FCC issued the 2015 Ruling, notified the Third Circuit about the Ruling. The 2015 Ruling was clearly one of the reasons for the remand back to this Court. Because Plaintiff promptly filed an Amended Complaint in this Court after the remand, without any objection by Yahoo, the Court will not find waiver.

**IV.   Capacity in the TCPA and FCC Rulings**

In its appellate decision, the Third Circuit noted that this Court's prior opinion did not contain a detailed discussion of the meaning of "capacity," a key term at the heart of this matter. Thus, we will begin by addressing the definition of "capacity" in the context of the TCPA and the FCC rulings interpreting it.

The TCPA, passed by Congress in 1991, prohibits certain types of calls made from an ATDS, which the statute defines as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Although "capacity" is not defined in the TCPA, three FCC rulings published since the law's passage discuss the meaning of the term and, in light of the dearth of appellate decisions engaging in any such discussion, provide the most instructive

6

authority on its definition. See 47 U.S.C. § 227(b)(2) (authorizing the FCC to implement rules and regulations enforcing the TCPA); Hartley-Culp v. Green Tree Servicing, LLC, 52 F. Supp. 3d 700, 703 (M.D. Pa. 2014) (holding that FCC rulings are binding on district courts).

### A.   1992 Ruling

Shortly following the promulgation of the TCPA, the FCC issued its first ruling addressing the definition of an ATDS. See Rules & Regulations Implementing Tel. Consumer Protection Act of 1991, 7 FCC Rcd. 8752, 1992 WL 690928 (FCC Oct. 16, 1992) [hereinafter 1992 Ruling]. In the 1992 Ruling, the FCC considered whether the prohibitions of the TCPA applied to functions such as "speed dialing" or "call forwarding" and determined that they did not, "because the numbers called are not generated in a random or sequential fashion." Id. at *17, ¶ 47. That finding bears on the instant inquiry even though "capacity" is not explicitly referenced because it reveals that the FCC's understanding at the time was that, to be an ATDS, a given piece of equipment must function as one at the time the challenged calls were made. See 2015 Ruling, 2015 WL 4387780, at *81 (dissent of Commissioner Pai) (interpreting the 1992 Ruling as the FCC's first expression of what became its long-held approach to solely consider the present capacity of a given piece of equipment when determining if it qualified as an ATDS).

A second relevant statement in the 1992 Ruling reflects the FCC's then-current stance on definitional questions that regulated entities had raised in the wake of the TCPA's passage. In response to such questions, the FCC "decline[d] to adopt definitions offered by commenters where such definitions fit only a narrow set of circumstances," and instead voiced support for "broad definitions which best reflect legislative intent by accommodating the full range of telephone services and telemarketing practices." 1992 Ruling, 1992 WL 690928, at *2, ¶ 6. We note this statement here because it is cited in the 2015 Ruling as support for the FCC's

proposition that it has consistently interpreted terms in the TCPA broadly. See 2015 Ruling, 2015 WL 4387780, at *7, ¶ 16.

**B.    2003 Ruling**

A decade later, the FCC again confronted the definition of an ATDS, this time in response to dramatic changes in the telemarketing industry that had taken place in the intervening years. See Rules & Regulations Implementing Tel. Consumer Protection Act of 1991, 18 FCC Rcd. 14014, 2003 WL 21517853 (2003) [hereinafter 2003 Ruling]. In the 2003 Ruling, the FCC considered whether the definition of an ATDS was capacious enough to include "predictive dialers," which are dialing systems that "store pre-programmed numbers or receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiencies for call centers." Id. at *45, ¶ 130. It was undisputed that predictive dialers do not "store or produce telephone numbers to be called, using a random or sequential number generator;" but, nevertheless, the FCC ruled that predictive dialers fit within the definition of an ATDS. See 47 U.S.C. § 227 (a)(1); 2003 Ruling, 2003 WL 21517853, at *46, ¶ 133.

The FCC rested its conclusion on the use of the word "capacity" in the definition of an ATDS, holding that because a predictive dialer has "the capacity to dial numbers without human intervention," it was sufficiently automated to be an ATDS. 2003 Ruling, 2003 WL 21517853, at *46, ¶¶ 133-134 (emphasis in original). The FCC further relied on legislative intent to bolster its finding, stating that the TCPA was intended to alleviate the problem of unwanted automated calling and should not be sapped of its power to do so by virtue of a change in the methodology used by telemarketers. See id. at *46, ¶¶ 132-133 ("In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective.").

8

The 2003 Ruling's effect on the definition of an ATDS is cabined to its holding that the specific type of dialing equipment known as a "predictive dialer" qualifies as an ATDS. See id. at *46, ¶ 133 (summing up its discussion of "capacity" by holding that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress"). Although the reasoning underlying that finding reflects the FCC's movement towards a broader definition of "capacity" than had been previously embraced, the sole upshot of the 2003 Ruling, on this issue, is to include predictive dialers within the definition of ATDS and is not to "implicitly reject[] any 'present use' or 'current capacity' test." See 2015 Ruling, 2015 WL 4387780, at *7, ¶ 16. This is made clear in Commissioner Pai's dissent to the 2015 Ruling, discussed below, in which he refuted the majority's attempt to "seek[] refuge in Commission precedent," stating that the 2003 Ruling was exclusively relevant to predictive dialers and that, furthermore, it did not reject a "present use" test because the equipment at issue "had the capacity to dial random or sequential numbers at the time of the call, even if that capacity was not in fact used." Id., at *83; see also Blow v. Bijora, Inc., No. 11-3468, 2016 WL 7013507, at *5 (N.D. Ill., Feb. 4, 2016) (noting that the 2003 Ruling "limited this expanded definition [of capacity] to predictive-dialer systems" and that the 2015 Ruling "removed the predictive-dialer circumscription, yet").

### C.    2015 Ruling

Finally, the 2015 Ruling is central to this discussion, insofar as it addresses in the most comprehensive manner to date how "capacity" fits into the definition of an ATDS. The 2015 Ruling, currently on appeal before the D.C. Circuit, clarifies that the pertinent inquiry in determining whether equipment qualifies as an ATDS is the equipment's potential capacity to perform the functions described in the statute. See 2015 Ruling, 2015 WL 4387780 at *7, ¶ 16. By interpreting "capacity" in this way, the 2015 Ruling repudiated a "present use" or "current

capacity" standard and instead created a space within the definition for equipment that, while not an ATDS as currently configured, could become one with some level of modification. Courts have struggled to apply the FCC's newly promulgated interpretation of "capacity" because the 2015 Ruling provides scant guidance as to how to differentiate between "potential" capacity, which is covered by the statutory definition, and "theoretical" capacity, which is not. See id. at *7, ¶ 18 (explaining that equipment may possess the requisite capacity to be an ATDS if "it requires the addition of software to actually perform the functions described in the definition," but cautioning that "there must be more than a theoretical potential that the equipment could be modified to satisfy the [ATDS] definition") (emphasis added); Errington v. Time Warner Cable Inc., No. 15-2196, 2016 WL 2930696, at *3 (C.D. Cal. May 18, 2016) (noting that "[t]he July 2015 Ruling does not clarify the difference between 'potential' and 'theoretical' capacity"). Indeed, the only example in the 2015 Ruling of a piece of equipment that would exceed the outer limit of "capacity" is a rotary-dial phone which, although "theoretically possible to modify . . . to such an extreme that it would satisfy the definition of [an ATDS]," is too far afield from an ATDS to support a finding that it has the requisite capacity. 2015 Ruling, 2015 WL 4387780 at *7, ¶ 18.

Two Commissioners penned dissents on this topic, and they merit brief discussion here. The main thrust of Commissioner Pai's dissent was that if a dialing device cannot do the two things the statute states that an ATDS must be able to do, then it cannot meet the statutory definition of an ATDS. Id. at *81. Commissioner Pai characterized the majority's approach as contrary to prior FCC rulings rather than simply a "reaffirmation" of them, and argued that the "present capacity" approach is consistent with the use of the present tense and indicative mood in the statute. Id. He further concluded that the 2015 Ruling subverts legislative intent by

transforming "pretty much any calling device or software-enable feature that's not a 'rotary-dial phone'" into an ATDS, and therefore subjecting "almost all our citizens to liability for everyday communications." Id. at *82. In sum, the Commissioner strongly opposed what he characterized as the dramatic expansion of the TCPA's reach wrought by the 2015 Ruling.

The second dissent that addresses the 2015 Ruling's enlarged definition of "capacity" is that of Commissioner O'Rielly, who similarly described the majority's approach as over-inclusive and a fundamental "misread[ing] of] the statute." Id. at *92. Commissioner O'Rielly agreed with Commissioner Pai that the statutory language is clear: to be an ATDS the equipment must have the capacity to function as an ATDS at the time that the challenged call is made. Id. at *91. He further stated that the 2015 Ruling runs contrary to the plain language of the TCPA "by including equipment [in the definition of an ATDS] that merely has the capacity to dial from a list of numbers." Id. at *92. At least one court has cited these dissents as support for a finding that the 2015 Ruling is likely to be overturned. See Gensel v. Performant Techs., Inc, No. 13-1196, 2015 WL 6158072, at *2 (E.D. Wis. Oct. 20, 2015) (granting stay based on conclusion that the 2015 Ruling's definition of "capacity" contradicted the plain language of the TCPA and would therefore not be entitled to deference on appeal).

As the above makes clear, the 2015 Ruling advanced a definition of "capacity" that is at once broader than the definitions previously elucidated by the FCC, and lacking in clearly delineated boundaries. The dissents of Commissioners Pai and O'Rielly capture the sentiment of uncertainty that is currently prevailing among regulated entities and courts faced with interpreting and applying the 2015 Ruling. In this litigation, neither Party argued that the relevant standard was "potential" or "latent" capacity prior to the issuance of the 2015 Ruling. See Yahoo's Initial Mot. for Summary Judgment (ECF 14) at 6-7 (focusing on "capacity" in

11

general, with no reference to potential or latent capacity); Pl. Response to Yahoo's Initial Mot. for Summary Judgment (ECF 19) at 4-5 (same).

**D.      Present capacity is a viable legal standard**

The Third Circuit opinion in this case is non-precedential, which means that it is a decision affecting only the parties of this case and is not binding on future panels of the Third Circuit hearing similar cases.  The Third Circuit's opinion noted that the parties had agreed that "present capacity" was the governing concept.  Plaintiff asserts that, on remand, this Court is not bound to consider "present capacity" and a better interpretation of the Third Circuit's ruling is that, by remanding in part because of the FCC's 2015 Ruling, the Third Circuit was requiring this Court to abandon "present capacity" and substitute the concepts of "latent" or "potential" capacity.  The Court rejects this argument as erroneously interpreting the Third Circuit's opinion as mandating that this Court abandon the concept of "present capacity."   For reasons stated elsewhere in this memorandum, this Court has decided not to apply the 2015 Ruling.

This Court also believes that because the Third Circuit's opinion is not precedential, this Court may, on remand, review the entire record and may determine once again that the appropriate concept of "capacity" is "present capacity."  This Court's view is that it should apply the concept of "present capacity" because that was the FCC's test when this case was filed and when Plaintiff was receiving the text messages which form the basis of this lawsuit.

However, alternatively, this Court will then consider whether the 2015 Ruling should be applied retroactively, and then, whether Plaintiff has satisfied their burden of showing, in responding to Yahoo's motion for summary judgment, that there is evidence from which the Court can determine there is a genuine issue of fact as to the "capacity" of the Yahoo E-mail SMS Service, to require a jury trial.

V.     **Whether the FCC's 2015 Ruling Applies to this Case**

Whether the 2015 Ruling is applicable may depend upon how the administrative agency's

decision is classified; namely, how it fits into one of several well-known categories of agency

rulings [and] whether it is a "substantive" rule, an "adjudicative" rule, an "interpretive" rule, or a

"statement of policy" under the Administrative Procedure Act ("APA").   As surprising as this

may sound, the FCC itself did not characterize the 2015 Ruling as belonging to any of the above

categories.[2]  Indeed, the parties to the pending appeal to the District of Columbia Circuit Court of

Appeals "suffer" through this uncertainty, by themselves failing to characterize the FCC ruling

as belonging to any one of the above categories.   At least a cursory review of the pending briefs

did not disclose any discussion, or even debate, on how to categorize the 2015 Ruling.

The best characterization of the 2015 Ruling is that it resembles a "mongrel" – with no

offense to dogs.  The Court expresses its dismay that the majority of FCC Commissioners would

have issued it without any characterization– thus, infecting numerous district court judges with

the disease of uncertainty.

However, this Court believes that it must make an attempt to fit the FCC Ruling into one

or more of the above categories in order to determine whether it should be applicable to this case

as retroactive.

A.     **"Substantive" Rules (Not Retroactively Applicable)**

The APA defines a "substantive" rule as "an agency statement of general or particular

applicability and future effect designed to implement, interpret, or prescribe law or policy or

describing the organization, procedure, or practice requirements of an agency."   5 U.S.C. §

---

[2]        At most, the 2015 Ruling provides small clues (like the breadcrumbs Hansel and Gretel dropped) by
acknowledging that it is (1) "address[ing] 19 petitions" for declaratory rulings and/or exemptions and one "letter . . .
requesting clarification"; (2) "declin[ing] to grant a petition for rulemaking[,]"; and (3) "address[ing] [the issues]
together by issue rather than individually" because of "the significant similarity of issues between some of the
petitions."  2015 Ruling, 2015 WL 4387780, at *3, ¶4.

551(4).  A substantive rule "characteristically involves the promulgation of concrete proposals, declaring generally applicable policies binding upon the affected public generally, but not adjudicating the rights and obligations of the parties before it."  PBW Stock Exch., Inc. v. SEC., 485 F.2d 718, 732 (3d Cir. 1973) (quoting 1 K. Davis, Administrative Law Treatise, § 5.01 (1958)).  These rules have the force and effect of law and must be promulgated in accordance with the proper notice and comment procedures under the APA.  See Beazer E., Inc. v. EPA, Region III, 963 F.2d 603, 606 (3d Cir. 1992).

The Supreme Court has made clear that substantive rules may not be retroactively applied, see Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988), "in order to protect the settled expectations of those who had relied on the preexisting rule."  Williams Nat. Gas Co. v. FERC, 3 F.3d 1544, 1554 (D.C. Cir. 1993) (internal citations omitted).

**B.     "Policy Statements" (Not Retroactively Applicable)**

While the term "statements of policy" is not explicitly defined in the APA, the Supreme Court has afforded deference to the definition proffered in the Attorney General's 1947 Manual on the APA ("Attorney General's Manual"), stating it is a pronouncement "issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  Lincoln v. Vigil, 508 U.S. 182, 197 (1993) (quoting Attorney General's Manual 30, n. 3 (1947)).  Policy statements are excluded from the APA's notice and comment requirement.  See United States v. Mead Corp., 533 U.S. 218, 226 (2001); Madison v. Res. for Human Dev., Inc., 233 F.3d 175, 179 (3d Cir. 2000).

The law on the retroactivity of a policy statement is not settled in the Third Circuit, but most Circuits adhere to the definition of policy statements as pronouncements to "advise the public *prospectively*."  Mada-Luna v. Fitzpatrick, 813 F.2d 1006, 1014 (9th Cir. 1987); see also

Am. Hosp. Ass'n v. Bowen, 834 F.2d 1037, 1046 (D.C. Cir. 1987); Burroughs Wellcome Co. v. Schweiker, 649 F.2d 221, 224 (4th Cir. 1981). This Court finds, as it has before, "that policy statements may not be applied retroactively." Colacicco v. Apotex, Inc., 432 F. Supp. 2d 514, 534 (E.D. Pa. 2006) (Baylson, J.), aff'd, 521 F.3d 253 (3d Cir. 2008), cert. granted, judgment vacated, 556 U.S. 1101 (2009); see also Lincoln, 508 U.S. at 197.

### C.    "Interpretative" Rules (Retroactively Applicable)

Unlike "substantive" rules, "interpretive" rules seek only to interpret the meaning already in properly issued regulations, and are meant "to give guidance to its staff and affected parties as to how the agency intends to administer a statute or regulation." Beazer, 963 F.2d at 606; Daughters of Miriam Ctr. for the Aged v. Mathews, 590 F.2d 1250, 1258 (3d Cir. 1978). "If the rule in question merely clarifies or explains existing law or regulations, it will be deemed interpretive." Bailey v. Sullivan, 885 F.2d 52, 62 (3d Cir. 1989). Interpretive rules, like statements of policy, are exempted from the APA's notice and comment requirement. Beazer, 963 F.2d at 606.

Retroactive application of an "interpretive" rule is permissible. See Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary, 93 F.3d 103, 113 (3d Cir. 1996). The Third Circuit has held that "where a new rule constitutes a clarification—rather than a substantive change—of the law as it existed beforehand, the application of that new rule to pre-promulgation conduct necessarily does *not* have an impermissible retroactive effect, regardless of whether Congress has delegated retroactive rulemaking power to the agency." Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 506 (citing Appalachian States, 93 F.3d at 113) (emphasis in original).

### D.    "Adjudicative" Rule (Retroactively Applicable, with Exception)

Last, an "adjudicative" rule does "'not purport to engage in formal rulemaking or in the promulgation of any regulations' but instead amounts to an adjudication of the rights and obligations of the parties before it." Town of Deerfield, N.Y. v. FCC, 992 F.2d 420, 427 (2d Cir. 1993) (quoting FCC v. Pacifica Found., 438 U.S. 726, 734 (1978)). While the line dividing adjudications and rulemakings "may not always be a bright one," there is a "recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." Chem. Leaman Tank Lines, Inc. v. United States, 368 F. Supp. 925, 934 (D. Del. 1973). "The mere presence in the decision of general statements that might have applicability to controversies between other persons does not change the character of an order from one that is essentially adjudicatory to one that is quasi-legislative." Town of Deerfield, N.Y., 992 F.2d at 427.

Administrative adjudications "carry a presumption of retroactivity that [courts] only depart from when to do otherwise would lead to 'manifest injustice.'" Am. Tel. & Tel. Co. v. F.C.C., 454 F.3d 329, 332 (D.C. Cir. 2006); see Williams Nat. Gas Co., 3 F.3d at 1554 (when an agency adjudication announces a new application of existing law or clarification, "which may give rise to questions of fairness, it may be necessary to deny retroactive effect to a rule announced in an agency adjudication in order to protect the settled expectations of those who had relied on the preexisting rule.").

### E.   Discussion

Having surveyed the potential classifications, the Court must determine which best suits the 2015 Ruling, which, by extension, may determine its retroactive applicability. Wright v. Target Corp. has addressed the retroactive application of the 2015 Ruling. No. 14-cv-3031, 2015

WL 8751582, at *6 (D. Minn. Dec. 14, 2015). There, considering generally whether the 2015

Ruling constituted an "adjudication" or a rulemaking, the court reasoned:

> Nearly all of the twenty-plus consolidated petitions to the FCC
> underlying the [2015 Ruling] were framed as petitions for
> declaratory rulings or clarifications, with only one petitioner
> framing its petition as a request for rule making. Moreover, the
> portion of the [2015 Ruling] regarding the revocation of consent
> states that it is clarifying prior law: "[W]e clarify that consumers
> may revoke consent through any reasonable means." However, as
> Defendant notes, the Order is styled as "In the Matter of Rules and
> Regulations Implementing the [TCPA] of 1991," and applies
> across the board to the entire regulated industry, rather than being
> limited to particular parties or an industry subset.

Id. (internal citations omitted). The court noted that "[c]ertainly, if the [2015 Ruling] is an

adjudication, the Court is obligated to retroactively apply the FCC's interpretation of the TCPA."

Id. Ultimately, however, the court concluded that it "need not resolve the question." Id.

Retroactivity of the 2015 Ruling was also touched on in Jenkins v. mGage, No. 14-cv-

2791, 2016 WL 4263937 (N.D. Ga. Aug. 12, 2016). There, the court granted summary judgment

in the defendant's favor, holding that the defendant's platform was not an ATDS because its use

involved a level of "human intervention" for which liability under the TCPA did not attach. In

rejecting the plaintiff's argument that the court's holding "ignore[d] the 2015 [Ruling]," the court

explained that the FCC's 2015 Ruling was not "dispositive in the present case *because the FCC

issued the ruling after the calls in question*." Id. at *6 (emphasis added). While the court clearly

considered retroactive application of the 2015 Ruling to conduct that preceded it, the court did

not engage in a robust discussion of retroactivity, potentially because it would have reached the

same conclusion even if it had applied the Ruling retroactively. See id. ("Plaintiff ignores that

the [2015 Ruling] underscored that a defining characteristic of an autodialer is the ability to dial

numbers without human intervention.").

17

Turning to this case, we can quickly eliminate the possibility that the 2015 Ruling constituted a "policy statement," since it did far more than merely explain how the FCC "intends to exercise a discretionary power." Lincoln, 508 U.S. at 197.

Determining whether the 2015 Ruling is a "substantive" versus an "interpretive" rule, however, requires a more searching inquiry. In Levy, 544 F.3d at 506, the Third Circuit explained that there is no "bright-line test" to determine whether a new regulation merely "clarifies" the existing law, but identified four factors as "particularly important for making this determination[,]" including:

> (1) whether the text of the old regulation was ambiguous; (2) whether the new regulation resolved, or at least attempted to resolve, that ambiguity; (3) whether the new regulation's resolution of the ambiguity is consistent with the text of the old regulation; and (4) whether the new regulation's resolution of the ambiguity is consistent with the agency's prior treatment of the issue[.]

Id. at 507. The court also stated that "an enacting body's description of an amendment as a 'clarification' of the pre-amendment law [is not] necessarily relevant to the judicial analysis." Id. (citing United States v. Diaz, 245 F.3d 294, 304 (3d Cir. 2001)).

Collectively, what the Levy factors ask is whether a given agency action marks a significant change in the interpretation or application of the agency's rule, or whether it simply resolved an open question in an unsurprising way. The Levy factors—as well as the Third Circuit's remand asking for this Court's definition of "capacity—appear to warrant the conclusion that the term "capacity" is ambiguous. As noted above, the TCPA does not define the term "capacity" and, of the five FCC Commissioners, two of them issued a strong dissent on this issue. Additionally, numerous lower courts have granted a stay of proceedings under the TCPA, in part because the FCC's ruling is on appeal, but also because it is subject to many different

interpretations, which may be a polite way of saying that the FCC's rulings have been ambiguous.

Regarding the second factor, this Court cannot reasonably conclude that the 2015 Ruling "resolved" an ambiguity. The 2015 Ruling provided very little guidance as to what could now constitute an ATDS, and gave only one example—a rotary phone—of what would conclusively fall outside the bounds of the term "capacity." 2015 Ruling, 2015 WL 4387780, at *8, ¶ 18. Since the 2015 Ruling, many courts have stayed cases where liability under the TCPA hinges on classification as an ATDS, pending clarity regarding the scope of the term from the D.C. Circuit. See, e.g., Rajput v. Synchrony Bank, No. 15-1079, 2016 WL 6433134 (M.D. Pa. Oct. 31, 2016) (granting stay); Errington, 2016 WL 2930696 (same).

The third factor, whether the new regulations' resolution of the ambiguity is consistent with the text of the old regulation, is difficult to answer because a fair reading of the 2015 Ruling does not allow a conclusion that the new regulation resolved the pre-existing ambiguity; indeed, the 2015 Ruling only made the ambiguity more severe by introducing the concept of "potential" capacity without adequately defining it.

Regarding the fourth factor, it is not clear that the 2015 Ruling is consistent with the FCC's prior treatment of the term "capacity."[3] As explained above, a close reading of the FCC's prior rulings demonstrate that the 2015 Ruling's definition of the term "capacity" marked a significant departure from its prior meaning. True, the 2003 Ruling expanded the definition of ATDS to include equipment known as "predictive dialers," which "had the capacity to dial random or sequential numbers at the time of the call, even if that capacity was not in fact used." See 2015 Ruling, 2015 WL 4387780, at *7, ¶ 16. But the 2015 Ruling went much further. It

---

[3]     Yahoo's argument that the FCC's 2003 Ruling adopted "potential" capacity as the relevant standard is rejected.

19

expanded the definition of "capacity" to include any equipment that had the "potential capacity" to "dial random or sequential numbers" at the time of the call, even if it did not have the "present capacity" to do so. As Commissioner Pai notes in his dissent, this constituted a "dramatic[] depart[ure] from the ordinary use of the term 'capacity.'" Id., at *82.

That the 2015 Ruling is inconsistent with prior treatment of the term "capacity" is also obvious by virtue of the course of this very litigation. When the 2015 Ruling was issued, both parties filed letters pursuant to Federal Rules of Appellate Procedure 28(j) ("Rule 28(j) Letter"), alerting the Third Circuit to what they obviously considered an important development. That the Third Circuit remanded this case on the basis that this Court needed to consider the definition of "capacity" more fully speaks volumes that the Third Circuit thought the term was ambiguous. Moreover, since remand, the Parties have almost entirely focused on whether Yahoo's system has the "potential" capacity to be classified as an ATDS. The Parties have devoted several months of discovery to the issue, including submitting several new expert reports and submitting new declarations, all of which focus on the new meaning of the term "capacity."

Accordingly, the Court is satisfied that the 2015 Ruling was not an "interpretive" rule that only clarified an existing rule. Importantly, as the Levy court articulated, the fact that the 2015 Ruling references itself as merely "clarifying whether conduct violates the TCPA" is "not all that significant." Levy, 544 F.3d at 507. As the Third Circuit in Levy no doubt recognized, the judicial analysis, which may result in significant liability of the defendant, cannot hinge on the agency's own passing characterization of its action. Only Congress, not an administrative agency, can authorize damage actions.

The 2015 Ruling fits no more comfortably within the definition of a "substantive" rule, however, than it does in the definition of an "interpretive" rule. For instance, the 2015 Ruling

explicitly states in its introduction that it "decline[d] to grant a petition for [substantive] rulemaking." 2015 Ruling, 2015 WL 4387780, at *3, ¶ 3.  Moreover, the 2015 Ruling had no period for notice and comment, a procedural requirement for "substantive" rulemaking.  Beazer, 963 F.2d 603, 606 (3d Cir. 1992).

Notwithstanding the fact that the 2015 Ruling does not have the procedural hallmarks of a "substantive" rule, it certainly has the character of one.  Definitionally, the 2015 Ruling's interpretation of the term "capacity" seems to be "an agency statement of general . . . applicability and future effect designed to. . . interpret . . . law . . . of an agency."  5 U.S.C. § 551(4).  Moreover, the 2015 Ruling has spawned multiple litigations over whether it was even a proper exercise of administrative power, and has been referred to by FCC Commissioners as a "dramatic[] depart[ure] from the ordinary use of the term 'capacity.'"  2015 Ruling, 2015 WL 4387780, at *82.  To refuse to classify the 2015 Ruling as a "substantive" rule that can have only prospective effect may then be to put form over substance.

Finally, we must consider whether the 2015 Ruling may properly be classified as an "adjudicative" rule.  The Wright court suggested that the fact that the 2015 Ruling was promulgated in response to several petitions for declaratory rulings or clarifications meant it was akin to an adjudication.  Wright, 2015 WL 8751582, at *6.  As the court there noted, however, the 2015 Ruling is meant to apply to all those regulated by the FCC, not only the individual petitioners.  Id.

If the 2015 Ruling is an "adjudicative" rule, the Court finds that retroactive effect would be inappropriate because it would constitute a "manifest injustice" to Yahoo.  See Clark-Cowlitz, 826 F.2d 1074, 1081 (D.C. Cir. 1987) (en banc) ("[A] retrospective application can properly be

21

withheld when to apply the new rule to past conduct or prior events would work a 'manifest injustice.'").

The District of Columbia Court of Appeals has not been "entirely consistent in enunciating a standard to determine when to deny retroactive effect in cases involving 'new applications of existing law, clarifications, and additions' resulting from adjudicatory actions." Verizon Tel. Cos. v. FCC, 269 F.3d 1098, 1109–10 (D.C. Cir. 20001). In some instances, it has adopted multi-factor tests, see, e.g., Retail, Wholesale & Dep't Store Union v. NLRB, 466 F.2d 380, 390 (D.C. Cir. 1972),[4] whereas other times it "jettisoned multi-pronged balancing approaches altogether," holding that they all "boil down to a question of concerns grounded in notions of equity and fairness," as well as the reasonableness of a party's reliance on the state of the law prior to the administrative adjudication. Cassell v. FCC, 154 F.3d 478, 486 (D.C. Cir. 1998).

Regardless of the difficulty of categorization, applying the fundamental principle of fairness, retroactive application of the 2015 Ruling would, in this instance, be manifestly unjust to Yahoo. First, throughout this litigation, Yahoo has demonstrated a sincere belief that the law regarding the meaning of "capacity" was "settled." See, e.g., Tr. of Jan. 10 Hrg., p. 38: 23-25; 39:5 (discussing Yahoo's first motion for summary judgment and arguing it "said the relevant standard was only present capacity")); Yahoo Supp. Br. (ECF 123) at p. 5 ("Yahoo argued [in its first motion for summary judgment] that the proper standard was present, not future

---

[4]     The test articulated in Retail, Wholesale is: "(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard."

capacity[.]"). Therefore, this is not a case where there was "a mere lack of clarity in the law," making a finding of manifest injustice unwarranted. Qwest Servs. Corp. v. FCC, 509 F.3d 531, 540 (D.C. Cir. 2007); cf. Am. Telephone and Telegraph Co. v. FCC, 454 F.3d 329, 332 (D.C. Cir. 2006) ("AT & T does not and indeed cannot point us to a settled rule on which it reasonably relied."); Verizon, 269 F.3d at 1111 ("Because the object of the [petitioners'] reliance was neither settled . . . nor 'well-established,' we are skeptical that retroactive liability against the [petitioners] would actually impose a manifest injustice." (citation omitted)).

Second, Yahoo's reliance on its understanding of the term "capacity" prior to the FCC's 2015 Ruling was reasonable. See Qwest, 509 F.3d at 540 ("[F]or reliance to establish manifest injustice, it must be reasonable—reasonably based on settled law contrary to the rule established in the adjudication."). The FCC'S incredibly broad interpretation of the term is being vigorously challenged on appeal. Moreover, it bears repeating that Commissioner Pai's dissent stated that the meaning of "capacity" articulated in the 2015 Ruling "dramatically departs from the ordinary use of the term 'capacity.'" 2015 Ruling, 2015 WL 4387780, at *82.

Finally, because retroactive application of the 2015 Ruling in this case may necessarily involve the imposition of massive damages on Yahoo, the Court must be particularly sure of its propriety. However, Plaintiff has not directed the court to—and this Court is unable to locate—a single case where retroactive application was warranted where, as here, it would result in money damages for conduct not previously known to be proscribed.

Accordingly, if the Court were to find that the 2015 Ruling was retroactively applicable against Yahoo, it would have found that the 2015 Ruling is best classified as either an "interpretive" rule or an "adjudicative" rule for which retroactive application is not "manifestly unjust." For the reasons stated above, this the Court cannot do. While it is not clear that this is a

23

"substantive" rule, it is more like a substantive rule than anything else, such that only prospective application will be permissible.

**VI.    Alternatively, the Court considers the FCC's 2015 Ruling**

If, in the alternative, the 2015 Ruling does apply, then the question is whether Plaintiff has presented evidence so that a reasonable jury could find Yahoo liable given the FCC's new definition of "capacity."    That is, whether Plaintiff has provided evidence to create a factual dispute as to whether the Yahoo E-mail SMS Service had the "potential" or "latent" capacity to generate and dial random or sequential numbers. If so, then a jury may find Yahoo's system to be an "automated telephone dialing system" within the meaning of the TCPA. If the system did not have this capacity, then Yahoo would likely be entitled to summary judgment. Yahoo argues that there is no genuine issue of fact regarding this issue, and presents a declaration of Yahoo employee Gareth Shue which presents facts and concludes that Yahoo's system did not have the requisite capacity. See Declaration of Gareth Shue (ECF 70, Attachment 1).

Specifically, Mr. Shue's declaration sets forth the following facts. Yahoo's Email SMS Service could not generate phone numbers randomly, sequentially, or any other way. Id. at ¶ 9. Instead, Yahoo users had to affirmatively put their numbers into the system. Id. at ¶ 5. The Yahoo Email SMS Service was custom-designed to perform a single function: to forward a text message alert when an email was received to a specific single mobile telephone number that was manually inputted by the user. Id. at ¶ 10. As a result, the system was not set up (nor did it have unused functionality) to send text blasts to multiple numbers – because each email address was only associated with one mobile number at a time. Id.

According to Mr. Shue, Yahoo's Email SMS Service lacked the "latent capacity" to generate phone numbers randomly, sequentially, or any other way. Id. Indeed, as Mr. Shue

24

reasoned, it would not make sense to build in this functionality, as it would have had no purpose in the program. The program was designed to alert specific users (that opted in) of specific emails received. Id.

Further, Mr. Shue states that Yahoo's Email SMS Service was never connected to any server, system, or database that had any capacity to generate phone numbers. The Email SMS Service operated with three proprietary Yahoo Platforms – these platforms did not have the capacity to generate and dial random phone numbers either. Id. at ¶ 12.

In his opposition to Yahoo's Motion for Summary Judgment, Plaintiff relies on four expert reports as providing evidence which Plaintiff contends creates a genuine issue of fact as to whether Yahoo's system had the latent capacity to generate random or sequential telephone numbers to be called. Admissible expert testimony can create an issue of fact to defeat summary judgment. In re Domestic Drywall Antitrust Litig., 163 F. Supp. 3d 175, 230 (E.D. Pa. 2016) (Baylson, J.). In response to Plaintiff's proffered expert evidence, Yahoo filed a Motion to Exclude all four experts (ECF 91). In assessing this Motion, the Court will first summarize Supreme Court and Third Circuit law under Daubert and the admissibility of expert testimony.

## A. Admissibility of Expert Testimony in the Third Circuit

District Court Judges act as gatekeepers "to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997), as amended (Dec. 12, 1997) (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993)). To be admissible under Federal Rule of Evidence 702, expert testimony must meet three primary requirements: (1) the expert witness must be qualified, (2) the testimony must be reliable, and (3) the testimony must be relevant and "fit" the facts of the case. Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). The

Third Circuit has interpreted Rule 702 to have a preference toward admissibility; and has noted that the most important consideration is whether the evidence would be helpful to the trier of fact in a broad sense. Linkstrom v. Golden T. Farms, 883 F.2d 269, 270 (3d Cir. 1989).

### 1. Qualification

To be qualified as an expert, the witness must possess specialized expertise. Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). The Third Circuit has interpreted the qualification standard liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Id.; see also Betterbox Commc'ns Ltd. v. BB Techs., Inc., 300 F.3d 325, 328 (3d Cir. 2002) (admitting expert testimony in trademark lawsuit on basis of expert's experience in marketing and use of logos). Indeed, the Third Circuit has admonished that it is an abuse of discretion to exclude testimony because the proposed expert does not have the specialization that the court considers most appropriate. Pineda, 520 F.3d at 244; see also In re Paoli R.R. Yard PCB Litig., 916 F.2d 829 (3d Cir. 1990) (holding that education or training in court-defined specific areas are not required). As a result, arguments regarding the qualifications of the expert generally go to the weight of the evidence, not admissibility. Holbrook v. Lykes Bros. Steamship Co., 80 F.3d 777, 782 (3d Cir. 1996).

### 2. Reliability

For an expert's testimony to be admissible the process or technique the expert used in formulating his or her opinion must be reliable. Pineda, 520 F.3d at 247. Though the proponent of the testimony has to make more than a prima facie showing that their expert's methodology is reliable, an expert does not have to be proven correct in order to be reliable. Paoli, 35 F.3d at 742. The Third Circuit has instructed District Courts to use the following non-exclusive factors for determining the reliability of expert testimony: (1) whether a method consists of a testable

26

hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. Paoli, 35 F.3d at 742; see also Pineda, 520 F.3d at 247-48. Though the focus is on methodology, and not on the conclusions they generate, the two are related – a court may decide that there is too great a gap between the data available and the opinion proffered. Montgomery Cty. v. Microvote Corp., 320 F.3d 440, 448 (3d Cir. 2003).

Related to the topic of reliability is the Supreme Court's recent decision in Comcast v. Behrend, 133 S.Ct. 1426 (2013). There, the Supreme Court reversed the Third Circuit's affirmance of Judge Padova's decision to certify an antitrust class based on a damages model presented by an expert. Justice Scalia, writing for the 5-4 majority, was critical of the District Court's failure to thoroughly examine the expert's methodology. The Supreme Court held that the methodology presented by the expert could not support a class wide calculation of damages, and therefore could not form the basis of class certification.

### 3. Fit

Third, the expert's testimony must "fit" the facts of the case in which it is offered. That is, there must be a connection between the methodology or test result to be presented and the particular factual issues in the case. In re TMI Litig., 193 F.3d 613, 665 (3d Cir. 1999), amended, 199 F.3d 158 (3d Cir. 2000). The Third Circuit has framed this requirement as one of relevance – that is, to be admissible, the expert testimony must help the trier of fact understand the evidence or determine a fact issue. Id. at 665. For example, as the Third Circuit explained in

27

Paoli, "animal studies may be methodologically acceptable to show that chemical X increases the risk of cancer in animals, but they may not be methodologically acceptable to show that chemical X increases the risk of cancer in humans." Paoli, 35 F.3d at 743.

### B. Reliability Examined: Testability in the Third Circuit

Returning to the second prong (reliability), the Court notes that the first Daubert factor listed above, whether an expert's method consists of a testable hypothesis, is important here. Indeed, in Daubert, the Supreme Court noted that "ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." Daubert, 509 U.S. at 593. This question of "testability" has been a focus of several Third Circuit decisions.

In United States v. Mitchell, 365 F.3d 215 (3d Cir. 2004), the Third Circuit considered the admissibility of expert testimony regarding fingerprint identification. The Third Circuit began its analysis by "first consider[ing] whether the premises on which fingerprint identification relies are testable–or, better yet, actually tested." Mitchell, 365 F.3d at 235. The Third Circuit went on to equate "testability" to "falsifiability" and explained that "proving a statement false typically requires demonstrating a counterexample empirically." Id. The court provided a helpful example to illustrate its point, noting that "for instance, the hypothesis 'all crows are black' is falsifiable (because an albino crow could be found tomorrow), but a clairvoyant's statement that he receives messages from dead relatives is not (because there is no way for the departed to deny this)." Id. The Third Circuit ultimately determined that the challenged expert testimony was reliable because the premises upon which the opinion rested – that human fingerprints are unique and permanent – were testable and falsifiable, even though the *actual* testing of these hypotheses was not particularly robust. Id. at 236.

28

In <u>Oddi v. Ford Motor Co.</u>, 234 F.3d 136 (3d Cir. 2000), the Third Circuit affirmed the District Court's exclusion of an expert in a products liability case based on the expert's failure to test his hypotheses. The expert posed two alternative designs that would have made the truck at issue in the case safer – (1) "the front bumper's design should have included either bracketry or a brace system that would have increased the bumper's rigidity" and (2) "that thicker and/or ribbed metal on the flooring of the cab would have retained the integrity of the cab." <u>Id.</u> at 156. The expert's testimony revealed that he had not tested the adequacy of these alternative designs. <u>Id.</u> Indeed, the expert testified that his methodology for coming up with these designs consisted of observing other similar trucks in a parking lot that included these different designs. <u>Id.</u> at 156-157. However, he did not look into whether those alternative designs actually improved the safety of the vehicle, and could not determine whether those trucks would have resulted in the same injury as occurred with the truck at issue in the case. <u>Id.</u> at 157. He also conceded that "strengthening the bumper as he proposed could result in even greater injury because the increased rigidity could transmit more force to the driver of the truck." <u>Id.</u> The Third Circuit concluded that the expert "conducted no tests and failed to attempt to calculate any of the forces on [the plaintiff] or the truck during this accident" and "used little, if any, methodology beyond his own intuition." <u>Id.</u> at 158. As a result, the Third Circuit held that the expert's opinion was not reliable and the District Court properly excluded his testimony.

Similarly, the testability of the expert's methodology was a factor in the Third Circuit's decision in <u>Elcock v. Kmart Corp.</u>, 233 F.3d 734 (3d Cir. 2000). There, because the expert did not thoroughly explain his methodology for arriving at his conclusion, it was not possible to determine whether the premises underlying his methodology were testable. <u>Id.</u> at 747. Because this factor and other <u>Daubert</u> factors raised doubts as to the reliability of the expert's testimony,

the Third Circuit vacated the District Court's admission of the testimony and remanded with the instruction to conduct a full Daubert hearing. Id. at 750.

Unsurprisingly, if a hypothesis is tested, the results of the test and the expert's reaction to the test are important. In In re TMI Litig., 193 F.3d 613, the Third Circuit affirmed the exclusion of expert testimony in an environmental class action regarding a nuclear reactor accident. The excluded experts hypothesized that the "radioactive decay" found in soil was "directly attributable to fission products released to the environment by the reactor accident." Id. at 675. The Third Circuit noted that that hypothesis was testable, and was, in fact, tested - however, the tests undermined the conclusions of the experts. Id. at 675-76. The Third Circuit held that the fact that the tests undermined the experts' conclusions, and that the experts did not re-examine their hypothesis or address the test results in their reports, made their methodology unreliable. Id. The Third Circuit reasoned that the failure to address the adverse tests was the "antithesis of good science and dramatically undermine[d] their proffered opinions." Id.

As a counter-example to the above cases, in Pineda, the Third Circuit cautioned against too-rigid an application of the Daubert factors, noting that the "inquiry envisioned by Rule 702 is a flexible one." Pineda, 520 F.3d at 248 (quoting Daubert, 509 U.S. at 594). The Third Circuit reversed the District Court's decision to exclude expert testimony in a products case because the District Court's application of the factors was too narrow – in particular, the Third Circuit held that the District Court focused too harshly on the proposed expert's failure to test alternative warnings. Id. The Third Circuit held that the District Court's lack of flexibility was an abuse of discretion warranting reversal. Id. Importantly, in Pineda, the expert's testimony was about the adequacy of a particular warning, not the viability of an alternative design. That is, the purpose of the expert testimony was not to propose specific alternate language, rather, the expert was

assessing the adequacy of the already-existing warning within the context of his expertise as an engineering expert who "understood the stresses and forces that might cause glass to fail." See id.

Judge Pratter recently had the opportunity to assess the reliability of proffered expert testimony in a personal injury case regarding a tractor-trailer accident, and her analysis in that case is helpful here. Miller v. Brodie, No. CV 15-4992, 2016 WL 5405110 (E.D. Pa. Sept. 28, 2016). There, one of the challenged experts was an expert in physics who applied the laws of physics and accident reconstruction techniques to opine as to how the accident would have occurred. Id. at *2. The party moving to exclude this expert argued that the expert failed to visit the accident scene, conduct any tests, or perform accident reconstruction simulations – in part because the evidence in the case did not allow for a valid reconstruction of the accident. Id. In arguing that this inability to test counseled in favor of excluding the expert, the moving party cited the Third Circuit's precedential decision in Oddi, discussed above, and its non-precedential decision in Meadows v. Anchor Longwall and Rebuild, Inc., 306 F. App'x. 781 (3d Cir. 2009), in which the Third Circuit affirmed the exclusion of a physics expert who admitted that he was unable to recreate the conditions of a product at issue in the products liability case. Id. at *2-*3.

Judge Pratter distinguished both Oddi and Meadows from the case before her, noting that the failure to test was more important in a products liability case. Id. at 3. She explained that "the considerations for determining the reliability of an expert opining on the likely events leading up to an accident are different than the considerations for determining the reliability of an expert opining on a product's manufacture or design." Id. In her view, the testimony of the physics expert in her case was based on a sufficient factual foundation of the totality of the evidence in the case – including the parties' depositions, the crash investigation report, the

31

remains of the truck, and a video showing the aftermath of the truck. Id. at *3-*4. She reasoned that the expert's testimony – especially when subject to cross examination – would be helpful to the trier of fact as one piece of evidence to consider when determining the cause of the accident. Id. at *4.

### C. Court Discretion in Ruling on Expert Testimony

District Courts can exercise discretion when applying the above-discussed Daubert principles to a particular case. That is, the Circuit Court will not disrupt a District Court's decision to admit or exclude expert evidence unless the decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." In re TMI Litig., 193 F.3d at 666.

### D. Overview of Parties Arguments on Daubert Motion

Yahoo argues that each of Plaintiff's proffered experts should be excluded under the above-discussed Daubert principles. Below is a summary of each of the Plaintiff's experts' reports, and the Parties' arguments regarding the admissibility of the experts' opinions.

#### 1. Expert 1: Sarvana Krishnamurthy

Through an analysis of the "source code" and architecture of the Yahoo SMS Service, Mr. Krishnamurthy concludes that the Yahoo Email SMS Service, or any portion of the system, could be modified to generate random or sequential telephone numbers in five different ways that would be straightforward for any programmer familiar with the programming language used by Yahoo (C++).

Yahoo argues that Mr. Krishnamurthy's conclusions are based on untested assumptions and incomplete analysis. Specifically, Yahoo argues that Mr. Krishnamurthy does not explain how exactly the source code could be modified, and he does not actually test his five hypotheses.

See Yahoo's Opening Daubert Br. (ECF 93) at pp. 7, 10, 11; Yahoo Daubert Reply (ECF 106) at p. 4. In arguing that Mr. Krishnamurthy's testimony should be excluded because he does not explain how exactly his hypotheses would work, Yahoo cites Kerrigan v. Maxon Industries, Inc., 223 F. Supp. 2d 626 (E.D. Pa 2002). Yahoo argues that Kerrigan stands for the proposition that an expert must show how an alternative design would work in practice in order to be found reliable. In Kerrigan, Judge Van Antwerpen held that the challenged expert's testimony was not reliable because he failed "to offer any designs, drawings, plans, demonstrations or working examples of the proposed [alternative design]" and that was "fatal to a finding . . . of the reliability of his methodology." Id. at 638.

Plaintiff does not cite any cases in response, but rather distinguishes Kerrigan on the basis that it was a products liability case. Plaintiff reasons that this case is not a products case, where the functionality of the proposed alternative design is critical to the outcome of the case. Plaintiff further argues that Mr. Krishamurthy used a well-accepted method to arrive at his conclusions – the use of the C++ programming language. In sum, Plaintiff argues that in the context of this case, Mr. Krishnamurthy's opinion is sufficiently specific and is reliable. See Pl. Daubert Br. at pp. 7, 8 (ECF 97).

Yahoo next argues that the fact that Mr. Krishnamurthy says it would take four to six months to modify the program to have the capacity to be an ATDS fatally undermines the conclusion that there is a latent capacity in the Yahoo E-mail SMS Service, because Mr. Krishnamurthy at best shows a theoretical possibility. Yahoo Opening Daubert Br. at p. 11; Yahoo Daubert Reply at p. 4; Krishnamurthy Report at p. 21. In support, Yahoo points to Mr. Krishnamurthy's deposition testimony where he states that "any portion of the Email SMS

33

Service" can "potentially" be modified to generate numbers.  See Yahoo Opening Daubert Br. at pp. 13-14, citing Krishnamurthy Dep. Tr. at 20:20-21:9.

Yahoo also argues that Mr. Krishnamurthy speaks in generalities and did not tailor his opinion to fit this case.  For example, Mr. Krishnamurthy opines that his methodologies can be applied to *any* software-based program.  See Krishnamurthy Report at pp. 14-18.  In addition, Yahoo argues that Mr. Krishnamurthy's opinions rely on certain assumptions, but Yahoo's program does not fit these assumptions.  See Yahoo Opening Br. at p. 8; Krishnamurthy Report at 14-18; Krishnamurthy Dep. Tr. at 10:23-11:6; 11:20-23.  Relatedly, Yahoo argues that Mr. Krishnamurthy does not explain how the added functionality of number generation would fit with the other existing functionalities of the program.  Yahoo Opening Daubert Br. at p. 14.

In response, Plaintiff notes that Mr. Krishnamurthy used Yahoo's own documents and source code to arrive at his conclusions.  [Pl. Daubert Br. at 6; Krishnamurthy Report at 5].  Plaintiff argues that this is the best evidence in the case, and as a result, Mr. Krishnamurthy's opinions fit the facts of this case.  Pl. Daubert Br. at 9.

### 2. *Expert 2: Jeffrey Hansen*

Through an analysis of the Yahoo servers, Mr. Hansen concludes that the servers (Linux and FreeBSD) had the power and ability to generate and dial numbers randomly or sequentially, without adding software or changing any configuration.

Yahoo first argues that Mr. Hansen should be excluded because he is not qualified.  Yahoo contends that Mr. Hansen's listed qualifications are misleading in that the certifications he claims are entry level, unverified, or outdated.  See Yahoo Opening Daubert Br. at pp. 17-20.  Yahoo further argues that Hansen's purported qualifications are irrelevant to this case, because, according to Yahoo, he based his opinion on a twenty minute analysis of Yahoo's operating

34

system and writing a few lines of code, and therefore did not apply his listed expertise to the issue. See Hansen Dep. Tr. at 49:3-50:2.

Plaintiff counters that Mr. Hansen is qualified based on his twenty-five year career working with Linux Red Hat operating systems, which Yahoo's documents indicate that the Email SMS Service operated on. Plaintiff points out that the Third Circuit has held that expert qualifications can include a broad range of knowledge, skills, and training, and the analysis of qualifications should be liberal. Plaintiff further argues that the attacks on Hansen's qualifications are irrelevant to the opinion he offers.

Yahoo next argues that Hansen's opinions are speculative and unreliable and would not help the trier of fact. Yahoo highlights this argument by noting that ultimately, Mr. Hansen arrives at the general and unhelpful conclusion that "all computers can generate random or sequential numbers." See Hansen Report at p. 17; Hansen Dep. Tr. at 10:13-16; 11:13-15. Further, Yahoo argues that all Hansen did was write a few lines of code that would produce a list of random 10-digit numbers, but did not explain how those lines of code would interface with the Yahoo Email SMS Service. Yahoo argues that Mr. Hansen admitted that his opinions were based on an "off the shelf" product, and that a custom program might be different or more complicated, or require additional lines of code. Yahoo Opening Daubert Br. at p. 22; Hansen Dep. Tr. at 68:15-73:3. In sum, Yahoo argues that Hansen did not use a methodology, and did not review several aspects of the Yahoo system. Yahoo argues that Hansen's report speaks in generalities and is too basic to be helpful. Yahoo Opening Daubert Br. at pp. 22-23; Hansen Dep. Tr. at 18:17-21; 42:1 - 43:19.

Plaintiff contends that the amount of time it took Mr. Hansen to write his report is irrelevant, given that the analysis required was relatively simple. Plaintiff further argues that Mr.

Hansen's opinion fits the facts of this case because his opinion is based almost entirely on Yahoo's documents. Pl. Daubert Br. at p. 9.

### 3. *Expert 3: Randall Snyder*

Mr. Snyder, who supplied an expert report in the earlier phase of this case, analyzed new technical information concerning the Email SMS Service that Yahoo provided post-remand, and concluded that the Yahoo Email SMS Service's operating system, security protocols, and encryption indicated that the system had the capacity to generate random numbers.

Yahoo argues that Snyder is not qualified to opine about the use of encryption software to generate random numbers because he has not written C++ code since 1992, and has never used the encryption software about which he offers his expertise. Yahoo Opening Daubert Br. at p. 23; Snyder Dep. Tr. at 11:16-20. Plaintiff argues that Yahoo's attacks on Mr. Snyder's qualifications do not relate to the narrow scope of Mr. Snyder's report. See Pl. Br. at pp. 12-13; Snyder Dep Tr. at 17:11-18:23.

Yahoo argues that Snyder's opinions are unreliable because he did not review all documents or source code in the case, and some of his opinions contradict evidence in the record, such as the testimony of a Yahoo's 30(b)(6) witness regarding the implementation of encryption software. Yahoo Opening Daubert Br. at p. 24; Snyder Dep. Tr. at 8:3-5. Further, Yahoo argues that Snyder's opinions are unhelpful and lack "fit" because whether Yahoo's encryption technology has the capability to generate random numbers is irrelevant to whether the Email SMS Service has the latent capacity to generate sequential or random telephone numbers and then dial them. Yahoo Opening Daubert Br. at p. 25; Snyder Supp. Decl. at ¶¶ 28-31; Snyder Dep. Tr. at 31:4-20; Yahoo Daubert Reply at p. 11.

36

In response, Plaintiff argues that the point of Snyder's report is in part to show that the encryption technology could be used to generate random telephone numbers. Plaintiff argues that this is exactly the kind of background the trier of fact needs to be able to conclude whether the Yahoo Email SMS Service had the latent capacity to be used as an ATDS. Pl. Daubert Br. at pp. 13-14.

### 4. *Expert 4: Gerald Christensen*

Through analysis of the Email SMS Service's design and architecture, Christensen explains how the platform interfaces with other apps and modules and how it could easily be used to operate as an ATDS.

Yahoo argues that Christensen's opinions rely on hypothetical external third-party applications and abstract conclusions. Yahoo Opening Daubert Br. at p. 26. Yahoo more specifically argues that Christensen's opinions are speculative because they rely on the capabilities of the "Athena" platform which is used as a part of the Email SMS Service, but is not the same. Yahoo argues that Christensen assumes that a programmer could append a hypothetical external or third party application to Athena to send text messages, without substantiating this assumption. Yahoo Opening Daubert Br. at pp.26-27; Christensen Dep. Tr. at 39:13-18; Yahoo Reply at p. 12. Yahoo argues further that Christensen's opinions lack "fit" because he focuses on Athena's ability to connect to other programs, which does not inform as to whether the E-mail SMS Service had the "capacity" at issue here. Yahoo Opening Daubert Br. at p. 27; Christensen Report at ¶¶ 23-29; Yahoo Daubert Reply at p. 13.

Plaintiff argues that Christensen's report is specifically designed to show the capabilities of the system as a whole, not just the Email SMS Service as it was designed. Pl. Daubert Br. at p. 16; Christensen Dep. Tr. at 48:7-21.

### 5. Parties' Further Arguments Regarding Failure to Test

On the issue of testability, discussed above, there was further discussion at the January 10, 2017 Oral Argument, see Hrg. Tr. 34-37, as to whether the Plaintiff's experts' opinions were reliable when there had not been any showing that there had been any testing, in view of the strong requirement in both *Daubert* and subsequent Third Circuit opinions, that an expert's testing was crucial for a court considering the expert's opinion to be reliable and to fit the facts.

Both Parties submitted supplemental briefing on this issue (ECF 118 and ECF 123). Plaintiff argues that though it is not possible to test the current Yahoo system, his experts' opinions are in fact "testable." That is, Plaintiff claims that Yahoo could have hired its own experts to "test" the hypotheses presented by Plaintiff's experts, but did not do so. See Plaintiff's Supp. Br. at pp. 4-5. Yahoo argues that without testing the experts' hypotheses, the jury would be left with nothing more than the experts' *ipse dixit*, which is not reliable, nor helpful to the Court. See Yahoo's Supp. Br. at pp. 1-3.

### E. Plaintiff's Experts are not Reliable

As stated at Oral Argument, although Yahoo takes issue with the qualifications of all four experts, the Court holds that under the standard articulated by the Third Circuit for expert qualification, all four experts are qualified. See Schneider v. Fried, 320 F.3d 396 (3d Cir. 2003). However, for the reasons articulated below, their opinions are not reliable and must be excluded. Yahoo's Motion to Exclude will therefore be GRANTED.

All four of Plaintiff's experts present opinions without testing the viability of their hypotheses. As outlined above, the Third Circuit has found this failure to test persuasive in many cases. The discussion in Miller v. Brodie (discussed *supra*) provides a helpful analysis explaining why hypothesis testing is important in certain cases and less critical in others. Using

the framework presented there, the instant case is more like a products "alternative design" case than a vehicular accident case. In Miller v. Brodie, the proffered expert testimony provided a lens through which the trier of fact could assess how a vehicular accident occurred. A trier of fact is well-equipped to decide the weight to afford to expert testimony in the context of a vehicular accident because they can assess all evidence (including each parties' testimony, any other witness testimony, photos of the accident, et cetera) *in the context of their own experience*.

This case is different. Here, the trier of fact would be asked to determine whether a computer program had the capacity to perform a particular function. This is much more technical, and is akin to showing that an alternative design of a product would be safer in a products case. Plaintiff's experts provide no frame of reference through which the jury could weigh the evidence and assess whether Yahoo's Email SMS Service had the capacity to generate and dial random numbers. Rather, the jury would be left only with the experts' conclusions versus Yahoo's contrary assertion. Essentially, the Court holds that the expert reports as they stand now, without any way to test their hypotheses, would be unhelpful to a jury asked to assess liability in this case. As the Third Circuit has held, helpfulness is the hallmark of admissibility determinations under Daubert. See Linkstrom, 883 F.2d at 270.

The record establishes that as of the time of the remand, and possibly as of an earlier time, Yahoo had abandoned the program that enabled the E-mail SMS Service and, after that date, it was not possible for anyone to test the Yahoo system. In further response to a question by the Court to counsel, Yahoo responded that it would not be possible to "resuscitate" the E-mail SMS Service that existed when Plaintiff had purchased his phone such that anyone could test the Yahoo system at this time.

In this discussion of testing, the Court is not necessarily being critical of Plaintiff or his counsel or experts, but rather finds that the fact that the Yahoo system is no longer operable, and could not be resuscitated, basically prevented any expert, no matter how qualified, to "test" the Yahoo system to meet the definition of latent capacity.  The fact that because time has passed and the Yahoo system is no longer operable, may mean that Plaintiff does not have the means, no matter how much money he or his lawyers could spend on this topic, to perform any kind of "test" results in the conclusion that Plaintiff has failed to satisfy his burden of proof.  Although this fact may generate some sympathy for Plaintiff, it does not generate a viable legal theory, which is what the law requires.

Because Plaintiff's experts' methodologies are not testable and not falsifiable, this Court holds that the proffered expert opinions are not reliable, and are therefore not admissible. Further, because Plaintiff's counsel admitted at oral argument (Hrg. Tr. at p. 16) that Plaintiff's evidence about the ability of the Yahoo system to meet the statutory requirement was only as established by its experts, the Court is required to conclude, from the above analysis of the expert reports, that Plaintiff has not presented enough evidence to warrant a jury finding in its favor on this issue.

**F. Even if admissible, Plaintiff's Expert Reports do not Create a Factual Issue for Trial**

Having discussed the expert reports proffered by the Plaintiff, the Court will now consider whether, if the expert reports were admissible, the reports considered together with the experts' testimony at their depositions could establish a factual issue that the Yahoo system was able to generate sequential or random numbers and call those numbers.  On this point, the Court concludes that even if the expert reports were admissible, they do not create a genuine dispute of material fact so as to prevent summary judgment.

40

Initially, Yahoo's counsel at oral argument advocated an argument that the word "call" in the statute was not synonymous with other verbs that describe the text messaging system. The Court rejected these interpretations for the very simple reason, as any smartphone user knows that a "text" is "sent" to another smartphone only by using a telephone number. The smartphone does not have a "dial" the way a rotary phone does, but rather uses a "number pad" which appears on the smartphone when the user wishes to send a text, and the user inputs the numbers on the smartphone "pad" or "screen," to which the text is intended, and after that telephone number is inserted on the smartphone, and the "send" button (or something similar) is pushed, the text message is then "sent," "transmitted," or "delivered" (any one of these synonyms is an accurate description) to the recipient smartphone. Eventually at the oral argument, see Hrg. Tr. 32), Yahoo counsel conceded that "call" was synonymous with the method of sending a text. Yahoo's counsel did, perhaps correctly, assert that within Yahoo's internal computer system, which may have been employed or employable by Yahoo, there is not any "transmission" that is synonymous with a "call."

Yahoo contends that Plaintiff's experts had not adequately shown any basis for the Yahoo system being able to both generate random/sequential numbers and "call" those numbers. At the oral argument, there was extensive discussion about whether the opinions of the Plaintiff's experts were sufficient to warrant a factual issue that the Yahoo system had "latent capacity" to both generate random/sequential numbers and call them. The Court had noted this as a prime issue in the letter to counsel prior to the argument.

Plaintiff's counsel initially cited the opinion, and affidavit, of one of its experts, Mr. Christensen, who had extensive experience as a telecom expert. Plaintiff's counsel cited paragraphs 40-52 of the Christenson Report as establishing facts that would allow a jury to

conclude that the Yahoo system had the "latent capacity" to satisfy the statutory requirement. Mr. Christensen states in the initial cited paragraph (¶ 40):

> Furthermore, Yahoo documentation references "The Athena platform provides several API's for MO and MT deliver". It is my opinion that a computer programmer of normal skill could easily use one of the Yahoo API's to transmit messages to the Athena Platform in conjunction with a sequential number generator or to cause text messages to be sent based on integration of a commonly available random number generator program.

This expert report qualified its opinion by linking it to an Athena platform, and there was extensive argument about this reference to Athena. Initially, the Court had questioned whether the expert's admitted inclusion of the Athena program, the effect of which has been disputed by Yahoo, would satisfy establishing a factual issue that Yahoo's system had the requisite latent capacity. However, as the above paragraph demonstrates, Mr. Christensen's report only concludes that a programmer using the Yahoo system could transmit messages to the Athena platform, "or to cause text messages to be sent . . ." (emphasis added). The use of the disjunctive in this paragraph is not consistent with the plain language of the statute, which uses the conjunctive "and" to connect the requirement of generating a random/sequential number and "call." The same conclusion is true of the other paragraphs 42 through 51 in the Christensen affidavit, such as paragraph 51 which includes his conclusionary opinion on this issue as follows:

> It is my opinion that a computer programmer of normal skill could easily configure the system to interface with an application that uses a sequential number generator or to cause text messages to be sent based on integration of a commonly available random number generator program, which works in conjunction with the "Ad Module" to transmit messaging content similar to those received by the Plaintiff.

Furthermore, in paragraph 52, Mr. Christensen again avoids the "genuine" issue in this case, when he talks about the latent capacity "to generate random and/or sequential ten digit numbers" but says nothing about ability to "call" those numbers.

In addition, Yahoo attacked the Christensen report as not being "reliable" or not being able to "fit" this situation because, at his deposition, Mr. Christensen was unable to identify any specific program that could be used for this purpose, and furthermore, he did not back up his opinion with any evidence of the statutory requirement of both generating random/sequential numbers and the ability to then call each of those numbers. See Christensen Dep. Tr. at 95:21-96:14.

The second expert on whom Yahoo relied for its argument about the "latent capacity" of the Yahoo system was Mr. Krishnamurthy, who also fails to give a firm opinion that the Court can find to be reliable or to fit the issues that the Yahoo system had the latent capacity to meet the statutory definition. See page 7 of his Report:

> I'll also show 3 instances in the provided Yahoo SMS Service source code where these methodologies could be applied to modify the behavior of Yahoo SMS Service to generate random numbers or sequence of numbers.

This expert, as well as Mr. Christensen, also discussed the Athena platform, which was identified within the Yahoo source code to which the expert had access as part of the supplemental discovery which took place after the Third Circuit remand. However, nowhere in the record, despite the argument of Plaintiff's counsel, see Hrg. Tr. pp. 7-17, did this expert have any opinion that the Yahoo system had the latent capacity to both generate random/sequential numbers and call them. For example, the above summary of this witness's conclusion only gives an opinion about the "latent capability to generate random numbers or sequence." He says nothing about the concomitant requirement that the system be able to "call" those same numbers.

43

Yahoo also disputed reliance on this expert because he testified that it would take him four to five months of work on the Yahoo system to demonstrate the latent capacity. Yahoo appropriately characterizes this as a "re-engineering" rather than the type of modification that the Third Circuit held would be the focus of further inquiry on remand. As a result, even if reliable, Mr. Krishnamurthy does not offer an opinion that could create a factual issue for trial.

In conclusion, given that Plaintiff cannot point to any record evidence that sufficiently links a latent capacity to generate random or sequential numbers to the capacity to then dial those same numbers, this Court holds that even if the expert reports were considered reliable and admissible, Yahoo would nevertheless be entitled to summary judgment. The expert reports do not create a genuine factual issue regarding the Yahoo E-mail SMS Service's capacity to generate and dial random or sequential numbers.

## VII.   Waiver

The Third Circuit, in the last sentence of its opinion in this case, noted that Plaintiff and Yahoo "agree it is the equipment's 'present capacity' that is relevant to the statutory definition." Accordingly, the panel suggested that this Court "consider on remand whether Dominguez properly preserved this issue [of potential/latent capacity] (and how any 'waiver' might be affected by the intervening 2015 FCC Ruling)." Dominguez v. Yahoo, 629 F. App'x 369, 373 (3d Cir. 2015).

### A.  Applicable Law

Generally, "arguments not raised before the District Court are waived on appeal." DIRECTV Inc. v. Seijas, 508 F.3d 123, 125 n.1 (3d Cir. 2007). When there is an intervening decision from a superior court that changes controlling law, however, an exception to the normal waiver rule, known as the "intervening law exception," applies.  See Zichy v. City of Philadelphia, 590 F.2d 503, 508 (3d Cir. 1979). When an intervening change in controlling law

44

occurs, parties may be allowed to raise arguments for the first time on appeal. See Beazer E., Inc. v. Mead Corp., 525 F.3d 255, 264-65 (3d Cir. 2008).

If an argument that was raised on appeal was not "expressly or implicitly disposed of by the appellate decision," on remand the district court is free to "make any order or direction in further progress of the case, not inconsistent with the decision of the appellate court, as to any question not settled by the decision." Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943, 950 (3d Cir. 1985).

### B. Discussion

Plaintiff filed the Rule 28(j) Letter with the Third Circuit four days after the 2015 Ruling. Plaintiff asserts that the "[l]atent capacity issue was simply not the law prior to the July 2015 FCC Ruling." Pl. Opposition to Summary Judgment Motion (ECF 87) at p. 2. Yahoo, however, mounts several arguments—none of which persuade this Court—that Plaintiff has "waived" any argument based on the 2015 Ruling.

Yahoo argues that it "moved for summary judgment based on a lack of both present *and* potential capacity[,] . . . [a]nd while Yahoo argued that the proper standard was present, not future capacity, [P]laintiff opposed summary judgment not by urging this Court to adopt the future capacity standard, but instead by arguing exclusively that the Service had the present capacity to function as an ATDS." Yahoo Supp. Br. at p. 4. This argument must fail. For one, nothing in Yahoo's first motion for summary judgment establishes that it moved "based on a lack of both present *and* potential capacity." Yahoo did argue that there are "two independent reasons" why Plaintiff's claim failed as a matter of law, yet only one of them related to the fact that Yahoo's equipment did not meet the statutory definition of an ATDS. See Yahoo Supp. Br. at 4 (citing ECF 14 at p. 13 ("plaintiff's TCPA claim fails as a matter of law for either one of two independent reasons. First . . . the messages at issue were not sent using an ATDS[,] [and]

45

[s]econd . . . [they]were sent in response to a specific request to send them, and therefore were not the kind of messages the TCPA aims to prevent.")). Within the first argument, Yahoo fails to differentiate its argument regarding the definition of "capacity" in any way, let alone even use the words "present," "future," or "potential." Yahoo's statement that "[t]he SMS messages sent via the Email SMS Service were not and *could not* have been sent via an ATDS" does not change this conclusion.

While the fact that Yahoo did not explicitly move for summary judgment based on the "potential capacity" definition of an ATDS is not dispositive of whether Plaintiff waived it, it lends strong support to the notion, as Plaintiff argues, that it was not raised because it was not a viable argument that could have been raised prior to the 2015 Ruling.

Yahoo contends that the fact that "Plaintiff . . . distinguished future capacity cases cited by Yahoo, by emphasizing that he was not arguing that Yahoo was liable based on future . . . capacity" may bolster its position that Plaintiff has waived his "potential capacity" argument. Yahoo Supp. Br. at p. 4. But Yahoo cannot, in the same breath, argue that "the proper standard was present [capacity]" and that Plaintiff should have known that "potential capacity" was a viable argument. Id. At most, Plaintiff's effort to distinguish cases is consistent with the Third Circuit's understanding that the parties were in agreement, prior to the 2015 Ruling, that "present capacity" was the relevant standard. This agreement, contrary to Yahoo's contention, does no more to show that the "potential capacity" argument was waived than it does to show that it did not, effectively, exist.

Yahoo alternatively argues that the Rule 28(j) Letter did not properly raise the "potential capacity" issue because it did not argue that the 2015 Ruling clarified that Yahoo's equipment fell within the TCPA because it had the "latent capacity" to send texts to randomly or

46

sequentially generated numbers.  Rather, Plaintiff argued that the 2015 Ruling clarified that it fell within the TCPA because ATDSs "includes technology that dials from lists," an argument that the Third Circuit explicitly rejected.  Yahoo Renewed Summary Judgment Mot. (ECF 70) at p. 13.  Plaintiff argues that the Rule 28(j) Letter properly raised the issue by informing the Third Circuit about an intervening change in law, such that the "intervening law exception" applies, and Plaintiff properly raised it via a Rule 28(j) letter as soon as the 2015 Ruling was issued.  See Zichy, 590 F.2d at 508.

Preliminarily, it is clear that, in the Rule 28(j) Letter, Plaintiff argued both that the definition of ATDS (1) "includes technology that dials numbers from lists" (which the Third Circuit rejects), and that it (2) "only requires potential capacity."  Pl.'s Rule 28(j) Letter, App. Dkt. No. 14-1751 (Jul. 14, 2015); see Yahoo Reply Br. in Support of Renewed Summary Judgment Mot. (ECF 103) at p. 15.  Therefore, the "potential capacity" issue warrants an exception to the normal waiver rule because the 2015 Ruling constituted an intervening change in law, such that Plaintiff was allowed to—and did—raise the argument for the first time on appeal.  See Beazer E., Inc. v. Mead Corp., 525 F.3d at 264–65.

Accordingly, Plaintiff has not waived his ability to argue "potential capacity," nor was the argument "disposed of" on appeal because the Third Circuit specifically remanded the case so that this Court could consider Yahoo's motion in light of the 2015 Ruling's "clarification on the meaning of 'capacity.'"  Dominguez, 629 F. App'x at 373.

## VIII.  Conclusion

For the foregoing reasons, Yahoo's Renewed Motion for Summary Judgment (ECF 70) and Yahoo's Motion to Exclude Plaintiff's Experts (ECF 91) are GRANTED.  An appropriate order follows.

O:\CIVIL 13\13-1887 dominguez v. yahoo\Memorandum on Yahoo MSJ.docx